**CARELLA, BYRNE, CECCHI, BRODY
 & AGNELLO, P.C.**
James E. Cecchi
5 Becker Farm Road
Roseland, New Jersey 07068
Tel.: (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com

*Liaison Counsel for Lead Plaintiffs*
[*Additional counsel on signature page*]

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE INTEGRA LIFESCIENCES HOLDINGS CORPORATION SECURITIES LITIGATION | Case No.: 3:23-cv-20321-MAS-TJB <br><br> District Judge Michael A. Shipp <br> Magistrate Judge Tonianne J. Bongiovanni <br><br> Motion Day:  March 17, 2025 |

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................1

STATEMENT OF FACTS .........................................................................................4

I.  INTEGRA'S MOST LUCRATIVE DEVICE WAS BIOLOGIC MESH
    MANUFACTURED AT THE BOSTON FACILITY ........................................4

II.  PRIOR TO THE START OF THE CLASS PERIOD, DEFENDANTS BECAME
     AWARE OF SERIOUS CGMP DEFICIENCIES AT THE BOSTON FACILITY ...........5

III.  DEFENDANTS REPEATEDLY ASSURED INVESTORS THAT INTEGRA
      WAS REMEDIATING THE BOSTON FACILITY'S COMPLIANCE
      DEFICIENCIES................................................................................................6

IV.  IN TRUTH, INTEGRA HAD NOT UNDERTAKEN MEANINGFUL
     REMEDIAL MEASURES AT THE BOSTON FACILITY, WHICH REMAINED
     RIFE WITH DEFICIENCIES THROUGHOUT THE CLASS PERIOD ..........................9

     A.  Integra's cGMP Violations Persisted Due to Defendants' Failure to
         Remediate Them Following the 2019 Warning Letter .............................9

     B.  In 2021, the FDA Discovered—and Privately Warned Defendants—that
         the Boston Facility Remained Rife with cGMP Violations....................11

     C.  A 2022 Internal Whistleblower Complaint and Resulting FDA Inspection
         Yet Again Identify Risk of Dangerous Endotoxin Contamination at Boston
         Facility ...................................................................................................12

     D.  Recognizing Their Inability to Remedy the Boston Facility's Severe
         Compliance Issues, Defendants Quietly Make Plans to Relocate to a New
         "State of the Art" Facility In Braintree ..................................................13

V.  THE TRUTH IS GRADUALLY REVEALED...................................................13

LEGAL STANDARD................................................................................................14

ARGUMENT ............................................................................................................15

I.  THE COMPLAINT ADEQUATELY ALLEGES THAT THE DEFENDANTS
    MADE MATERIALLY FALSE AND/OR MISLEADING MISSTATEMENTS ..........15

    A.  The Remediation Misstatements Were Materially False or Misleading...............16

    B.  The Capacity Misstatements Were Materially False or Misleading......................22

    C.  The Compliance Misstatements Were Materially False or Misleading.................25

    D.  Defendants' Statements Are Not Inactionable Opinions ......................................28

    E.  Defendants' Statements Are Not Protected by the Safe Harbor ...........................29

i

II.     THE COMPLAINT RAISES A STRONG INFERENCE OF SCIENTER ......................31

        A.    Defendants Had Knowledge of Facts and Access to Information
              Contradicting Their Public Statements .................................................................32

        B.    The Inference of Scienter is Strengthened by Defendants' Deliberate
              Effort to Avoid Manufacturing Disruptions to Correct Quality Concerns ............38

        C.    The Importance of the Boston Facility and Biologic Mesh to Integra's
              Business Strengthens the Inference of Scienter .......................................................39

        D.    Defendants' 2023 Actions, Including Its Plan to Relocate to Braintree,
              Reinforces Scienter .................................................................................................39

        E.    The Inference of Fraud Is at Least as Compelling as Defendants'
              Competing Inference................................................................................................40

III.    THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION ...........................41

IV.     THE COMPLAINT ADEQUATELY ALLEGES SCHEME LIABILITY.......................44

CONCLUSION..................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Able Labs. Sec. Litig.*,
2008 WL 1967509 (D.N.J. Mar. 24, 2008)................................................................26, 27, 33

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021) ...........................................................................30, 36, 39

*In re Alstom SA Sec. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008) ................................................................................. 43-44

*In re Anadigics, Inc., Sec. Litig.*,
2011 WL 4594845 (D.N.J. Sept. 30, 2011),
*aff'd*, 484 F. App'x 742 (3d. Cir. 2012).................................................................................25

*Anderson v. Stonemor Partners, L.P.*,
296 F. Supp. 3d 693 (E.D. Pa. 2017)
*aff'd sub nom., Fan v. StoneMor Partners LP*, 927 F. 3d 710 (3d. Cir. 2019).......................27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................... 14-15

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004)...........................................................................................15

*In re Cambrex Corp. Sec. Litig.*,
2005 WL 2840336 (D.N.J. Oct. 27, 2005)........................................................................3, 32

*In re Celgene Corp. Sec. Litig.*,
2019 WL 6909463 (D.N.J. Dec. 19, 2019)................................................................... 21-22

*City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*,
865 F. Supp. 2d 811 (W.D. Mich. 2012) .........................................................................21

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*,
2013 WL 566805 (N.D. Ill. Feb. 13, 2013) .........................................................17, 21, 25, 35

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
70 F.4th 668 (3d Cir. 2023) .......................................................................................15, 19, 28

*City of Warwick Ret. Sys. v. Catalent, Inc.*,
2024 WL 3219616 (D.N.J. June 28, 2024).........................................................................22

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
2018 WL 3772675 (D.N.J. Aug. 8, 2018) .........................................................................22

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
  2020 WL 3026564 (D.N.J. Jun. 5, 2020).................................................................44, 45

*In re Coinbase Glob., Inc. Sec. Litig.*,
  2024 WL 4053009 (D.N.J. Sept. 5, 2024) ........................................................22, 24

*In re CommVault Sys., Inc. Sec. Litig.*,
  2016 WL 5745100 (D.N.J. Sept. 30, 2016) ..................................................... 19-20

*Cont'l Gen. Ins. Co. v. Olafsson*,
  2024 WL 4263211 (D.N.J. Sept. 23, 2024) ......................................................28, 29

*Cullen v. RYVYL Inc.*,
  2024 WL 898206 (S.D. Cal. Mar. 1, 2024) .............................................................37

*Dalberth v. Xerox Corp.*,
  766 F.3d 172 (2d. Cir. 2014)...................................................................................44

*In re Discovery Labs. Sec. Litig.*,
  2006 WL 3227767 (E.D. Pa. Nov. 1, 2006) ............................................................27

*In re Dr. Reddy's Lab. Ltd. Sec. Litig.*,
  2019 WL 1299673 (D.N.J. Mar. 21, 2019)...........................................18, 26, 29, 32

*In re Enzymotec Sec. Litig.*,
  2015 WL 8784065 (D.N.J. Dec. 15, 2015)...............................................21, 29, 30

*Emps. Ret. Sys. of P.R. Elec. Power Auth. v. Conduent Inc.*,
  2020 WL 3026536 (D.N.J. June 5, 2020).................................................................29

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*,
  778 F.3d 228 (1st Cir. 2015)....................................................................................37

*In re Genzyme Corp. Sec. Litig.*,
  754 F.3d 31 (1st Cir. 2014)......................................................................................37

*Hall v. Johnson & Johnson*,
  2019 WL 7207491 (D.N.J. Dec. 27, 2019)....................................18, 19, 41, 42, 43

*Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*,
  2022 WL 889158 (E.D. Pa. 2022) ...........................................................................29

*In re Hertz Glob. Holdings Inc.*,
  905 F.3d 106 (3d Cir. 2018).....................................................................................31

*Hills v. Bioxcel Therapeutics, Inc.*,
  2024 WL 3374145 (D. Conn. July 11, 2024) ..........................................................37

*Hull v. Glob. Digital Sols., Inc.*,
   2017 WL 6493148 (D.N.J. Dec. 19, 2017) ................................................................ 41-42

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
   620 F. Supp. 3d 167 (D.N.J. 2022) ................................................................... *passim*

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
   2020 WL 1479128 (E.D. Pa. March 25, 2020) .......................................................... 31

*Inst'l Inv'rs Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) ................................................................................ 29, 36

*In re Intelligroup Sec. Litig.*,
   527 F. Supp. 2d 262 (D.N.J. 2007) ............................................................................ 41

*Loc. 731 I.B. of T. Excavators & Pavers Pens. Tr. Fund v. Swanson*,
   2011 WL 2444675 (D.N.J. June 14, 2011) ................................................................ 30

*Lopes v. Fitbit Inc.*,
   2020 WL 1465932 (N.D. Cal. Mar. 23, 2020),
   *aff'd*, 848 F. App'x 278 (9th Cir. 2021) ................................................................... 44

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
   363 F. Supp. 3d 476 (D. Del. 2019) .......................................................................... 20

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
   601 U.S. 257 (2024) ............................................................................... 15-16, 18

*McCabe v. Ernst & Young, LLP*,
   494 F.3d 418 (3d. Cir. 2007) ...................................................................................... 41

*McClain v. Iradimed Corp.*,
   111 F. Supp. 3d 1293 (S.D. Fla. 2015) ............................................................... 25, 31

*McDermid v. Inovio Pharms., Inc.*,
   520 F. Supp. 3d 652 (E.D. Pa. 2021) ........................................................................ 23

*In re Merck & Co. Sec. Deriv. & "ERISA" Litig.*,
   2011 WL 3444199 (D.N.J. Aug. 8, 2011) .................................................................. 15

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) ................................................................................. 44

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
   761 F.3d 245 (2d Cir. 2014) ...................................................................................... 30

*Mosco v. Motricity, Inc.*,
   649 F. App'x 526 (9th Cir. 2016) .............................................................................. 37

v

*Mulligan v. Impax Labs., Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) ............................................................... *passim*

*In re Mylan N.V. Sec. Litig.*,
2023 WL 3539371 (W.D. Pa. May 18, 2023)................................................33, 40, 45

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
720 F. Supp. 2d 517 (D.N.J. 2010) .........................................................................41

*In re Ocular Therapeutix, Inc. Sec. Litig.*,
2019 WL 1950399 (D. Mass. Apr. 30, 2019),
*aff'd sub nom. Mehta v. Ocular Therapeutix, Inc.*, 955 F.3d 194 (1st Cir. 2020)........26, 31, 37

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015).....................................................................................24, 28, 29

*In re Philip Morris Int'l Inc.*,
89 F.4th 408 (2d. Cir. 2023) ...................................................................................26

*In re PolarityTE, Inc., Sec. Litig.*,
706 F. Supp. 3d 1343 (D. Utah 2020)......................................................................25

*Rahman v. Kid Brands, Inc.*,
736 F.3d 237 (3d Cir. 2013).....................................................................................32

*Roofer's Pension Fund v. Papa*,
2018 WL 3601229 (D.N.J. July 27, 2018)......................................................23, 31, 40-41

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
351 F. Supp. 3d 874 (E.D. Pa. 2018) .............................................................28, 31, 34

*Shapiro v. UJB Fin. Corp.*,
964 F. 2d 272 (3d Cir. 1992).....................................................................................21

*Shemian v. Rsch. In Motion Ltd.*,
2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013),
*aff'd*, 570 F. App'x 32 (2d. Cir. 2014)......................................................................27

*SLF Holdings LLC v. Uniti Fiber Holdings, Inc.*,
499 F. Supp. 3d 49 (D. Del. 2020).............................................................................44

*Smith v. Antares Pharma, Inc.*,
2020 WL 2041752 (D.N.J. Apr. 28, 2020) .........................................................32, 33

*Strougo v. Mallinckrodt Pub. Ltd. Co.*,
2022 WL 17740482 (D.N.J. Dec. 16, 2022).............................................................39

vi

*In re Supreme Indus., Inc. Sec. Litig.*,
  2018 WL 2364931 (N.D. Ind. May 23, 2018) .........................................................................37

*In re Talis Biomedical Corp. Sec. Litig.*,
  2022 WL 17551984 (N.D. Cal. Dec. 9, 2022) ........................................................................31

*Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*,
  83 F.4th 514 (6th Cir. 2023) ...................................................................................................38

*Tellabs, Inc. v. Makor Issues & Rights, Ltd*,
  551 U.S. 308 (2007).....................................................................................................31, 32, 41

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
  625 F. Supp. 3d 164 (S.D.N.Y. 2022).....................................................................................38

*Twin Master Fund, Ltd. v. Akorn, Inc.*,
  2020 WL 564222 (N.D. Ill. Feb. 5, 2020) ......................................................................... 35-36

*U.S. v. Schiff*,
  602 F.3d 152 (3d Cir. 2010)......................................................................................................15

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
  2017 WL 1658822 (D.N.J. Apr. 28, 2017) ..............................................................................29

*In re Viropharma, Inc. Sec. Litig.*,
  2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) .............................................................................40

*In re Viropharma, Inc. Sec. Litig.*,
  21 F. Supp. 3d 458 (E.D. Pa. 2014) .........................................................................................30

*Weiner v. Quaker Oats Co.*,
  129 F.3d 310 (3d Cir. 1997)......................................................................................................15

*Wilkof v. Caraco Pharm. Labs., Ltd.*,
  2010 WL 4184465 (E.D. Mich. Oct. 21, 2010) ..................................................................25, 26

*Winer Family Tr. v. Queen*,
  503 F.3d 319 (3d Cir. 2007)......................................................................................................32

**Statutes**

15 U.S.C. § 78u-5(c)(1)(A)(i) .........................................................................................................30

**Rules**

17 C.F.R. § 240.10b-5(b) ................................................................................................................15

## INTRODUCTION[1]

This case arises from Defendants' false and misleading statements about Integra's systemic violations of current Good Manufacturing Practices ("cGMP") at the Boston Facility where it manufactured the biological mesh products that were critical to the Company's future profit growth. While Defendants repeatedly assured investors that Integra had remediated the compliance deficiencies identified by the FDA and were in compliance with cGMP, in truth, they flouted the FDA's warnings throughout the Class Period. When the truth about Integra's ongoing non-compliance was ultimately revealed to the market—in the form of, among other things, a costly production halt at the Boston Facility, a "global recall" of all products manufactured at that site *for more than five years*, a total shutdown of the Boston Facility—and, ultimately, production and shipping halts across *all* Company facilities while Integra's Board instituted a "compliance master plan" to address systemic quality system and cGMP deficiencies impacting *all* key product lines. Integra's stock price collapsed and investors lost over $2 billion.

