# **EXHIBIT A**

I3GPHEAO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE:  HEARTWARE
INTERNATIONAL, INC.
SECURITIES LITIGATION,

                                    16 CV 0520 (RA)

------------------------------x

                                    New York, N.Y.
                                    March 16, 2018
                                    11:06 a.m.

Before:

                    HON. RONNIE ABRAMS,

                                    District Judge

                         APPEARANCES

BERNSTEIN LITOWITZ BERGER & GROSSMANN, LLP
     Attorneys for Plaintiffs
BY:  JOHN RIZIO-HAMILTON, ESQ.
     ABE ALEXANDER, ESQ.

WILMER CUTLER PICKERING HALE & DORR LLP
     Attorneys for Defendants
BY:  JEREMY T. ADLER, ESQ.
     MICHAEL G. BONGIORNO, ESQ.

I3GPHEAO

it's certainly not a standalone theory.  I just went through one through four and core operations was five, I believe -- actually, sorry, core operations was four.  Five was Valtech. We cited to the Gentiva case on that point.  The Valtech transaction cannot support an inference of scienter.  It certainly cannot support an inference of scienter 13, 14 months before it was entered into.  Again, most of what you heard about scienter was problems with the CE Mark trial, which didn't start until late 2015.  That cannot support scienter for this class period.

THE COURT:  All right.  Thank you.

MR. ADLER:  Thank you.

THE COURT:  Why don't we adjourn for a few minutes, and then resume our proceedings.  Thank you.

(Recess)

THE COURT:  Be seated.  I am prepared to rule, and in the interest of moving the case along, I'm going to rule orally today.  You can, of course, obtain a transcript of today's proceeding.

In short, Defendants' motion is denied.  I think Plaintiff has adequately pled its claims.  I'm going to assume the parties' familiarity with the facts alleged in the Complaint, which are construed in the light most favorable to Plaintiff.  See *Kleinman v. Elan Corp.*, 706 F.3d at 152.

The motion to dismiss standard is familiar.  Plaintiff

must state enough facts to state a claim to relief that is plausible on its face. *Twombly*, 550 U.S. at 570. A claim has facial plausibility when it contains factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678.

Claims alleging securities fraud, moreover, are subject to additional pleading requirements. A claim under Section 10(b) of the Exchange Act sounds in fraud and must meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure and of the Private Securities Litigation Reform Act, the PSLRA, 15 U.S.C. 78u-4(b). Rule 9(b) requires a plaintiff to (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d at 99.

The PSLRA, similarly, requires that a plaintiff specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading. 15 U.S.C. 78u-4(b)(1). If an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

To state a claim under Sections 10(b) and 20(a) and

Rule 10b-5 promulgated thereunder, a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury. *ATSI*, at 105.

Defendants have moved for dismissal of the Section 10(b) claim on the basis that Plaintiff has failed to plead sufficient facts with respect to the following three elements: that the identified statements were misleading; that Defendants acted with the requisite scienter; and that the purported misstatements caused Plaintiff's losses. If the Section 10(b) claim is dismissed, the 20(a) claim also fails.

A Section 10(b) plaintiff must demonstrate with specificity why and how a statement is false. See *Rombach v. Chang*, 355 F.3d at 174. Falsity is a failure to be truthful. It is not a misapprehension, misunderstanding, or misstatement of fact at the time a statement was made. In re: *Lululemon Securities Litigation*, 14 F. Supp. 3d at 571.

The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers. *Kleinman v. Elan Corp.*, 706 F.3d at 153. Statements that are literally true may become misleading based upon their context and manner of presentation. *Id*. Whether a statement is misleading

depends on the perspective of a reasonable investor. *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. at 1327.

Plaintiff alleges that Godshall made material misstatements and omissions with respect to three subjects: (1) HeartWare's efforts and success in remediating the deficiencies identified in the FDA Warning Letter; (2) MVAD's safety profile, particularly the effectiveness of its controller and the qPulse algorithm; and (3) MVAD's progress in the CE Mark trial.