Defendants' conduct constitutes a straightforward case of securities fraud. At the beginning of the Class Period, Integra received a Warning Letter that identified serious cGMP violations at the Boston Facility and required that Integra "take prompt action to correct the violations." The FDA flagged that Integra lacked fundamental processes and controls, including to prevent bacterial and fungal contamination during the manufacturing process. These were significant violations, as Integra marketed its biological mesh products as sterile implants for patients needing skin substitutes or tissue recovery. Defendants repeatedly assured investors that they were actively

---

[1] Unless otherwise noted: (i) all capitalized terms have the same meaning as set forth in the Consolidated Class Action Complaint (the "Complaint"); (ii) all emphasis is added; (iii) all internal citations and quotation marks are omitted; (iv) ¶__ refers to the paragraphs of the Complaint; and (v) Ex. A refers to the exhibit attached to the Declaration of James E. Cecchi, filed herewith.

1

remediating the quality control deficiencies, that patient safety was not compromised, and that the Company's ability to manufacture and ship products from the Boston Facility remained unaffected.

But Defendants knew their statements were untrue. As FDA investigators, a whistleblower complaint, and numerous former employees ("FEs") from multiple levels and sites across Integra warned Defendants prior to and throughout the Class Period, the Boston Facility remained rife with pervasive, systemic, and serious violations of fundamental cGMPs related to bacterial and fungal contamination. These corroborative sources confirm that, contrary to their statements, Defendants did not implement the necessary steps to correct the cGMP deficiencies.

As one example, the FDA's pre-Class Period inspection of the Boston Facility found that Integra's contamination control and testing processes for dangerous endotoxins were violative "on multiple levels," including that Integra failed to investigate why batches failed endotoxin testing. Contrary to Defendants' representations that they were addressing this fundamental issue: (i) FE 5, a manufacturing employee from 2020 to 2023, recalled that Integra did not closely inspect the root causes of nonconformance and endotoxin contamination because "they wanted to sweep the surface stuff under the rug" due to a constant desire to push products out the door; (ii) as noted in the 2021 Form 483, the FDA found that when testing the Clean Rooms for fungal contamination, Integra documented the results as "passing" under its acceptance criteria, even where "fungal growth results were recorded" as "too numerous to count"; (iii) the 2022 whistleblower reported "quality issues" over Integra's "bacterial endotoxin testing"; and (iv) the 2023 Form 483 documented seven ways that endotoxin testing procedures remained in violation of cGMP, many of which tied back to the 2018 Form 483. The Complaint pleads similar support for each quality system deficiency that Defendants purported to remediate. *See* Appendix A.

Investors had no reason to know of the true state-of-play at the Boston Facility. Defendants

2

falsely reassured investors at each turn that, for example, they had undertaken "significant efforts to remediate the observations," the Company "adheres to good manufacturing practices," and the Company—despite the 2019 Warning Letter—could manufacture "safety stock" of supply.

Defendants contend that they fully informed investors of the seriousness of the cGMP violations and that the Complaint fails to plead the prerequisites under the PSLRA. These arguments do not withstand scrutiny. First, Defendants are wrong to suggest that Plaintiffs have not pleaded falsity as to any alleged statement. The Complaint identifies each statement and explains with particularity why it was false or misleading. Defendants' arguments that their statements were not false ignore well-settled law that they "may not describe 'a favorable picture' of [a]material issue 'without including the details that would have presented a complete and less favorable one.'" *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 186 (D.N.J. 2022). Defendants' arguments that their statements constitute puffery, were non-actionable opinions, and are protected by the PSLRA safe harbor, fare no better. Defendants' statements were contemporaneous, verifiable, and belied by known facts. Falsity is met.

Second, the inference of scienter is strong and at least as compelling as any innocent inference urged by Defendants. The Complaint alleges "that defendants had knowledge of facts or access to information that contradict[ed] their statements." *In re Cambrex Corp. Sec. Litig.*, 2005 WL 2840336, at *11 (D.N.J. Oct. 27, 2005). The problems at the Boston Facility were widespread, and by May 2023, had resulted in: two FDA Form 483s, a whistleblower complaint, and two FDA Warning Letters. Defendants fail to rebut, and do not even seriously contest that they were aware of these issues. Unable to plead ignorance, Defendants resort to arguing counter-inferences based on the alleged facts to suggest that they were forthright with investors. But these attempts are unavailing. Even as Defendants purported to disclose negative news about their lack of cGMP

3

compliance, they repeatedly made reassuring statements underplaying their impact. Moreover, that Defendants' acknowledged receipt of the 2021 Form 483 in Integra's Annual Report does not negate scienter because they did not disclose *the contents* of that Form 483—which included the same repeated and pervasive cGMP deficiencies that Defendants previously claimed to have remediated. Considered holistically, the Complaint cogently pleads a strong inference of scienter.

Third, Defendants' partial loss causation challenge falls flat. While Defendants do not contest that the Complaint pleads loss causation for the April 26, 2023 and May 23, 2023 corrective disclosures, their loss causation challenges for the last three corrective disclosure dates fail. For each date, Plaintiffs allege that new information was disclosed that revealed the truth about Defendants' misrepresentations and omissions and caused Integra's stock price to decline. Nothing more is required under the law of this District.

Finally, Plaintiffs' allegations that Defendants deceived FDA inspectors and covered up the pervasive quality control issues at Boston are sufficient to plead claims for "scheme liability."

For these and all the other reasons stated herein, Defendants' Motion should be denied.

## STATEMENT OF FACTS

### I.    INTEGRA'S MOST LUCRATIVE DEVICE WAS BIOLOGIC MESH MANUFACTURED AT THE BOSTON FACILITY

Integra is a manufacturer of surgical and wound care medical devices. ¶36. Its most lucrative "biologic mesh" products were acquired through the Company's 2015 acquisition of TEI. ¶¶4, 37. As part of the acquisition, which the Company hailed as a "significant opportunity to build our platform and fuel a robust pipeline of regenerative products to accelerate Integra's overall growth," Integra acquired the Boston Facility and made it the exclusive site for manufacturing biologic mesh products, including the leading Surgimend and PriMatrix brands. ¶¶4, 37, 38.

After the acquisition and throughout the Class Period, Integra repeatedly touted its biologic

4

mesh portfolio as key to the Company's top- and bottom-line growth, and investors were laser focused on Integra's ability to: (i) manufacture enough product to meet the strong demand for biologic mesh devices; and (ii) comply with cGMP, which are foundational FDA regulations governing product quality and safety. ¶¶1, 39-40, 53. Importantly, Integra's ability to manufacture and sell its highly-profitable EBM products depended upon its strict adherence to cGMP. ¶41.

## II. PRIOR TO THE START OF THE CLASS PERIOD, DEFENDANTS BECAME AWARE OF SERIOUS cGMP DEFICIENCIES AT THE BOSTON FACILITY

On November 2, 2018, following a seven-day inspection of the Boston Facility, the FDA privately issued a blistering Form 483 to Integra detailing widespread violations of critical cGMP measures designed to test for and prevent contamination from endotoxins. ¶¶54-63. These violations, which were also detailed in the 2018 EIR that was issued to Integra on November 28, 2018, included gross deficiencies in its contamination controls, environmental controls, process validation controls, and CAPA framework controls relating to Integra's manufacturing of EBM products. *Id*. The FDA concluded that the severe and pervasive nature of these deficiencies required a broad overhaul of Integra's manufacturing processes at the Boston Facility. ¶¶56-61.

On March 16, 2019, just days before the start of the Class Period, the FDA issued the 2019 Warning Letter to Integra and its CEO, Defendant Arduini. ¶¶5, 64, 228. The 2019 Warning Letter informed Integra that "deficiencies observed during [the FDA's 2018] inspection *are significant and demonstrate a systemic failure of your firm's quality systems*," and characterized Integra's remedial measures since receiving the 2018 Form 483 as inadequate. ¶¶66, 228. It further demanded that Integra "take prompt action to correct the violations addressed in [the 2019 Warning Letter]" and warned that "*[f]ailure to promptly correct these violations may result in regulatory action* being initiated by the FDA without further notice." *Id.*

### III.    DEFENDANTS REPEATEDLY ASSURED INVESTORS THAT INTEGRA WAS REMEDIATING THE BOSTON FACILITY'S COMPLIANCE DEFICIENCIES

Knowing that the FDA would publish the 2019 Warning Letter in short order, Defendants disclosed it to investors on March 11, 2019. ¶67. To assuage investor concern, Defendants misleadingly downplayed the FDA's citations and assured investors that Integra was successfully remediating the serious deficiencies in manufacturing and quality control processes at the Boston Facility. ¶¶6, 68. Indeed, on March 11, 2019 and throughout the Class Period, Defendants continually reassured the market that Integra: (i) was successfully addressing the cGMP violations identified by the FDA; (ii) was complying with applicable cGMP requirements; and (iii) would continue manufacturing its EBM products at full capacity.

These statements were unquestionably false. As the Company was ultimately forced to disclose, Integra was not adequately addressing the FDA's violations, was not complying with applicable cGMP requirements, and its critical Boston Facility was utterly unable to manufacture products free from contaminants. Indeed, the Boston Facility's manufacturing process was so defective, and so plagued by fundamental, systemic and severe deficiencies, that Integra was ultimately forced to institute a global recall of *every product* manufactured at the Boston Facility for more than *five years*, and shortly thereafter *completely shutter* the Facility precisely because for years it had been unable to make products that complied with FDA regulations.

False Statements About Integra's Remediation Efforts. Throughout the Class Period, Defendants repeatedly told investors that Integra's remediation in response to the 2019 Warning Letter was proceeding as planned, that Integra had successfully addressed the serious violations of fundamental cGMPs identified by the FDA, and that Integra's remediation efforts were financially immaterial. For instance, on the first day of the Class Period, Integra filed a Form 8-K with the SEC stating that "since the conclusion of the [FDA] inspection, [Integra] *has undertaken*

6

*significant efforts to remediate* the observations and continues to do so." ¶¶70, 267-68. Defendants made similar representations at investor conferences and in SEC filings throughout the Class Period. *See, e.g.,* ¶71 (Defendant Coleman stating on February 19, 2020 that Integra had successfully undertaken "*quality remediation efforts throughout 2019*" and intended to complete its remediation efforts "*in the short term*" and emphasizing that "*there are no patient safety issues*"); ¶72 (Defendant Coleman stating during Integra's May 20, 2021 Virtual Investor Day that remediation at the Boston Facility "*is now complete*" and "*we've strengthened our quality operating mechanisms and reduced quality risk with enhanced rigor*").

<u>False Statements About Manufacturing Capacity</u>. Defendants repeatedly touted Integra's biologic mesh devices as being among its fastest growing and highest margin products. On October 28, 2020, for example, Defendant Coleman told investors that SurgiMend and PriMatrix were "very high margin products for us, 80% plus," and that Integra was "well positioned not just to capitalize on the top-line, but also drive higher gross margins going forward." ¶84. Integra's ability to continue manufacturing EBM products to meet market demand and capitalize on this high-growth, high-margin business was critical to investors throughout the Class Period.

For this reason, Defendants repeatedly represented that the FDA's findings would have no impact whatsoever on the Boston Facility's biologic mesh manufacturing volumes. ¶¶81, 294. Indeed, on the first day of the Class Period, Defendants emphasized to investors that the 2019 Warning Letter "*does not restrict* the Company's ability to manufacture or ship products or require the recall of any products." ¶86. Thereafter, during Integra's February 19, 2020 earnings call, Defendant Coleman told investors that the Company's remediation efforts were specifically designed to "*get [the Company] 50% more capacity as [it] enter[s] 2020*." ¶¶82, 297-98.