While I am not going to rule on each of the almost 50 alleged misstatements, and some may not constitute material misstatements, I do find that there are well-pled allegations relating to each of these three topics.

Before turning to the alleged misstatements, I want to address Defendants' point about the degree to which Plaintiff relies on confidential sources. It appears that a split exists in this District as to whether the use of confidential witnesses to plead securities fraud cases remains viable following the Supreme Court's decision in *Tellabs*. Compare In re: *MRU*, 769 F. Supp. 2d at 516, with In re: *PXRE*, 600 F. Supp. 2d at 526, note 18.

At the very least, I believe it is appropriate to rely on such information where, as here, the Complaint provides a plausible basis for each confidential witness' knowledge and

the statements attributed to the witnesses are detailed, factual allegations rather than conclusory statements. See In re: PXRE, at note 18.

As to the first category of statements, Godshall's comments relating to the efforts and success in remediating the deficiencies described in the FDA warning letter, Plaintiff has alleged in detail why Godshall's statements were misleading. On an October 30, 2014, third-quarter earnings call, for instance, Godshall made the following comment: "Most importantly, we have made significant progress in our effort to address the FDA warning letter issues. The warning letter remediation project is an enormous undertaking by so many of our employees and impacts every aspect of our Company. We have upgraded many of our key procedures and are already seeing a positive impact from the new approach. We are working diligently through issues we find, as is evidenced by our battery replacement effort which began a few months ago."

These comments stand in contrast to Plaintiff's allegations that the company failed to undertake serious remediation efforts, which led to its lack of progress in resolving the issues identified by the FDA. The FDA warning letter provided a non-exclusive list of violations, which included: (1) failure to establish and maintain procedures for implementing corrective and preventive action; (2) failure to establish and maintain procedures for validating the device

I3GPHEAO

design; (3) failure to validate computer software for its intended use, according to an established protocol when computers or automated data processing systems are used as part of production of the quality system, as required by 21 C.F.R. 820.70(i); and (4) failure to maintain a record of the investigation by the formally designated unit when an investigation is made, as the company did not document the likely or potential root cause, or document an attempt to obtain the complete nature and details of at least ten complaints which were submitted to FDA as MDR, medical device reporting, events.

However, according to Former Employee 5, a validation and verification tester from August 2012 to March 2015 who worked on MVAD, including its controller, after receiving the FDA warning letter, the manufacturing, testing, and validation processes at HeartWare didn't change, rather, we were just doing exactly what we were doing before receiving the letter.

Former Employee 5 also explained that, when MVAD failed validation tests, supervisors simply relaxed the relevant specification to allow the device to satisfy the standard. MVAD's original specifications, for instance, called for the controller's alarm to sound at a particular decibel, which it failed to do. Rather than devise a way to increase the decibel level, the minimum standard was altered to permit the device to pass muster.

Furthermore, MVAD's impeller was insufficiently tested as of the time of Employee 5's departure from HeartWare in March of 2015.  Testing had been conducted on previous versions of the impeller, and the validation and verification team had access to the updated version of the impeller for only one week.

Former Employee 4, HeartWare's program manager for FDA 483 warning letter remediation for non-product software from March to August of 2014, further explained that adequate remediation of the problems identified in the warning letter would take years.  Employee 4 continued, there were tremendous gaps between the R&D processes at HeartWare's headquarters versus what was practiced in the manufacturing facility, which was still the case when the employee left HeartWare in August of 2014.

Moreover, the company allegedly failed to document required specifications for raw materials and components manufactured by third-party contractors, and failed to test and audit those materials to ensure they met design requirements and were suitable for the device's intended use.  This employee also explained that HeartWare had no process in place for auditing the software it used to test and validate its devices.

Employee 3, a corrective and preventative action manager at HeartWare from October 2014 to July 2015, buttressed these allegations, explaining that there was virtually no

quality assurance oversight at the company's Framingham headquarters and that HeartWare failed to create and maintain reliable deviation reporting, a reporting system for defects or flaws in the device, notwithstanding the FDA's instruction to remediate deficient corrective and preventative action procedures. When changes were made to a device, moreover, HeartWare had no system in place to monitor and evaluate those changes or to mandate retesting.