Defendants also touted Integra's purported build-up of "safety stock" that it could use to

satisfy increased demand for its biologic mesh products. For example, during Integra's May 7, 2020 earnings call, Defendant Anderson stated that Integra's investments in the Boston Facility were leading to an "increase in supply," that the Facility was "building safety stock," that this safety stock could be used to satisfy the demand for EBM products, and that as a result, investors should expect to see "double-digit growth" from Integra's EBM products. ¶¶83, 299-300.

False Statements About cGMP Compliance. Beginning in 2022, Defendants also began touting Integra's cGMP compliance and its "significant" investments in quality, including its purported implementation of internal mechanisms and processes to protect and ensure product quality for consumers. ¶76. For example, on September 30, 2022, the Company published the 2021 ESG Report, representing that Integra "*adheres to good manufacturing practices (GMPs), [and] quality system regulations (QSRs)*," and has "numerous mechanisms and processes embedded within [its] business operations to protect and ensure product quality, continuously improve the effectiveness of our quality management system, and ensure compliance with all regulatory requirements." ¶77; *see also* ¶¶78, 192 (similar statements issued in the 2022 ESG Report). Similarly, during Integra's May 4, 2023 Analyst/Investor Day presentation, Defendant Leonard assured investors that Integra had "*made significant investments in quality across all of our manufacturing sites with a focus on accelerating our quality project in Boston*." ¶¶79, 290-91.

Positive Analyst Reaction to Defendants' False Statements. Analysts reacted positively to Defendants' representations. ¶¶88-89. In March 2019, Piper Jaffray told investors not to be "overly concerned" about the 2019 Warning Letter because the Company had "emphasized that there were no safety issues associated with the products" and management assured they would "have the issued resolved within about six months" in the third quarter of 2019. ¶88. Morgan Stanley and Credit Suisse likewise stated that the cost to remedy the Boston Facility's compliance deficiencies

8

was likely immaterial, while Credit Suisse also noted that "sales of products from the facility should not be affected." *Id*. Even as late as 2023, analysts continued to rely on Defendants' reassuring statements about the Boston Facility, with BTIG crediting management's assurances in May 2023 that "there are no more 'big shoes' to drop." ¶89.

### IV.    IN TRUTH, INTEGRA HAD NOT UNDERTAKEN MEANINGFUL REMEDIAL MEASURES AT THE BOSTON FACILITY, WHICH REMAINED RIFE WITH DEFICIENCIES THROUGHOUT THE CLASS PERIOD

Contrary to Defendants' public statements, the severe cGMP violations identified by the FDA in the 2019 Warning Letter, including violations of requirements designed to prevent contamination of the Company's surgical products, went unremedied throughout the Class Period. Adequate remediation would have required a lengthy and costly closure of the Boston Facility— the only facility manufacturing Integra's high-growth, high-margin EBM products. Rather than investing the time and money needed to prevent product contamination and ensure adherence to other critical cGMP, Defendants embarked upon a scheme to prioritize profits over safety. This was confirmed by numerous former Integra employees who detailed the pervasive cGMP violations that existed at the Boston Facility and Defendants' abject failure to undertake any meaningful efforts to remediate them—despite representing the opposite to investors. ¶91.

### A.    Integra's cGMP Violations Persisted Due to Defendants' Failure to Remediate Them Following the 2019 Warning Letter

The Boston Facility was a converted, eighty-year-old school with a fragmented layout and antiquated equipment that presented numerous challenges to quality manufacturing. ¶¶38, 94. Numerous FEs who worked at the Facility reported that the obstacles to remediation due to the plant's aging infrastructure and fragmented layout were repeatedly brought to management's attention. ¶¶94, 96-97. FE 1, Integra's former Chief Scientific Officer, for example, described remediating the Boston Facility as a "money pit" and analogized it to "***buying an old farmhouse***

9

*that has lead pipes, and you have to change all piping, all the walls and rebuild it*." ¶94. FE 1 stated that installing proper water and air handling systems alone would have been costly and taken years to complete, and that Defendants decided to implement "a million Band Aids" rather than actually remediating the Facility's deficiencies. ¶95. FE 1 further stated that the Boston Facility's deficiencies and the FDA inspections were regular topics of discussion at monthly meetings with executives, including Defendants Arduini, Coleman, and Anderson. ¶¶96-97.

FEs likewise confirmed that after receiving the 2019 Warning Letter, the Company deliberately ignored the FDA's warning that an overhaul of the Boston Facility's quality systems was required. ¶107. According to FE 5, who was a Quality Control Analyst and later, a Quality Assurance Specialist, Integra did not dig deep into the root causes of nonconformances and endotoxin contamination issues and "*wanted to sweep the surface level stuff under the rug and let it all fester*." ¶108. Instead, the Company was focused on getting product out the door and refused to tolerate even the most minimal disruptions to the pace of production. *Id*. FE 5 described how the Boston Facility's Plant Manager routinely pushed for product to be approved regardless of the need for new reagents or failed testing. *Id*. FE 5's account was corroborated by three other high-ranking FEs. ¶¶98-106 (FEs 2, 3, and 4).

The Company's refusal to invest the resources necessary to bring the antiquated Boston Facility into compliance, particularly concerning sanitation remediation, were likewise confirmed by multiple FEs. ¶¶109-10. FE 6 described how basic cGMP were eschewed at the Boston Facility even after the 2019 Warning Letter was issued. For example, the Boston Facility's sterile manufacturing rooms were not sanitized, greatly increasing the risk of bacterial contamination, and the bovine skins used to make EBM devices were routinely left unmonitored in the Facility's basement. ¶109. Most concerning was that the Company's own internal documents reflected that

10

it failed to close out the FDA's findings from the 2018 inspection. ¶111. As FE 8, Integra's Quality Assurance and Regulatory Affairs Consultant indicated, when he arrived at the Boston Facility in 2021, **none** of the FDA's 2018 findings were closed out because Integra had not properly maintained documentation. *Id*. FE 9, who was hired as Integra's first Continuous Improvement Specialist in 2021, underscored that the Boston Facility suffered from continual noncompliance and that Integra "***[was] no way near close to where they should have been with CAPAs***," leading to the FDA discovering endotoxin contamination in product samples. ¶112.[2]

### B. In 2021, the FDA Discovered—and Privately Warned Defendants—that the Boston Facility Remained Rife with cGMP Violations

In the fall of 2021, the FDA conducted a nine-day inspection of the Boston Facility, which corroborated the FE accounts by discovering many of the same cGMP violations outlined in the 2019 Warning Letter, including environmental control and process validation control violations, persisted and had not been remediated. ¶¶118-21. The FDA privately issued the 2021 Form 483 that detailed its findings from the inspection, including Defendants' failure to remediate cGMP failures identified in the 2019 Warning Letter. ¶¶118, 122, 229. Additionally, the FDA discussed the findings from the 2021 inspection with Integra management at a close-out meeting on or about November 12, 2021. ¶122.

The FDA did not publicly disclose the 2021 Form 483. ¶123. While Integra disclosed its receipt of the 2021 Form 483 months later in its 2021 Annual Report, it failed to explain that the 2021 Form 483 involved repeated, pervasive, and serious departures from cGMP that the FDA observed—and the foreseeable consequences to the Company if the deficiencies went

---

[2] As multiple FEs confirmed, these quality systems issues were not limited to the Boston Facility, but instead reflected a systemic, Company-wide issue evidenced by cGMP violations at Integra's plants in Ohio, Massachusetts, New Jersey, and Texas. ¶¶113-16.

unaddressed. *Id*. Defendants continued to falsely assure investors that all compliance issues were being successfully remediated. *See, e.g.*, ¶74. Yet, contrary to these statements, numerous FEs confirmed that Integra failed to undertake meaningful remediation efforts following its receipt of the 2021 Form 483, *see* App'x A, and instead continued to "slap[] band aids" on these serious regulatory issues. *See, e.g.,* ¶¶124-31.

> **C.    A 2022 Internal Whistleblower Complaint and Resulting FDA Inspection Yet Again Identify Risk of Dangerous Endotoxin Contamination at Boston Facility**

In October 2022, Integra launched an internal investigation into the Boston Facility after an employee privately notified Integra's compliance hotline of "quality issues" in "manufacturing areas" related to Integra's "inspection process, bacterial endotoxin testing, bovine hide/skin thickness measurements, and control of sterilized devices." ¶¶139-40. The Company's investigation identified at least 37 lots of product impacted by quality issues. ¶140. On December 14, 2022, Integra initiated holds on the product in the 37 adulterated lots and on the production of any new product out of the Boston Facility, and thereafter it expanded the hold to include the manufacturing of any in-process products at various stages of the manufacturing process. *Id*.

The internal whistleblower complaint triggered the FDA's for-cause inspection beginning on March 1, 2023. ¶142. Less than two weeks later, the production and distribution of any and all products manufactured at the Boston Facility were placed on hold, making a product recall inevitable. ¶142.  Ultimately, the FDA issued another Form 483 to Integra on May 17, 2023, citing it for violations that corroborated the whistleblower's complaint and mirrored the violations identified in the 2018 Form 483, the 2019 Warning Letter, and the 2021 Form 483. ¶¶143-52.  This included deficiencies in Integra's contamination and process validation controls, product non-conformance controls, and CAPA controls, that Defendants previously claimed to have fixed.

**D.**     **Recognizing Their Inability to Remedy the Boston Facility's Severe Compliance Issues, Defendants Quietly Make Plans to Relocate to a New "State of the Art" Facility In Braintree**

Throughout the Class Period, Defendants were aware of the Boston Facility's outdated infrastructure and poor design, and they understood that effective remediation efforts would lead to lost sales and significant costs. ¶164. Unbeknownst to investors, by no later than the spring of 2022, Defendants made the strategic decision to move Integra's EBM manufacturing operations to the Braintree Facility in lieu of remediating the Boston Facility. ¶¶166-69.

## V.     THE TRUTH IS GRADUALLY REVEALED

The truth about Defendants' materially false and misleading statements was disclosed to investors through a series of corrective disclosures in 2023 and 2024, which gradually revealed to the market the true extent of the Boston Facility's serial cGMP non-compliance, Defendants' failure to remediate known cGMP deficiencies, and the severe impact they had inflicted on Integra's financial condition. In particular, the truth was revealed on five dates.

On April 26, 2023, Defendants announced a production pause at the Boston Facility to "make the changes in process and physical layouts that are needed," ¶¶170-71, but continued to assure investors that the pause would not disrupt the Company's operations, ¶172. Integra's stock price declined by $4.64 per share, or nearly 8%, in response to these disclosures. ¶¶173, 312.

On May 23, 2023, Integra announced a global recall of all products manufactured at the Boston Facility during the past five years, disclosed that it "decided to initiate the voluntary recall and extended the temporary halt of manufacturing at its Boston [F]acility to implement additional detection and quality controls" after consultation with the FDA, and revealed that the recall and continued manufacturing stoppage would have a significant impact on profitability. ¶¶179-181. Integra's common stock price declined by $10.24 per share, or 22.5%, in response to these disclosures. ¶¶182, 312.

13

On February 28, 2024, Integra announced De Witte's surprise resignation after less than two years as CEO, disclosed disappointing 2023 financial results and 2024 guidance driven by the recall and Boston Facility shutdown, revealed extended timeline for resuming production at Boston Facility, and disclosed that the reopening would not include any private label business. ¶¶196-99. Integra's stock price declined by $7.36 per share, or over 16%, in response to this news. ¶200.

On May 6, 2024, Integra slashed full-year EPS guidance and disclosed that, following FDA audit, "we no longer expect to resume commercial distribution in 2024" at the Boston Facility. ¶203. Integra's stock price declined by $5.75 per share, or 22.5%, in response to this disclosure. Months after this announcement, on July 15, 2024, Defendants announced that the Company planned to wind down the Boston Facility and restart production of its PriMatrix and SurgiMend products at its new manufacturing site in Braintree, Massachusetts, thereby conceding that deficiencies at the Boston Facility were so pervasive, severe, and time-consuming and costly to remediate that it was preferable to shutter the plant completely and restart manufacturing of EBM devices at an entirely new plant. ¶212.

Then, on July 29, 2024, Integra disclosed systemic cGMP deficiencies and shipping holds across *all* Integra facilities, which required Integra to implement a "compliance master plan" that required a complete production halt on all key production lines, and severe financial impact that the Company's compliance deficiencies were inflicting upon its business. In response to this disclosure, Integra's stock price declined by $6.01 per share, or 21%.

As the market learned the truth that Defendants' fraud had previously concealed, Integra's stock price lost ***more than half*** its value, causing severe harm to Plaintiffs and the Class. ¶17.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S.

14

662, 678 (2009). A complaint meets this standard if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court considers the entire complaint, takes factual allegations as true, and construes them "in the light most favorable to plaintiff[]". *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 315 (3d Cir. 1997).[3]

<strong>ARGUMENT</strong>

**I.    THE COMPLAINT ADEQUATELY ALLEGES THAT THE DEFENDANTS MADE MATERIALLY FALSE AND/OR MISLEADING MISSTATEMENTS**

Rule 10b-5 makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To plead falsity, the complaint must "support a reasonable belief as to the misleading nature of the statement or omission." *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004). "Rule 9(b) and the PSLRA do not insist upon irrefutable evidence of a statement's falsity at the pleading stage; rather, a complaint must contain particularized factual allegations that plausibly allege that a statement was misleading." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 681 (3d Cir. 2023). "Some statements, although literally accurate, can become through their context and manner of presentation, devices which mislead investors." *In re Merck & Co. Sec. Deriv. & "ERISA" Litig.*, 2011 WL 3444199, at *9 (D.N.J. Aug. 8, 2011).