Plaintiff alleges that the failure to remediate the deficiencies noted in the warning letter continued through the end of the class period, i.e., the third quarter of 2015.

With respect to the second category of statements, Godshall's comments relating to the safety profile of MVAD and the effectiveness of its controller and the qPulse algorithm, plaintiff has similarly satisfied its burden.

On the same October 30, 2014, third-quarter earnings conference call, for example, Godshall stated that: Every data point we receive from bench testing, animal studies, and physician commentary is that the MVAD will be paradigm-changing.

Plaintiff has provided detailed allegations, however, as to the inadequacy of both MVAD's controller and the qPulse algorithm, which together rendered MVAD less safe than previous ventricular assist devices. These two features were of critical importance to MVAD's functionality because the

controller contained the device's alarm system, notifying patients and doctors when the pump created an imbalance of pressure on the left ventricle, while qPulse allowed MVAD to adjust its pumping speeds in an effort to reduce the frequency of adverse events.

Employee 1, HeartWare's director of program management from June 2008 to April 2014 and a member of HeartWare's leadership team, reporting first to the company's chief scientific officer, Jeff LaRose, and then to its senior vice president for research, development, and quality, Mark Strong, noted, for instance, the suction alarm, the algorithms, the qPulse displays that were blank or showed gibberish, those were problems that dogged the project throughout. Of the problems HeartWare had in the clinical trials, Employee 1 continued, I haven't heard of anything that wasn't on their radar screens early on.

With respect to the controller specifically, Employee 1 further explained that nothing really worked right. There were improper alarms, improper touch screen performance, gibberish on display screens, just so many alerts and problems and it wasn't working at all reliably. There was also a total lack of reliability and robustness in the design of the software to make the controller function properly. Moreover, there were literally more than 100 hot and critical issues tracked on a daily basis trying to fix them when I left, and

that was in April of 2014.

Many of these issues stemmed, in the employee's opinion, from management's continued use of Band-Aid solutions for basic, inherent problems that no one wanted to listen to early on. Instead of doing it right, they got so far down the pathway that either you take an eight-month hit to resolve the issues, or you say this is the best you can do and you make it acceptable.

Employee 5, and other HeartWare personnel, observed and reported that the suction alarm on the controller was defective, corroborating Employee 1's account. MVAD's alarm, according to Employee 5, would not trigger except under the most extreme conditions.

There were also purportedly well-known flaws with respect to the qPulse algorithm. Employee 2, a senior software engineer throughout the class period, for example, reported that significant risks were found with the MVAD's pump pressure algorithm, which was designed to reset the device if internal pressure caused the pump's impeller to move too far out of place.

Aspects of MVAD's unique design, Employee 2 explained, guaranteed that the impeller would be forced out of place and would strike the ends of the impeller housing, grinding blood cells like a mortar and pestle, which would likely cause clots and promote pump thrombosis.

The pump pressure algorithm was tasked with detecting that we hit the end of the pump, we had a strike, and reducing the pump speed because HeartWare's testing had shown that below a certain speed, you could not get it to strike; so you want to reduce the speed and then slowly return it to the former speed.

Employee 2 explained, however, that because the algorithm was hastily designed, it failed to properly slow the pump. A consultant was hired to examine this issue, but when the consultant discovered that the pump pressure algorithm failed to prevent the impeller from grinding against the pump housing, HeartWare's chief scientific officer, who reported directly to Godshall, told those working on the investigation to cease and desist.

Together, these flaws, as alleged by plaintiff, painted a clear picture of a flawed product, not one that, based on all data points, would be "paradigm changing" as Godshall claimed.

I also find that Plaintiff has pled sufficient facts to survive defendant's motion to dismiss with respect to the final category of claims relating to the CE Mark trial.