While "[a]bsent a duty to disclose, silence is not fraudulent or misleading under Rule 10b-5," courts have long recognized that "[w]hen you speak . . . you are bound to speak truthfully." *U.S. v. Schiff*, 602 F.3d 152, 162 (3d Cir. 2010); *see Macquarie Infrastructure Corp. v. Moab*

---

[3] Defendants' request for the court to take judicial notice of 42 documents, nine of which were not referenced in the Complaint, is improper without formal motion for the Court and parties' consideration.

15

*Partners, L.P.*, 601 U.S. 257, 263 (2024) ("[h]alf-truths," which "state the truth only so far as it goes, while omitting critical qualifying information" are actionable under Section 10(b)).

### A.    The Remediation Misstatements Were Materially False or Misleading

Defendants repeatedly told investors that Integra had implemented remedial measures to address the cGMP violations at the Boston Facility and that those remediation efforts were proceeding as planned. *See* ¶¶267-72. For example, Defendants stated they had "undertaken significant efforts to remediate the observations and continue[d] to do so" (No. 1), touted the success of their "quality remediation efforts," faced "no patient safety issues" (No. 3), and that the "work" at the Boston Facility "is now complete" such that the Facility was "able to produce quality products" (No. 9). In truth, as multiple FEs reported, the Company "kicked [remediation] to the curb" (¶103), resulting in recurring cGMP violations that Defendants "had no interest in fixing" (¶239). These decisions, corroborated by the FDA's findings (¶¶119-21, 145-49) and whistleblower reporting (¶¶139-41), created endotoxin exposure risks that caused a complete shutdown of the Boston Facility, a global recall of all products manufactured at the Facility for more than five years, and severely harmed Integra's performance and growth prospects.

Defendants also continued to issue false assurances about these remediation efforts even *after* the truth began leaking out to investors. For example, Defendants assured investors that they were "working for . . . years to upgrade our Boston facility based on FDA observations in 2018 and 2021" (No. 14), and "fully expect[ed] to complete the remediation" in short order (No. 19). *See also* Nos. 16-18, 23-28. These statements were false. Indeed, as the Company was later forced to disclose, the purported remediation was so lacking that Integra had to shut down the Boston Facility forever and relocate because Boston could never comply with cGMP. ¶212. As a direct result of Defendants' years-long refusal to address core and systemic cGMP violations repeatedly flagged by the FDA at the Boston Facility, Integra was forced to institute a costly, Company-wide,

16

"compliance master plan"—which necessitated a complete production halt on *all* key product lines and shipping holds impacting *all* of Integra's manufacturing plants nationwide. ¶215. As corroborated by FE accounts, these eventualities were caused by Defendants' years-long failure to remediate the cGMP deficiencies. *See, e.g.*, ¶¶106-12, 161-63.

Courts have consistently sustained claims based on nearly-identical misstatements and facts reported by FEs. *See Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 946-57, 960 (N.D. Cal. 2014) (sustaining misstatements that defendants had "taken a number of steps to thoroughly review our quality control and manufacturing systems" and "made significant quality improvements" where FE accounts "call[ed] into question whether there was ever a true commitment to remedy the . . . problems"); *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira*, *Inc.*, 2013 WL 566805, at *21 (N.D. Ill. Feb. 13, 2013) (sustaining misstatements that "we have essentially completed all of the activities . . . outlined in our response to the [FDA] warning letter"); Hr'g Tr., *In re HeartWare Int'l, Inc., Sec. Litig.*, No. 16-cv-00520 (S.D.N.Y. March 16, 2018), ECF No. 47 at 31-32 (Ex. A) (sustaining misstatements touting "significant progress in our effort to address the FDA warning letter issues" based on FE account that company "failed validation tests" and "supervisors simply relaxed the relevant [device] specification[s]"). Here, the Complaint's well-pled allegations similarly establish that—contrary to Defendants' public statements—they were not remediating the Boston Facility's cGMP violations. *See* App'x A. Such detailed, cross-corroborating, substantive factual accounts provided by fifteen FEs who witnessed the serial cGMP violations firsthand are more than sufficient to plead falsity.

Defendants' arguments that the remediation statements were not false or misleading when made mischaracterize both their statements and Plaintiffs' claims. First, Defendants are wrong to argue these statements merely indicated efforts to remediate issues, and did not warrant the

17

success of those efforts. The Complaint here alleges that Defendants significantly overstated the scope and progress of Integra's remediation campaign by describing, for example, their "significant efforts" (No. 1), and by stating that the Boston investments "is now complete" (No. 9) and that Integra had "been working for the past couple of years to upgrade our Boston facility based on FDA observations in 2018 and 2021" (No. 14).

Indeed, far from disclosing Integra's "remediation struggles" (Mot. at 18), Defendants misled investors by ***minimizing*** and, in some instances, ***denying the very existence of***, such struggles when discussing the Boston Facility. For example, when disclosing the production pause, De Witte reassured investors that Integra had "been working for the past couple of years to upgrade our Boston facility based on FDA observations in 2018 and 2021" and was "on the right track" with implementing quality system upgrades (No. 14). A reasonable investor would have understood such statements as reassurances regarding the Company's progress in remediating the cGMP deficiencies, rather than admissions of the Company's shortcomings. *See In re Dr. Reddy's Lab. Ltd. Sec. Litig.*, 2019 WL 1299673, at *9, *18 (D.N.J. Mar. 21, 2019) (pharmaceutical manufacturer's statements about having "embarked on an initiative to revamp [] quality systems" when revealing warning letter deemed actionably misleading); *HeartWare*, Ex. A at 31-34.

In fact, even if the Court credits Defendants' suggestion that they invested some sums into remediating the Boston Facility (Mot. at 18), their statements were still misleading "[h]alf-truths" because they "omit[ed] critical qualifying information" about the shortcomings of those efforts. *Macquarie*, 601 U.S. at 263.[4] By putting Integra's remediation efforts "in play, Defendants were

---

[4] To this end, Defendants point to their 2021 disclosure that they spent $38.9 million in "capital expenditures" at four plants, including Boston. Mot at. 18. Based on this bare disclosure, Defendants improperly ask this Court to draw significant factual inferences in their favor at the motion to dismiss stage concerning the nature and extent of any of these "capital expenditures."

also required to disclose certain facts contradicting th[ose] representations," *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *16 (D.N.J. Dec. 27, 2019), including that Integra had not implemented meaningful remediation and that the quality control issues had continued unabated. *See* App'x A; *see also Becton*, 620 F. Supp. 3d at 186 ("Defendants may not describe 'a favorable picture' of a material issue 'without including the details that would have presented a complete and less favorable one.'").

Second, the FE allegations demonstrate Defendants' systemic disregard of any meaningful remediation efforts by describing Integra's ongoing violations in the ***exact*** quality systems that the Company was purportedly remediating at the Boston Facility. *See* App'x A. Defendants' attempt to discredit the FEs likewise fails, as the Complaint clearly sets forth each witness's knowledge base in detail, and these accounts are corroborated by other evidence (including FDA findings) and are internally consistent. *Prudential*, 70 F.4th at 691-92 (setting forth factors for crediting FE allegations); *see* App'x A (detailing corroborated FE accounts); *see also Becton*, 620 F. Supp. 3d at 186 (rejecting FE attack that "fails to appreciate the level of corroborating information").

Likewise, Defendants' argument that the FEs need to "have participated in the remediation," Mot. at 18, "view[s] the inquiry too narrowly" because Plaintiffs "use the confidential witnesses" to demonstrate "the pervasive and systemic nature of [Integra's] problems and the purposefulness in failing to address and remedy these problems" even after the FDA observations. *Mulligan*, 36 F. Supp. 3d at 963; *see also In re CommVault Sys., Inc. Sec. Litig.*, 2016 WL 5745100, at *7 (D.N.J. Sept. 30, 2016) (marketing employees "most likely had the firsthand knowledge as to the impact occurring on the ground"; and "would know the pulse of the

Defendants' request is not only improper, it ignores that the salient issue is not whether Integra spent ***some*** money on Boston remediation, but that the spend was ***grossly inadequate to fix*** the myriad cGMP deficiencies flagged for years by the FDA both before and during the Class Period.

19

company"). Finally, Defendants' characterization of these employees as "low-level" is not only factually wrong—the FEs include both senior executives in Boston and at corporate with national reach, and multiple high-ranking employees at the Boston Facility tasked with addressing, overseeing, and reporting quality control issues—it has likewise been rejected by courts. *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 493 (D. Del. 2019) (rejecting argument to discount FE allegations on the grounds that they were "'low-level former employees' and 'were not employed for the full class period'").

Third, Defendants are wrong to contend that no reasonable investor would have understood Misstatement No. 9 to say that remediation efforts were in fact completed at Boston. Mot. at 19. This argument ignores Coleman's actual words that the Company "***made investments***" including at Boston and that "***work is now complete***." ¶271. Defendants' reliance on context (Mot. at 19)—Coleman's comments concerned "progress" in the Company's "manufacturing footprint . . . over the past few years"—undercuts their position because Coleman specifically references the time period that Defendants were purportedly remediating the Boston Facility following the 2018 Form 483. ¶¶64-66. Moreover, Defendants are incorrect that the 2021 Form 483 would have informed investor understanding because the FDA had not yet made those observations; and, in any event, Defendants never disclosed the nature of the FDA's findings. *See* Facts §IV.B; App'x A.

Fourth, the Complaint adequately alleges that Defendants had not experienced a "strengthening" of its quality systems as of May 2021 when Coleman issued Misstatement No. 10. Defendants do not challenge the allegations supporting falsity, but instead argue that the statement is puffery and did not specifically reference the Boston Facility. Mot. at 19. They are wrong. Because this statement was a "***factual representation[] at [its] core***" about whether Defendants had "institute[ed] various changes to the manufacturing and/or quality control procedures or

20

processes," it is not puffery or opinion. *Mulligan*, 36 F. Supp. 3d at 967; *see Hospira*, 2013 WL 566805, at \*24 (rejecting argument that statements concerning issuer's progress in remediating warning letter-related deficiencies were puffery).[5] In any event, "a statement is considered puffery only when it is immaterial," *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at \*13 (D.N.J. Dec. 15, 2015), and "[m]ateriality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact." *Shapiro v. UJB Fin. Corp.*, 964 F. 2d 272, 280 n.11 (3d Cir. 1992).

Fifth, with respect to Misstatement No. 14, Defendants incorrectly suggest (Mot. at 19) that the Complaint fails to plead facts related to the "audit" referenced by De Witte to contradict his assertion that the Company "was on the right track with our execution." In truth, the whistleblower reported, just months earlier, widespread endotoxin contamination at the Boston Facility resulting in adulterated lots and a production pause. ¶¶132-34. The whistleblower's account directly contradicted De Witte's statement. Further, the Company improperly sought to limit the impact of the whistleblower's report and did not conduct a health impact evaluation for nearly six months (¶¶150-52), and the FDA was actively inspecting the plant and corroborating the deficiencies in its quality systems and controls (¶¶144-52). *See In re Celgene Corp. Sec. Litig.*, 2019 WL 6909463, at \*17 (D.N.J. Dec. 19, 2019) (finding defendant's failure to disclose discovery of an effect that would require further safety testing was materially misleading in light of existing

---

[5] This specific assurance about improved quality systems that led to "better FDA inspection results" is also readily distinguishable from the generic Form 10-K statement in *City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*, 865 F. Supp. 2d 811, 824 (W.D. Mich. 2012) (Mot. at 19) that the company "believe[d] that the manufacturing and quality control procedures" were compliant.

21

disclosure of timeline for submitting NDA).[6]

Sixth, Defendants' arguments regarding the patient safety aspects of Misstatement Nos. 3 and 17 (Mot. at 20-21) rely on flawed premises. In context, both statements falsely reassured investors about Integra's quality systems and ability to produce compliant and safe product at the Boston Facility, despite knowing that they were failing to remediate the serious endotoxin and environmental contamination issues that led to the product safety recall. ¶180. Defendants' argument that the Complaint must plead "patient complaints or adverse events indicating patient safety . . . as of that date," Mot. at 20, creates another false pleading burden, as Coleman's statement merely spoke to "patient safety" in the context of the "quality remediation efforts" taken "throughout 2019." ¶269. As to Misstatement No. 17, De Witte's reference to having received "no specific indications of any product complaints related to high endotoxin levels" and that "[p]atient safety is non-negotiable for us" misled investors about existing patient complaints (¶180) and Integra's efforts to address the quality concerns. *See* App'x A.[7]

## B.     The Capacity Misstatements Were Materially False or Misleading

Throughout the Class Period, Defendants repeatedly assured investors that they could significantly increase the production capacity of their EBM product, despite critical FDA findings.