On October 29, 2015, HeartWare issued a press release announcing its third-quarter financial and operating results. The release noted that: We are also reviewing reported adverse events, which are typical of those seen in other clinical trials for ventricular assist devices, and we are confident

I3GPHEAO

that we will resolve the issue in order to resume the MVAD CE Mark clinical trial.

Plaintiff alleges that HeartWare knew that it was unlikely to resume the CE Mark trial because the results to that point were far from typical. In particular, the 27 percent incidence rate of pump thrombosis was seven to 13 times the rate reported in early clinical trials of competing devices that contributed to VAD market growth, and at least three times the rate reported in an NEJM study that had contributed to the stagnation of the VAD market.

Moreover, the thromboses observed in the CE Mark trial occurred more quickly after device implantation, approximately six times faster than reported in competing devices and more than twice as quickly as such incidents had occurred in HVAD patients.

Defendants argue that Godshall's comments were not misleading because they concerned the events being analyzed rather than their frequency and that pump thrombosis is, in fact, a common adverse event in VAD trials. The disclosure that adverse events had occurred and the description of them as being typical, however, renders the statement objectively misleading, given that the events had allegedly occurred with substantial frequency and so soon after implantation. These purported facts also belie HeartWare's claim that it was confident that the CE Mark trial would resume.

Contrary to Defendants' arguments, moreover, none of the purported misleading statements upon which I base my ruling are forward looking, inactionable statements of honestly held opinions or so vague as to constitute statements of corporate optimism.

Pursuant to the PSLRA, a well-pled securities fraud claim must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C. 78u-4(b)(2). The issue is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. *Tellabs, Inc. v. Makor Issues & Rights,* 551 U.S. at 322 to 23.

A strong inference of scienter, moreover, must be more than merely plausible or reasonable. It must be cogent and at least as compelling as any opposing inference of non-fraudulent intent. *Id*. at 314.

In this Circuit, a strong inference of scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness. *ECA v. JP Morgan Chase Co*., 553 F.3d at 198.

Because I find that Plaintiff has alleged circumstantial evidence of, at the very least, recklessness, I need not address whether Plaintiff has sufficiently pled motive

and opportunity.  A plaintiff adequately pleads recklessness where he alleges that the defendant knew facts or had access to information contradicting its public statements; or (2) failed to review or check information that it had a duty to monitor.  See *Novak*, 216 F.3d at 308.

Plaintiff has adequately alleged scienter when all the allegations are considered, not individually but in tandem, pursuant to the Tellabs standard.  The complaint contains facts that would allow a reasonable person to infer that scienter is at least as compelling as any opposing inference.

The following factors, particularly when considered together, properly make out scienter:  First, in response to concern over rumors of adverse events in the CE Mark trial, Godshall told investors those adverse events were "typical of those seen in other clinical trials for ventricular assist devices" even though Defendants allegedly possessed data showing that MVAD was causing adverse events at a rate substantially surpassing the norm and far more quickly than was typical;

Second, MVAD's deficiencies, including defects in the controller alarm and qPulse algorithm, were allegedly repeatedly discussed at meetings attended by Godshall, including weekly MVAD meetings and monthly project oversight board meetings, reflected in meetings of minutes Godshall received, and widely reported and discussed within HeartWare,

I3GPHEAO

even before the class period began;

Third, Godshall repeatedly stated that he was personally focused on the details of MVAD's development and commercialization, which means he either failed to perform the monitoring he claimed to have performed or recklessly misrepresented the circumstances to plaintiffs;

Fourth, many of Godshall's public statements concerned issues specifically raised by the FDA in the warning letter regarding a key product of the corporation, see e.g., In re: *Delcath Systems, Inc. Securities Litigation*, 36 F. Supp. 3d at 335, which is a small company or even a medium-sized company, as defendant contends, with only one manufacturing facility, and thus, management's attention is less likely to be divided.

Finally, the magnitude of the alleged fraud here further weighs in favor of a strong inference of scienter, see In re: *Salix Pharm.*, 2016 WL 1629341, at 16.