---

[6] Similarly, De Witte's February 27, 2024 statement (No. 27) misled investors by touting the "dress rehearsal" without disclosing continued failures (¶¶160-63). *See In re Coinbase Glob., Inc. Sec. Litig.*, 2024 WL 4053009, at *13 (D.N.J. Sept. 5, 2024) (issuers have duty to "include the details that would have presented a complete and less favorable" account to investors). Finally, even if De Witte's statements could somehow be interpreted to be "literally true" (which they were not), "they became through their context and manner of presentation, devices which [misled] investors" given the numerous omitted adverse facts. *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at *17 (D.N.J. Aug. 8, 2018).

[7] Defendants' reliance on *City of Warwick Retirement System v. Catalent, Inc.*, 2024 WL 3219616 (D.N.J. June 28, 2024), Mot. at 20, is misplaced because the statement at-issue there concerned generalized risks related to the COVID-19 pandemic. *Id.* at *9.

For example, they claimed that manufacturing of SurgiMend and PriMatrix products at the Boston Facility could "get [Integra] 50% more capacity as [it] enter[s] 2020" (No. 4) and that the Company was "building safety stock" (No. 5). Defendants also downplayed the FDA's concerns, falsely representing that the manufacturing deficiencies identified by FDA did "not restrict Integra's ability to manufacture or ship products or require the recall of any products," (No. 2), or their "ability to manufacture or ship products or require the recall of any products" (No. 11).

In truth, Defendants were only able to produce surplus supply of SurgiMend and PriMatrix by skirting cGMP regulations and deliberately failing to undertake meaningful remediation at the Boston Facility. *See* App'x A. To this end, numerous FEs recalled that management prioritized output and profit seeking over quality control, including FE 1 (¶97), FE 3 (¶102), FE 5 (¶¶108, 130), FE 7 (¶110), FE 8 (¶138), FE 13 (¶128), FE 14 (¶131). Defendants' focus on quantity at the expense of quality directly contradicted their public statements and ultimately led to costly manufacturing suspensions and product recalls. ¶¶179-181. By making statements about "their various manufacturing deals and progress," Defendants created a "a duty to include material information that would render those statements not misleading," including that Defendants were disregarding cGMP to produce this safety stock and that such practices carried the risk that the Company would sell contaminated product. *McDermid v. Inovio Pharms., Inc.*, 520 F. Supp. 3d 652, 667 (E.D. Pa. 2021); *See Roofer's Pension Fund v. Papa,* 2018 WL 3601229, at *13-14 (D.N.J. July 27, 2018) (falsity where positive statements omitted "known extensive problems").

Defendants' arguments fail. First, Defendants argue that the Complaint does not plead that these statements were false. *See* Mot. at 24. But Plaintiffs' claim is not that Defendants did not produce the supply that they claimed or that the 2019 Warning Letter put specific restrictions on output. Rather, Defendants misled investors about their ability to produce EBM devices at the

23

stated volume and within safety parameters given the fundamental quality control system deficiencies flagged by the FDA. *E.g.*, ¶300. When Plaintiffs' theory is properly framed, Defendants' argument falls flat. *See Coinbase*, 2024 WL 4053009, at *10 (finding the plaintiff's misleading by omission theory "persuasive" when properly framed and rejecting the defendants' argument that the statements were literally true).

Second, Defendants' half-hearted argument that "[n]o reasonable investor would understand these statements to make any representation about quality" (Mot. at 25, n.13) is unfounded and devoid of context. As Defendants note (Mot. at 21), a reasonable "investor takes into account the customs and practices of the relevant industry." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015). Here, investors would have understood Defendants' assurances regarding supply to include their ability to do so in accordance with basic manufacturing regulations. *See Mulligan*, 36 F. Supp. 3d at 968 (holding statement that company was "committed to providing the highest quality products to our customers" was materially misleading).

Nor did Defendants meaningfully warn investors about the ***present*** risks to the Company in tandem with their description of the FDA's actions in Misstatement Nos. 2 and 11. To the contrary, Defendants minimized those risks by claiming that they "d[id] not expect to incur ***material*** incremental expense for remediation activities." ¶70. Their generalized, categorical risk warning that "[a]ny adverse regulatory action, depending on its magnitude, may restrict us from effectively manufacturing, marketing and selling our products" provided no concrete warnings

24

about the known and significant risk of producing contaminated products through the Company's failures to remedy the cGMP violations. *See* Argument §I.E.[8]

## C.        The Compliance Misstatements Were Materially False or Misleading

Throughout the Class Period, Defendants touted Integra's cGMP compliance, such as that Integra had "numerous mechanisms and processes" to ensure quality and regulatory compliance (No. 12), "adheres to" GMPs and QSRs (Nos. 13, 20), and "continuously improve[s]" its QMS (No. 21). In truth, the Boston Facility was rife with serious cGMP violations, including widespread deficiencies related to contamination controls, environmental controls, process validation, CAPA, and purchasing controls. *See* App'x A. Courts consistently deem such statements actionably misleading. *See Hospira*, 2013 WL 566805, at *18-19, *23 (statements that company was "designed to . . . drive quality and operational excellence" and that its facilities were in "good operating condition" held actionable); *Wilkof v. Caraco Pharm. Labs., Ltd.*, 2010 WL 4184465, at *6 (E.D. Mich. Oct. 21, 2010) (quality compliance statements actionable when "[t]he witnesses' claims of rampant manufacturing problems are consistent with the FDA's findings, including those detailed on" a Form 483 and in an "FDA warning letter").

Defendants' efforts to defend their compliance statements fall flat. First, Defendants are wrong to suggest that these statements are not actionable because they did not guarantee success in ensuring "product quality and compliance." Mot. at 11. As courts have  acknowledged, statements addressing the "steps the company had purportedly taken to comply with the cGMP,"

---

[8] Defendants' cases are easily distinguishable. In *McClain v. Iradimed Corp.,* 111 F. Supp. 3d 1293 (S.D. Fla. 2015), none of the alleged misstatements followed the reception of an FDA warning letter. In *In re PolarityTE, Inc., Securities Litigation,* 706 F. Supp. 3d 1343 (D. Utah 2020), no warning letter was received at the time the statements were made. In *In re Anadigics, Inc., Securities Litigation,* 2011 WL 4594845 (D.N.J. Sept. 30, 2011), *aff'd*, 484 F. App'x 742 (3d. Cir. 2012), no regulatory body alerted the company to deficiencies in its production systems.

25

are actionable. *Compare* Misstatement No. 12 (describing "numerous mechanisms and process . . . to protect and ensure product quality") *with Dr. Reddy's*, 2019 WL 1299673, at *9, *17 (finding actionable statement that "[w]e take quality and compliance matters seriously and stand by our commitment to fully comply with the cGMP quality standards across all of our facilities") *and In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at *3, *16 (D.N.J. Mar. 24, 2008) (sustaining statements that the Company was "committed to [the FDA's [CGMP]] compliance," and "instituted operational procedures that enforce cGMP compliance").

Defendants' statements also affirmatively represented Integra's <u>adherence</u> to GMPs and QSRs (Nos. 13, 20) and "continuous[] improv[ement]" of their "Quality Management System" (No. 21). Such statements are "subject to objective verification" and thus are not puffery.[9] *See Wilkof*, 2010 WL 4184465, at *2, *4 (statement that company was "substantially cGMP compliant" held actionable). This is in contrast to the cases relied upon by Defendants where the statements were "too vague to be verified." *See* Mot. at. 10 (quoting *In re Mylan N.V. Sec. Litig.,* 2023 WL 3539371, at *10 (W.D. Pa. May 18, 2023)).[10]

<u>Second</u>, unable to credibly argue that Integra adhered to cGMPs and QSRs at the Boston Facility during the Class Period, Defendants argue their false statements should be excused

---

[9] Such statements are in contrast to the generic "using cGMP" statements at-issue in *In re Ocular Therapeutix, Inc. Securities Litigation*, 2019 WL 1950399, at *6 (D. Mass. Apr. 30, 2019), *aff'd sub nom. Mehta v. Ocular Therapeutix, Inc.*, 955 F.3d 194 (1st Cir. 2020) (Mot. at 11).

[10] Defendants' reliance on *Mylan*, *Catalent*, and *Stryker* (Mot. at 10) also fail because the "commitment" statements issued there are readily distinguishable. Defendants' further argument that these statements are inactionable opinion (Mot. at 11 n.3) fails for similar reasons and relies on inapposite case law concerning compliance with "inherently subjective" standards governing clinical research. *In re Philip Morris Int'l Inc.*, 89 F.4th 408, 419 (2d. Cir. 2023). Defendants' further reliance on inapposite cases not involving cGMP compliance in the pharmaceutical industry (Mot. at 10 n.2) overlooks Integra's role in "an industry where regulatory compliance, not to mention consistency and sanitation in production, is essential." *Mulligan*, 36 F. Supp. 3d at 968.

because a reasonable investor would have known that the Boston Facility was not in compliance. Mot. at 11-12. This is nonsensical. Defendants ignore that they issued Misstatement Nos. 11 and 12 after years of stating that they had implemented quality remediation at the Boston Facility. *See* Argument §I.A. Defendants' subsequent disclosure of the receipt of the 2021 Form 483 did not inform investors of the continued violations of cGMP at Boston because: (i) Form 483s are not a "final Agency determination" of non-compliance (Mot. at 3); and (ii) Defendants did not disclose the actual contents of this interim notice (which would have revealed Integra's continued violations of cGMP identified in the 2019 Warning Letter). *S*ee Facts §IV.B. And, Defendants issued Misstatement Nos. 20 and 21 less than one month after De Witte "assure[d]" Integra's "customers and investors that we are highly focused on our remediation efforts." Moreover, Defendants' assertion that investors knew that Boston was not in compliance is directly belied by the stock price reaction after they disclosed the extent, severity, and foreseeable consequences of the issues—a 55% decline in the aggregate—which demonstrates that investors did not know the true state of affairs at Boston. *See Able Labs.*, 2008 WL 1967509, at *15.

Third, Defendants' argument that the FE allegations merely confirm the 2019 Warning Letter (Mot. at 13) misses the point that the FE allegations establish the ongoing, unremediated cGMP failures at the Boston Facility that Defendants withheld from investors. Defendants' cases involve distinct scenarios where the full truth was revealed.[11]

---

[11] *See In re Discovery Labs. Sec. Litig.*, 2006 WL 3227767, at *11 (E.D. Pa. Nov. 1, 2006) (warnings letters issued for "another company's products in the same facility seven years earlier") (emphasis omitted); *Anderson v. Stonemor Partners, L.P.*, 296 F. Supp. 3d 693, 703 (E.D. Pa. 2017) ("Plaintiffs essentially concede that no information was concealed"), *aff'd sub nom., Fan v. StoneMor Partners LP*, 927 F. 3d 710 (3d. Cir. 2019); *Shemian v. Rsch. In Motion Ltd.*, 2013 WL 1285779, at *21 (S.D.N.Y. Mar. 29, 2013) ("inability" to market products was "a matter[ ] of general public knowledge"), *aff'd*, 570 F. App'x 32 (2d. Cir. 2014) (brackets in original).

27

### D.    Defendants' Statements Are Not Inactionable Opinions

Defendants' arguments that many of the statements are non-actionable opinions, Mot. at 11 n.3, 15-16, 22-24, are flawed because (i) many of these statements are not opinions at all, and (ii) even if they are, they are actionable under the *Omnicare* framework.

An "opinion is a belief, a view, or a sentiment which the mind forms of persons or things, whereas a fact is a thing done or existing or an actual happening." *Prudential*, 70 F.4th at 684 (brackets omitted); *see also Omnicare*, 575 U.S. at 183 ("a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not"). The statements Defendants challenge as opinions were "not [] subjective interpretation[s] or expression[s] of belief" but instead were "affirmative statement[s] that painted a favorable picture without including the details that would have presented a complete and less favorable one." *See SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 900 (E.D. Pa. 2018). These statements provided explanations of "a thing done or existing or an actual happening," *Omnicare*, 575 U.S. at 183 (alterations omitted), such as the Boston Facility was "pretty much running normal capacity . . . during this period of lower demand, we're actually building safety stock" (No. 5); "investments in our core plants . . . is now complete" (No. 9); and, "we've been working for the past couple of years to upgrade our Boston facility based on FDA observations in 2018 and 2021" (No. 14). *See* Misstatement Nos. 6, 10, 16, 22-25 and 27; *see also Cont'l Gen. Ins. Co. v. Olafsson*, 2024 WL 4263211, at *11 (D.N.J. Sept. 23, 2024) ("when read as a whole, [statements] appear[ed] to be more than mere opinions [or] beliefs").