These facts, taken together, raise a strong inference that Godshall, at a bare minimum, had access to information that contradicted his public statements regarding the company's remediation efforts, the safety profile of MVAD, and HeartWare's progress in the CE Mark Trial.

Finally, I must address whether plaintiff has adequately pled loss causation. Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by a plaintiff. See *Lentell v. Merrill*

I3GPHEAO

*Lynch & Co.*, 396 F.3d at 172. This question is not meant to impose a great burden on plaintiffs. *IBEW Local 90 v. Deutsche Bank AG*, 2013 WL 1223844 at 12.

Moreover, loss causation is subject to the less-onerous notice pleading requirements of Federal Rules of Civil Procedure 8(a)(2) in lieu of the rule 9(b) standard. See *id.* To establish loss causation, therefore, a plaintiff must only show that the loss was a foreseeable result of the defendant's conduct, i.e. the fraud, and that the loss was caused by the materialization of the risk concealed by the defendant's alleged fraud. See in re: *Vivendi, S.A. Securities Litigation*, 838 F.3d at 261.

Put more simply, proof of loss causation requires demonstrating that the subject of the fraudulent statement or omission was the cause of the actual loss suffered. *Id*. It is enough, for instance, that the loss caused by the alleged fraud results from the relevant truth leaking out. *Id*. Indeed, when the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus. *Id*. at 262.

Here, Plaintiff has adequately pled loss causation. Plaintiff alleges three separate events due to which it suffered losses: First, when HeartWare's stock fell 21 percent

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

the day following the announcement of the Valtech Transaction;
second, when HeartWare's stock price fell approximately 30
percent during the trading day immediately following the
October 12, 2015, disclosure that defendants had observed
adverse events in the CE Mark Trial and would further delay
resumption of the trial in order to investigate; and, finally,
on January 11, 2016, when the value of HeartWare's stock
declined more than 35 percent following the announcement that
nearly half of the patients in the CE Mark Trial had
experienced pump thrombosis, that qPulse and the suction alarm
appeared to elevate the risk of thrombosis, and that the trial
would be paused indefinitely.

In each of these events, the market's reaction to the
announcement demonstrates that the "relevant truth" had, at
least in part, leaked out. *Vivendi*, at 261. Each event
revealed additional information about MVAD, allegedly in
contravention of public statements made by defendants, and
precipitated an immediate and marked decline in the value of
shares of HeartWare's stock.

While the connection between the alleged misstatements
and the Valtech transaction is perhaps more attenuated,
particularly in light of the admitted significance of MVAD to
HeartWare's future profitability and the timing of the
announcement of the Valtech transaction, this event suffices as
a basis for pleading loss causation. Plaintiff has, thus,

I3GPHEAO

sufficiently pled loss causation.

So for all of those reasons, plaintiff has sufficiently pled each and every element of a section 10(b) violation, and defendants' motion to dismiss is denied. Because defendants' motion to dismiss with respect to the control person claim under section 20(a) rests entirely upon their argument that plaintiff has failed to plead the predicate 10(b) violation, the motion to dismiss is also denied as to the section 20(a) claim against Godshall.

All right. Thank you all for your patience. I think that this is more efficient to get the ruling faster. We can move forward with the case. How long do defendants need to file an answer?

MR. BONGIORNO: Like 60 days, your Honor. I have discussed not the number of days but an extension with plaintiff's counsel.

THE COURT: That's fine.

MR. BONGIORNO: And I think they're amenable.

THE COURT: All right. So we'll just make it May 16th. All right?

MR. BONGIORNO: Thank you.

THE COURT: Is there anything else we need to discuss today? All right.

MR. RIZIO-HAMILTON: No, your Honor.

THE COURT: Thank you. I said it at the start, but I

I3GPHEAO

thought the advocacy on both sides was really outstanding, and so I want to thank you for that. Enjoy the weekend.

MR. BONGIORNO: Thank you, your Honor.

MR. RIZIO-HAMILTON: Thank you, your Honor.

(Adjourned)