In any event, even if any misstatement is deemed an opinion, it is actionable because: (i) it "omit[ted] material facts about the [Defendants'] inquiry . . . or knowledge"; and (ii) the omitted facts "conflict[ed] with what a reasonable investor would take from the statement." *Omnicare*, 575 U.S. at 189; *see also id.* at 192 ("[L]iteral accuracy is not enough: An issuer must as well desist

28

from misleading investors by saying one thing and holding back another."). For example, in contrast to statements that Defendants' efforts to remediate were "on track" (Nos. 23-26) or that the Company was "in great shape when you look at our regenerative supply" (No. 8), Defendants omitted the material facts that they were systemically failing to implement remedial actions to the quality system deficiencies. *See Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*, 2022 WL 889158, at *11 (E.D. Pa. Mar. 25, 2022) (opinions about success of a product deemed actionable because they "omitted material facts supporting" the speakers' understanding); *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2017 WL 1658822, at *14 (D.N.J. Apr. 28, 2017).

### E.    Defendants' Statements Are Not Protected by the Safe Harbor

Defendants also argue that many of the remediation and capacity statements were forward-looking and thus protected by the PSLRA safe harbor. *See* Mot. 13-15, 21-22. They are wrong. To start, statements purporting "to describe historical facts or a then-present state of affairs . . . are not forward-looking." *Emps. Ret. Sys. of P.R. Elec. Power Auth. v. Conduent Inc.*, 2020 WL 3026536, at *6 (D.N.J. June 5, 2020); *see also Enzymotec*, 2015 WL 8784065, at *11 ("well positioned for future growth" and "achieving rapid penetration" conveyed "then-existing conditions as opposed to future projections"). Here, Defendants' statements implicated ***current or past events***, as shown by language such as "we're on the right track with our execution." ¶273. *See Dr. Reddy's*, 2019 WL 1299673, at *18 (statements that "[w]e *have embarked* on an initiative to revamp our quality systems and processes, as an organization-wide priority . . . are not within the safe harbor provision"). The present part of "[a] mixed present/future statement" is likewise not protected by the safe harbor. *Inst'l Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009); *Olafsson*, 2024 WL 4263211, at *11. For example, "we are on a path to reach world-class quality assurance across all manufacturing sites by the summer" (No. 16), is not protected in regard to the portions of the statements regarding the Integra's current trajectory.

29

Second, the safe harbor does not protect "omissions of existing facts or circumstances" because they "are not forward-looking." *In re Viropharma, Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 471 (E.D. Pa. 2014). Here, Defendants omitted a swath of materially adverse facts, precluding application of the safe harbor. *See* Argument §I.A-C.

Even if forward-looking, Defendants' misstatements are actionable because: (i) Defendants had actual knowledge that their statements were false or misleading; and (ii) the statements were not accompanied by meaningful cautionary language. Plaintiffs have sufficiently alleged that Defendants knew facts contradicting their Class Period misstatements. *See* Argument §II; *see also Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 209 (E.D. Pa. 2021) (safe harbor protection applies only if statements "were made without actual knowledge that the statement was false or misleading").

In addition, none of Defendants' statements was paired with "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those" stated. 15 U.S.C. § 78u-5(c)(1)(A)(i). "[C]autionary language must be extensive yet specific and touch upon the subject matter of the alleged misrepresentation in order for the safe harbor to apply." *Enzymotec*, 2015 WL 8784065, at *7; *see Loc. 731 I.B. of T. Excavators & Pavers Pens. Tr. Fund v. Swanson*, 2011 WL 2444675, at *13 (D. Del. June 14, 2011) (cautions not sufficiently specific when none warned of "secular decline" referenced in claims).

"[G]eneric warning[s]," such as Integra's Form 10-K risk factors, "will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014). Indeed, Defendants' cited language: (i) about what "may" happen if the FDA believes a company is non-compliant, Mot. at 4-5; (ii) that "adverse regulatory action may adversely affect our financial

30

condition and business operations," Def. Ex. 6 at 17; and (iii) about future FDA inspections, *id.*, could have applied to ***any medical device manufacturer***. *See In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *18 (E.D. Pa. March 25, 2020) ("generic warning" that is "inherently true" not meaningful).[12] These "warnings" said nothing about the specific undisclosed facts on the ground known to Defendants, including their failure to undertake necessary remediation efforts, the Boston Facility's persistent non-compliance, or that Defendants had acknowledged Boston's terminal non-compliance by deciding to relocate its operations a new facility. *See Endo*, 351 F. Supp. 3d at 897 (cautions "must include facts that the issuer knows contradict the forward-looking statement"); *Becton*, 620 F. Supp. 3d. at 191.[13]

## II.     THE COMPLAINT RAISES A STRONG INFERENCE OF SCIENTER

Scienter concerns Defendants' "intention to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*, 551 U.S. 308, 313 (2007). Scienter may be established by facts "constitut[ing] circumstantial evidence of either recklessness or conscious behavior." *See Papa*, 2018 WL 3601229, at *15. In evaluating scienter, a court must evaluate the allegations "collectively," not in isolation. *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 114 (3d Cir. 2018).

---

[12] Defendants' claim that the cautionary language meaningfully warned investors that increased capacity hinged on being able to "successfully remediate" (Mot. at 22) is particularly weak because the cautionary language itself denied that the deficiencies restricted production. *See* Nos. 2, 11.

[13] Because Defendants' cautionary language did not meaningfully inform investors of the impending risks inherent in its strategies and failed remediation, it is distinguishable from Defendants' authorities (Mot. at 14). *See, e.g.*, *Ocular*, 2019 WL 1950399, at *9 (company's statement "[a]dequate resolution of the outstanding Form 483 . . . is a prerequisite to the approval of the [new drug application]" warned of risk that failure to remedy Form 483 would result in denial) (first alteration in original); *In re Talis Biomedical Corp. Sec. Litig.*, 2022 WL 17551984, at *14-15 (N.D. Cal. Dec. 9, 2022) (statement that manufacturing lines "are not complete and could incur substantial delays" warned of risks related to meeting production targets). In *McClain*, the court did not specify the accompanying cautionary language. 111 F. Supp. 3d at 1303.

While the inference of scienter must be "at least as strong as any opposing inference[]", it "need not be irrefutable, i.e., of the smoking gun genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324, 326. "[I]t is not necessary to plead motive to establish . . . scienter." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013) (cited in Mot. at 33).[14]

A. **Defendants Had Knowledge of Facts and Access to Information Contradicting Their Public Statements**

To adequately plead scienter, "it is sufficient for plaintiffs to allege that defendants had knowledge of facts or access to information that contradict[ed] their statements." *Cambrex*, 2005 WL 2840336, at *11. Here, the Complaint alleges that Defendants knew of and had access to information that contradicted their public statements—as revealed through FDA correspondence, the accounts of former Integra employees, and whistleblower reporting. These sources establish that—in contrast to Defendants' public statements—they *knew* the Boston Facility remained rife with systemic violations of fundamental cGMP, that these continued violations carried the risk of product contamination and business interruptions, and that, without correcting these issues, the Company faced significant risk of severe regulatory penalty. These detailed, well-pled sources of information are frequently credited by courts in finding scienter met, and are detailed below. *See Dr. Reddy's*, 2019 WL 1299673, at *16 ("Defendants' alleged failure to investigate FDA warnings weighs further in favor of finding scienter and falsity.").

Receipt of FDA Form 483s and Warning Letters. Significantly, this is not a case where

---

[14] Contrary to Defendants' motion, Mot. at 38, the Complaint does not allege "[g]roup pleading" as to scienter, as Plaintiffs do not seek to hold Individual Defendants liable for unattributed statements or for statements attributed to other Individual Defendants. The group pleading cases cited by Defendants are easily distinguished. *See Winer Family Tr. v. Queen*, 503 F.3d 319, 337 (3d Cir. 2007) (sought group pleading absent additional circumstantial evidence); *Smith v. Antares Pharma, Inc.*, 2020 WL 2041752, at *9 (D.N.J. Apr. 28, 2020) (same).

Defendants can claim they were not fully aware *for years* that Integra's critically important Boston Facility was plagued by severe and pervasive manufacturing issues that precluded its ability to make safe and high-quality products in compliance with cGMP.[15]  Indeed, the FDA repeatedly told Defendants there were serious, recurring issues at Boston that were *not* being addressed. Defendants received *three Form 483s* and *two Warning Letters* alerting them to the Boston Facility's repeated cGMP violations and the inadequacy of the Company's purported remediation efforts. ¶¶62, 64, 122, 144-52, 156. As the Company's senior leaders, Defendants directly received these notices as the FDA directs Form 483s "to the top management of the firm" (¶49) and specifically addressed, the 2019 Warning Letter to Arduini (¶64) and the 2023 Warning Letter to De Witte (¶156).[16]

Through their receipt of these scathing regulatory notices, which identified the "systemic failure of [the Company's] quality systems" (¶92), Defendants knew of the cGMP violations at the Boston Facility, knew they were required by federal law to correct them, and intentionally failed to do so while assuring investors that they did. Courts frequently find such allegations as giving rise to the strong inference of scienter. *See, e.g., Becton*, 620 F. Supp. 3d at 194 (CEO's "aware[ness] of the FDA's communications" with the company supported scienter); *Mylan*, 2023 WL 3539371, at *18 (scienter met when the defendants had "access to observations and warnings from the FDA that directly contradicted the company's public statements").[17]

---

[15] By contrast, in *Antares*, 2020 WL 2041752, at *9 (Mot. at 35), the FDA concerns did not alert defendants to potential adverse actions.

[16] Defendants' argument that the Complaint "simply groups [Mosebrook]" into the category of "top management" minimizes his receipt of these repeated notices and role as a signor of the FY-2021 Form 10-K. Mot. at 44-45. These facts make it unreasonable that his assume his ignorance of status of the Boston Facility remediation.

[17] Defendants' cases are in accord. *See Able Labs.,* 2008 WL 1967509, at *16–17 (finding scienter

FE Allegations Report Defendants' Knowledge and Access to Information. Courts also acknowledge that scienter is supported by access to "detailed information regarding the company's business operations" including facts sourced by FEs. *See, e.g., Endo*, 351 F. Supp. 3d at 906. Here, numerous FEs report Defendants' knowledge and access to information related to the Boston Facility's cGMP deviations, endotoxin issues, and remediation needs and progress.

For example, FE 1 (Chief Scientific Officer; 2/2014 to 10/2021) reported that there were *monthly meetings with senior management and executive leadership, including Defendants Arduini, Coleman and Anderson, in which Integra's quality and regulatory teams led presentations on the operations of each facility, including the Boston Facility*. ¶96. At these meetings, the quality and regulatory teams presented on adverse events and the progress of any remedial work—with FE 1 specifically recalling that "there was no month that Boston was Scot-free," *id.* at ¶97, meaning that Defendants were informed of the ongoing remediation challenges at Boston on a monthly basis. FE 1's account is corroborated by FE 2 (Vice President, 10/2014 to 1/2019) and FE 3 (National Director, from before TEI acquisition until 2/2023). ¶¶98, 100-01.

FEs also provided information on the numerous sources that gathered information on the Boston Facility's issues, and explained how cGMP issues at the Boston Facility were widely known throughout the Company. For example, FE 4 stated the site quality directors for each of the Company's facilities, including Boston, held monthly meetings with Integra's senior quality leaders including Maria Cianciotto, Integra's (VP of Quality for Operations; 2018 until 12/2021) and then Annette Boland (VP of Global Product Quality; 1/2022 to 9/2023). ¶¶105, 243. FE 13 explained that he reported up to Integra's Head of Global Medical Affairs, Sandra Berriman, who

---

based on company's receipt of FDA Form 483, warning letter, and an investigation concerning the defendant company's manufacturing process).

was "well aware" of the Boston Facility's endotoxin issues, and reported directly to both senior executive Michael McBreen and Defendant Davis, who reported to Defendant De Witte. ¶127. As such, Defendants' knowledge of the ongoing compliance failures as reported by the former employees can be readily inferred. *See Hospira*, 2013 WL 566805, at *26 (the "[d]efendants' participation in various meetings on Hospira's remediation efforts support the inference that they were aware of the quality-control issues").[18]

Receipt of Whistleblower Complaint. Defendants' knowledge is further reinforced evidenced the 2022 whistleblower complaint. ¶¶139-40. Reporting on issues directly to the Company's compliance hotline, in October 2022, the whistleblower described "quality issues" in "manufacturing areas" related to Integra's "inspection process, bacterial endotoxin testing, bovine hide/skin thickness measurements, and control of sterilized devices," ¶139, i.e., the same issues identified in the 2018 Form 483, 2019 Warning Letter, and 2021 Form 483. *See* App'x A. That Defendants would have learned about this report is readily inferable through the seriousness of the charges, the fact that they concerned the exact issues that had been intensely scrutinized by the FDA, and because the issues contained in the whistleblower complaint ***triggered an internal investigation and other mandatory analyses*** at the Boston Facility, ultimately leading to the identification and distribution hold of at least 37 lots of adulterated product and an FDA for-cause inspection. ¶¶140-42. In similar instances, courts have found that employee complaints that put defendants "on notice" can strengthen the inference of scienter. *See, e.g., Twin Master Fund, Ltd.*

---

[18] Contrary to Defendants' argument that the complaint fails to allege facts that Defendants knew of the ongoing compliance failures after issuance of the 2023 Warning Letter (Mot. at 15), FE 15 reported specific ongoing deficiencies (¶¶160-63). Because FE 15 participated in process runs and validation checks with first-hand knowledge of the observations of Integra's cGMP auditor, his account provides knowledge imputable to Defendants based upon their requirements under the 2023 Warning Letter (¶¶156-58) and oversight of the audit process (*e.g.*, ¶¶172, 198).

*v. Akorn, Inc.*, 2020 WL 564222, at *14 (N.D. Ill. Feb. 5, 2020).

Defendants' Public Statements. Defendants' knowledge of the pervasive cGMP violations at the Boston Facility is further evidenced by their public statements acknowledging their intense focus on that Facility and the purported remediation efforts there. *See, e.g.*, ¶193 (Knight, September 6, 2023: "the Boston remediation continues to progress well" and that the Company had "hired in the right technical expertise to support and drive building a remediation plan and executing against it… we are absolutely on the right path."); ¶194 (De Witte, October 25, 2023: "our progress in addressing the Boston facility and returning to the market remains on track," and "the adequacy of [Integra's] remediation plan" was "confirm[ed]" by "[i]nterim external reviews."). Courts routinely such allegations indicative of knowledge. *See, e.g., Avaya, Inc.*, 564 F.3d at 268-69 (strong inference of scienter where defendants "repeatedly assured analysts and investors"); *Energy Transfer*, 532 F. Supp. 3d at 228 (inferring scienter where defendants spoke "in detail" about project while holding themselves out as well informed on topic).

These knowledge facts readily establish the strong inference of scienter. Defendants' attempts to improperly partition and discredit the well-pled facts are meritless.  First, with respect to the FDA documents, Defendants claim that the inference of scienter is undermined because they "informed the market of the FDA's regulatory correspondence" (Mot. at 25-26). But this claim does not withstand scrutiny because, in several instances, Defendants did not disclose *the contents* of the FDA findings. Indeed, Defendants' decision to conceal the details of the 2021 Form 483, which documented the same quality concerns over endotoxin contamination as the 2019 Warning Letter and thus contradicted their prior representations to investors, strengthen the inference of

scienter.[19] Defendants' argument that risks to Integra's capacity had been disclosed is also based on easily distinguishable case law. Mot. at 25 fn.13.[20]

Second, Defendants' attacks on the FEs (Mot. at 28-30) fail for reasons provided above. *Supra* at pp. 19-20. Defendants' further arguments that Arduini, Coleman, De Witte and Leonard "only. . . attended meetings" (Mot. at 41-42), and Davis's attendance was "insufficient" (Mot. at 41), ignores the well-pled FE allegations that the cGMP violations, endotoxin issues, and remediation progress (or lack thereof) continued unabated (see App'x A), and these exact issues were discussed at these monthly *and* quarterly meetings.[21] Further, Defendants' arguments that Defendants cannot possess scienter for information and events outside their tenure (Mot. at 40-43) ignore that "it is absurd to think that the CEO and CFO of a pharmaceutical company would be unaware of the alleged substandard, non-compliant conditions pervading their company's manufacturing and quality control divisions—the heart of a company whose main business is manufacturing pharmaceuticals for public consumption." *Mulligan*, 36. F. Supp. 3d at 970.[22]

Third, Defendants are wrong to claim that the whistleblower complaint cannot support

---

[19] Defendants' cases are distinguishable (Mot. at 26) because they did not involve repeated FDA warnings about persistent, unremediated deficiencies. *See Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 244 (1st Cir. 2015) (one warning letter); *Hills v. Bioxcel Therapeutics, Inc.*, 2024 WL 3374145, at *19 (D. Conn. July 11, 2024) (single Form 483); *In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 42 (1st Cir. 2014) (FDA indicated that approval timeline would not be affected); *Ocular*, 2019 WL 1950399, at *4 (FDA accepted corrective action plan).

[20] Defendants' continued reliance on *Discovery*, *StoneMor*, and *Shemian* fail. *See* p. 27 & n.11.

[21] Defendants' authorities are distinguishable for this reason (Mot. at 29). *See Mosco v. Motricity, Inc.*, 649 F. App'x 526, 529 (9th Cir. 2016) (no information on additional sources of information); *In re Supreme Indus., Inc. Sec. Litig.*, 2018 WL 2364931, at *10 (N.D. Ind. May 23, 2018) (one witness with "no corroboration").

[22] *Cullen* (Mot. at 38) is inapposite because there the company completely outsourced remediation efforts to a third party. *Cullen v. RYVYL Inc.*, 2024 WL 898206, at *19 (S.D. Cal. Mar. 1, 2024).

37

scienter for any alleged misstatements because it was "unverified" and was later disclosed on the Company's website. *See* Mot. at 27. The whistleblower complaint strengthens the inference of Defendants' scienter because it further corroborates the seriousness and pervasiveness of the deficiencies at the Boston Facility, in contrast to Defendants' longtime denials.[23] The Company's own (incomplete) actions in response to the whistleblower complaint after they received it show they knew it was legitimate and raised serious issues that could not be swept under the rug (¶¶140-141). That the Company failed to properly investigate and fully address the report for nearly six months (¶¶150-52), while the FDA swiftly corroborated it (¶¶144-52), specifically supports the scienter inference for Defendants' positive statements issued in April and May 2023 (Nos. 14-16).

**B.    The Inference of Scienter is Strengthened by Defendants' Deliberate Effort to Avoid Manufacturing Disruptions to Correct Quality Concerns**

Defendants' priority to maximize profits over ensuring product safety, and their retaliation against those who raised concerns about the quality control deficiencies, support scienter. *See, e.g., In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 244 (S.D.N.Y. 2022) (employee's termination after raising concerns supports scienter). Indeed, FEs recalled that Defendants deliberately avoided any costly or meaningful remediation efforts in favor of profit.[24] Some FEs further pointed to their personal experiences with the Company's efforts to cut corners while maximizing profits, including at the Boston Facility.[25] Further, FE 13 explained that when he, a director, complained about noncompliance, he discovered his boss had approached Human Resources to inquire about timing his future termination. ¶128. That Defendants had knowledge

---

[23] Defendants' reliance on *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 521 (6th Cir. 2023) (Mot. at 27) is misplaced because the government's adverse findings against the company—unlike here—came "a full year after the end of the Class Period."

[24] *See, e.g.,* ¶¶99, 129, 239, 245 (corroborative accounts of FE 3, FE 5, FE 8, and FE 13).

[25] *See, e.g.,* ¶¶114, 245, 247 (corroborative accounts of FE 8, FE 10, and FE 11).

and access to discussions regarding the Boston Facility's failure to comply with regulatory requirements, and deliberately refused to implement costly remediation, going so far as to retaliate against those who raised concerns, strengthens the scienter inference.

### C. The Importance of the Boston Facility and Biologic Mesh to Integra's Business Strengthens the Inference of Scienter

The inference of scienter is strengthened because Defendants' conduct concerned "core matters of central importance to the company and its high-level executives." *Energy Transfer*, 532 F. Supp. 3d at 232; *see also Becton*, 620 F. Supp. 3d at 196. Defendants' misstatements concerned its all-important SurgiMend and PriMatrix products, the Boston Facility where such products were manufactured, and issues concerning FDA compliance which directly impacted the Company's ability to manufacture and sell those products out of the Boston Facility. ¶¶256-58, 264.

### D. Defendants' 2023 Actions, Including Its Plan to Relocate to Braintree, Reinforces Scienter

At the same time Defendants were touting their remediation efforts at the Boston Facility, they were privately making plans to abandon that antiquated facility and relocate to a new "state-of-the-art" facility in Braintree. ¶¶249-55. These undisclosed relocation plans were tantamount to an internal acknowledgement that Integra could not remediate the Boston Facility without incurring massive costs and disruptions to its operations, and thus support an inference of their scienter. *Id.*; *Strougo v. Mallinckrodt Pub. Ltd. Co.*, 2022 WL 17740482, at *8 (D.N.J. Dec. 16, 2022) (company's active negotiation of settlement prior to filing Form 10-K that failed to disclose it supported a finding of scienter). Defendants' claim that there was not a definitive timeline for moving to Braintree (Mot. at 31) ignores that Integra's Board of Directors officially approved moving ahead with the Braintree relocation on April 1, 2022, ¶¶165-66, 254, while Defendants continued to tout the Boston Facility's remediation process ***well into 2023***.

### E.  The Inference of Fraud Is at Least as Compelling as Defendants' Competing Inference

Viewing these allegations holistically, as the Court must do under *Tellabs*, the most cogent inference is that Defendants knew of the systemic and pervasive cGMP violations at the Boston Facility and Defendants either knew that the deficiencies continued unabated, or they recklessly spoke about Integra's remediation efforts and the related effects without having knowledge of those efforts. Either way, the Complaint adequately pleads that Defendants acted with scienter.[26] *See In re Viropharma, Inc. Sec. Litig.*, 2003 WL 1824914, at *9 (E.D. Pa. Apr. 7, 2003) (plaintiffs "sufficiently alleged that the Defendants *either* knew that their statements were false *or* acted with reckless disregard for the truth of those statements.").

The inference of scienter here is at least as compelling as any nonculpable inference. Mot. at 33-34. None of Defendants' cases concerned situations where company executives were confronted with faced with the same level of scrutiny faced by Defendants during the Class Period, including *three* Form 483s and *two* warning letters concerning the same cGMP deficiencies. Defendants' persistent denials about the nature and impact of the issues plaguing the Boston Facility in the face of these repeated warnings—while *simultaneously assuring investors* that the issues were being remediated—establishes scienter. *See Mylan*, 2023 WL 3539371, at *19 (rejecting non-culpable inference when "the FDA's concerns had been repeatedly clarified").

Defendants suggest that scienter does not make sense here because they did not seek to capitalize financially on their false statements. Mot. at 33-34. But this argument is legally deficient because the Third Circuit has consistently held that "a plaintiff need not necessarily demonstrate

---

[26] Defendants' claim the Complaint "does not allege Knight was aware of any information contradicting her statements." Mot. at 43. This ignores her frequent, detailed statements holding, herself out as an expert on remediation efforts at the Boston Facility. *E.g.*, ¶¶193, 198, 205, 210.

40

motive and opportunity to adequately support a finding of scienter." *Papa*, 2018 WL 3601229, at *18 (strong inference of scienter for director defendants who did not make stock sales); *see also Tellabs,* 551 U.S. at 325 ("absence of a motive allegation is not fatal").[27]

## III.   THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION

"The loss causation inquiry asks whether the misrepresentation or omission proximately caused the economic loss." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d. Cir. 2007). A plaintiff pleads loss causation by showing that the revelation of truth regarding the alleged misrepresentations and/or omissions "were a substantial factor in causing the plaintiff's economic loss." *Id.* at 425-26. Contrary to Defendants' claim that the Rule 9(b) standard applies to loss causation allegations, "courts of this District have consistently analyzed loss causation under Rule 8(a), rather than the more stringent requirements of Rule 9(b)." *Hall*, 2019 WL 7207491, at *27.[28]

Here, Plaintiffs allege that the truth regarding Defendants' fraud was revealed over five disclosures occurring on April 26, 2023, May 23, 2023, February 28, 2024, May 6, 2024 and July 29, 2024. *See* Facts §V; ¶¶170-223. For each date, Plaintiffs allege that new information was disclosed that revealed the truth about Defendants' misrepresentations and omissions and caused Integra's stock price to decline. *Id.* Nothing more is required. *See Hull v. Glob. Digital Sols., Inc.*, 2017 WL 6493148, at *15 (D.N.J. Dec. 19, 2017) ("so long as the plaintiff alleges that the public

---

[27] Defendants' cases also highlight this. *See In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 370 (D.N.J. 2007) (citing *Tellabs); Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 548 (D.N.J. 2010) ("Motive and opportunity may be useful indicators, but nowhere in the statute does it say that they are [ ] necessary . . . .") (citing *Avaya*, 564 F.3d at 276).

[28] In *Hall*, the court cited at least six District of New Jersey decisions applying Rule 8(a) to loss causation allegations and concluded that "absent guidance from the Third Circuit, this Court aligns itself with the decisions of its sister districts . . . and applies the standard provided by Rule 8(a) to Plaintiffs' loss causation allegations." *Id*.

disclosure reveals that the defendant company made false claims, and that based on those disclosures, a corresponding drop in stock price occurred, loss causation is adequately pled").

Defendants do not dispute that the Complaint alleges loss causation for the April 26, 2023 and May 23, 2023 corrective disclosures, which caused Integra's stock price to plunge by 8% and 22.5%, respectively (¶312). Instead, they argue that Plaintiffs have not pled loss causation for the last three dates because, in their view, by May 23, 2023, "no reasonable investor could have thought that Boston was compliant, Integra's remediation had succeeded, or Boston was producing at full capacity." Mot. at 34-35. This argument, which attempts to recast the Complaint's fraud theory into a much narrower case, fails for several reasons.

First, Defendants' challenge to the final three corrective disclosures is a fact-intensive argument inappropriate for resolution in Defendants' favor at the pleading stage. The Third Circuit has recognized that loss causation "is a fact-sensitive inquiry typically left to the trier of fact" and that "doubts regarding the reasonableness of the reliance should be resolved in favor of extending the class period." *Hall*, 2019 WL 7207491, at *26, 29. Second, Defendants' argument ignores Plaintiffs' well-pled allegations that the market continued to be misled regarding the magnitude and scope of the Boston issues after the May 23, 2023 disclosure, including that: (i) analysts continued to credit Defendants' remediation statements after May 23, 2023; and (ii) Defendants' continued issuance of false statements following the May 23, 2023 disclosure. ¶¶189-190, 192-94.

Third, the Complaint alleges that each of the final three disclosures revealed new information to the market regarding the seriousness and extent of Integra's systemic compliance deficiencies and their impact on its operations, financial performance, and future prospects. For example, on February 28, 2024, the Company's stock price fell 16% after Defendants disclosed additional information about the financial impact of the Boston Facility's compliance deficiencies,

including a nearly 8% decline in adjusted EPS and a 24% decline in adjusted EBITDA margins, along with news of De Witte's resignation, and the market viewed these disclosures as "surprising" in light of Defendants' prior statements. *See, e.g.,* ¶¶197-201. Similarly, on May 6, 2024, the Company's stock price plunged 22.5% after Integra slashed its financial guidance due to issues with the Boston Facility, announcing that the issues were so severe that production would not resume in 2024 and that Integra was considering relocating all EBM manufacturing to a new "state-of-the-art" facility in Braintree. ¶¶202-06.

And on July 29, 2024, Integra's stock price fell an additional 21% after the Company disclosed—contrary to Defendants' purportedly deep commitment to producing high quality and safe medical devices Companywide that were fully compliant with cGMP and met "all regulatory requirements" (*e.g.*, ¶¶77-78)—the need to implement a costly, "compliance master plan" that encompassed production halts and shipping holds across *all* of the Company's key products and facilities worldwide, because the cGMP violations that the FDA had been flagging for years were so severe that they permeated the *entire* Company.  This stunning revelation that Integra had a pressing "need to bolster [its] manufacturing quality compliance processes across the organization" resulted in dramatically lower 2024 guidance, lowered 2025 guidance, and uncertain forecasts beyond. ¶¶214, 216. Analysts barraged management about the impetus for and the impacts of the "compliance master plan," as well as its financial repercussions, and specifically reported that these disclosures revealed new and disappointing information.  ¶¶219-221.

These allegations are sufficient to demonstrate loss causation. *See Hall*, 2019 WL 7207491, at *27 ("Although many of the alleged disclosures address the same subject matter . . . each provided new information as to the seriousness and extent of the Company's alleged fraud."); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 292 (S.D.N.Y. 2008) (rejecting argument that class

43

period should end on date when accounting improprieties were first revealed, because "[a]t that time . . . the full financial impact of the alleged improprieties" had not been revealed).[29]

Finally, Defendants' mostly out-of-circuit authorities are inapposite. *Dalberth*, 766 F.3d at 188, for example, involved a motion for summary judgment, not a motion to dismiss, and the court's loss causation ruling flowed entirely from its conclusion that the factual record did not demonstrate that the defendants misled investors.

## IV.   THE COMPLAINT ADEQUATELY ALLEGES SCHEME LIABILITY

To state a claim for scheme liability under Rule 10b-5(a) and (c), "a plaintiff must allege (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *16 (D.N.J. Jun. 5, 2020).

Here, the Complaint alleges a host of deceptive acts in furtherance of a scheme to conceal the truth from the market, including disregarding negative test results, releasing adulterated products to consumers, failing to remediate cGMP violations in contravention of their disclosures to the FDA, willfully failing to investigate patient complaints, and retaliating against employees

---

[29] The *Hall* court also rejected Defendants' argument that no loss causation can exist after "the date when this lawsuit was initiated" because by that point the full truth had already been disclosed. 2019 WL 7207491, at *28. Defendants' cases are inapposite. *Dalberth v. Xerox Corp.*, 766 F.3d 172, 188 (2d. Cir. 2014) involved a motion for summary judgment, not a motion to dismiss, and the court's loss causation ruling flowed entirely from its conclusion that the "record evidence" did not demonstrate plaintiffs' "overarching theory of the case." Defendants' other authorities all involved situations where, unlike here, no new information about the fraud was revealed to the market. *See Lopes v. Fitbit Inc.*, 2020 WL 1465932, at *12 (N.D. Cal. Mar. 23, 2020) ("The *only* new information that this press release included were results which did not live up to Fitbit's revised guidance."), *aff'd*, 848 F. App'x 278 (9th Cir. 2021); *SLF Holdings LLC v. Uniti Fiber Holdings, Inc.*, 499 F. Supp. 3d 49, 71 (D. Del. 2020) (price decline attributable to old information), *aff'd*, 2022 WL 3442353 (3d. Cir. 2022); *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013) (*only* new information was analyst analysis of previously disclosed news).

44

who raised compliance issues. *See, e.g.,* ¶343; *see also Mylan,* 2023 WL 3539371, at *18-20 (scheme liability sufficiently alleged when defendants violated FDA cGMPs, falsified data, and imposed "a pervasive, top-down scheme to dupe the FDA and ignore regulatory compliance best practices in the name of juicing manufacturing output and increasing corporate profits"). Further, as discussed above, the Complaint's FE allegations demonstrate Defendants' awareness or reckless disregard of the danger that their conduct would defraud investors. *See* Argument §II.A.

Defendants' scheme arguments fail. Their arguments regarding scienter and loss causation fail for the same reasons set forth above. *See* Argument §§II, III. Moreover, Plaintiffs have not merely "repackage[d]" misstatement claims as scheme claims. Rather, the Complaint lays out numerous concrete actions taken in furtherance of the scheme, *see, e.g.,* ¶343, and the mere fact that these actions may "overlap with misstatements or omissions" does not preclude Plaintiffs from stating a claim for scheme liability. *Cognizant*, 2020 WL 3026564, at *18.

Defendants are equally wrong to suggest that there is no nexus between the alleged deceptive conduct and investors. Mot. at 37. Each fraudulent action referenced in the Complaint had the effect of concealing from the market the true extent of Integra's compliance issues and the true risks facing the company and its investors. For example, retaliating against employees and disregarding negative test results had the clear effect of reducing the likelihood that negative information would enter the marketplace regarding the Company non-compliance and the safety of its products, which defrauded the market and directly impacted (i.e., artificially inflated) Integra's stock price. *See Cognizant*, 2020 WL 3026564, at *17 (sustaining scheme allegation based on conduct designed to ensure that the truth "would remain undetected").

## CONCLUSION

Plaintiffs respectfully request that Defendants' Motion be denied in its entirety. If the Court dismisses the Complaint in any respect, Plaintiffs respectfully request leave to amend.

Dated: January 13, 2025

Respectfully submitted,

By: *s/ James E. Cecchi*
James E. Cecchi
**CARELLA, BYRNE, CECCHI,**
  **BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel.: (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com

*Liaison Counsel for Lead Plaintiffs*

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMAN LLP**
Salvatore J. Graziano (*pro hac vice*)
Abe Alexander
Alexander Noble
Emily A. Tu
1251 Avenue of the Americas
New York, New York 10020
Tel.: (212) 554-1400
Fax: (212) 554-1444
salvatore@blbglaw.com
abe.alexander@blbglaw.com
alexander.noble@blbglaw.com
emily.tu@blbglaw.com

**SAXENA WHITE P.A.**
David R. Kaplan (*pro hac vice*)
Marti Worms (*pro hac vice*)
Emily R. Bishop (*pro hac vice*)
505 Lomas Santa Fe Dr.
Suite #180
Solana Beach, CA 92075
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com
mworms@saxenawhite.com
ebishop@saxenawhite.com

Steven B. Singer (*pro hac vice*)
Sara DiLeo (*pro hac vice*)
10 Bank Street, 8th Floor
White Plains, New York 10606

46

Telephone: (914) 437-8551
ssinger@saxenawhite.com
sdileo@saxenawhite.com

Lester R. Hooker  (*pro hac vice*)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
lhooker@saxenawhite.com

**KESSLER TOPAZ MELTZER**
   **& CHECK, LLP**
Gregory M. Castaldo
Richard A. Russo, Jr.
Nathaniel C. Simon (*pro hac vice*)
Farai M. Shawa (*pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Tel.: (610) 667-7706
Fax: (610) 667-7056
gcastaldo@ktmc.com
rrusso@ktmc.com
nsimon@ktmc.com
fshawa@ktmc.com

*Lead Counsel for Lead Plaintiffs*

47

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 13, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on January 13, 2025.

Respectfully submitted,

By: *s/ James E. Cecchi*
James E. Cecchi
**CARELLA, BYRNE, CECCHI
  BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel.: (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com

48

**APPENDIX A**

| Quality System Deficiency | Allegations Showing Deficiency Persisted Unabated |
|---|---|
| **Contamination testing** The 2018 Form 483 found that the Company's processes for contamination control and testing processes for dangerous endotoxins were violative *on multiple levels* including that Integra failed to investigate why batches failed endotoxin testing (¶¶55-56) | • FE 5 (manufacturing quality employee from 2020 to 2023) stated that Integra did not closely inspect the root causes of nonconformance and endotoxin contamination during his tenure because "[t]hey wanted to sweep the surface stuff under the rug" due to a constant desire to push products out the door (¶108); <br>• The 2021 Form 483 found repeated data integrity violations: when testing the Clean Rooms for fungal contamination, Integra documented the results as "passing" under its acceptance criteria, even where "fungal growth results were recorded" as "[t]oo numerous to count" (¶119); <br>• The 2022 whistleblower reported "quality issues" over Integra's "bacterial endotoxin testing" (¶139); and <br>• The 2023 Form 483 documented seven ways that endotoxin testing procedures remained in violation of cGMP, many of which tied back to the 2018 inspection (¶145). |
| **Environmental controls** The 2018 Form 483 flagged deficient environmental controls including failing to appropriately disinfect, sterilize, and test Clean Rooms and had failed to "establish procedures to control bacterial endotoxin contamination" (¶57) | • FE 6 (team leader, December 2020 until December 2022) recalled that Integra continued to fail to sanitize the sterile manufacturing rooms—specifically recalling *repeated issues* where the Company's procedures to thaw frozen bovine skins violated cGMP, providing example of employees leaving bags of frozen skin to thaw in the basement of the Boston Facility (¶¶109, 135-36); <br>• FE 14 (inventory control lead, June 2022 to July 2023) explained seeing repeated violations where EBM products "came out of the clean room and then went back into the clean room" and where bovine skins were stored in a storage room, termed the "rat room," that was not temperature-controlled (¶¶131-34); <br>• FE 8 (regulatory affairs consultant, December 2021 to May 2022) explained that Company continued to rely on "low-budget" sterilization methods (¶137); <br>• The 2021 Form 483 found that Integra had failed to establish alert and action levels for surface viable floor sites during routine environmental monitoring, exposing the sterile devices manufactured in the Clean Rooms to contamination from dangerous bacterial and fungal growth (¶119); <br>• The whistleblower 2022 reported "quality issues" in Integra's "control of sterilized devices" (¶139); and <br>• The 2023 Form 483 concluded that Integra "failed to include critical steps [in its endotoxin testing procedures] and their procedure, WCP-055, was inadequate." (¶145). |
| **Process validation control** | • FE 7 (quality control analyst from September 2020 until November 2020), responsible for running clean room testing for the air, |

1

| The 2018 Form 483 also flagged that Integra was "fail[ing] to re-validate processes critical to quality" that "pose high risk to manufacture of EBM medical devices" (¶58) | surfaces, and floor explained that the Company had "huge backlog" in documentation for validating their testing and training records (¶110);<br>• The 2021 Form 483 found that Integra failed to establish "procedures for monitoring and control of process parameters for a validated process" and also failed to validate "process[es] whose results cannot be fully verified by subsequent inspection" (¶121);<br>• The 2023 Form 483 concluded that Integra had failed to document important events, including by disregarding negative test results, allowing (without validation) for samples to be re-tested into compliance (¶146). |
|---|---|
| **CAPA Controls**<br>The 2018 Form 483 concluded that Integra was violating cGMP requiring the Company to properly investigate and correct known product safety and quality failures specifically related to contamination | • FE 8 (quality assurance and regulatory affairs consultant at Boston from December 2021 to May 2022) explained that <u>none</u> of the FDA's findings from the 2018 inspection were closed out when FE 8 arrived at the Boston plant in 2021 and was tasked with responding to them (¶111);<br>• FE 9 (continuous improvement specialist from July 2021 until May 2023) reported an extremely large number of CAPAs, that Integra's implementation and execution of CAPAs took "shocking[ly]" long, and that Integra was "no way near close to where they should have been with the CAPAs" (¶112);<br>• FE 14 did not recall or witness of any training on CAPAs, stating that "there were no meetings or formal training on how they were going to address" the 2021 Form 483 issues(¶133);<br>• The 2021 Form 483 found that Integra had not implemented CAPA related to bacterial endotoxin testing (¶121);<br>• The 2023 Warning Letter found detailed issues with CAPA procedures relating to whistleblower report (¶¶150-52); and,<br>• FE 15 (manufacturing process engineer, November 2023 to July 2024) reported that progress on remediating the long-existing CAPAs never materialized (¶162). |

2