# EXHIBIT 45

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THOMAS MYERS,

    Plaintiff

v.

INTEGRA LIFESCIENCES
CORPORATION,

    Defendant

## **COMPLAINT**

### I.    **INTRODUCTION**

1.    When Thomas Myers ("Myers") reported concerns regarding the manufacture, production, and distribution of a contaminated product, the defendant, Integra LifeSciences Corporation ("Integra"), should have praised him for his commitment to integrity and the good of the community. Instead, Integra fired him. As more fully described below, Integra management retaliated against Myers and terminated his employment because he reported concerns regarding the manufacture and production of a contaminated product that Integra wished to bring to market despite its life threatening risk to the general population. Myers brings claims for whistleblower retaliation in violation of Massachusetts General Laws c. 149, § 185 (Count I), whistleblower retaliation in violation of Rhode Island General Laws § 28-50-3 (Count II), breach of implied contract (Count III), and breach of the implied covenant of good faith and fair dealing (Count IV).

### II.    **PARTIES**

2.    Myers, is a natural person with a last and usual residence at 50 Billington Circle,

1

Cumberland, Rhode Island. Myers performed his work for Integra in both Massachusetts and Rhode Island. Myers did not perform any work for Integra in New Jersey.

3.      Integra, is a foreign corporation with a principle place of business located at 1100 Campus Road, Princeton, New Jersey.

## III.    **JURISDICTION**

4.      This Court has jurisdiction over the subject matter and the defendant in this case pursuant to 28 U.S.C. §1332 (federal diversity jurisdiction) because the parties reside in different states and the amount in controversy exceeds $75,000.

## IV.    **FACTS**

5.      Myers is a business operations leader with over thirty-three years of diversified professional experience spanning the aerospace, industrial manufacturing, biotechnology, software and solutions development, and medical device and diagnostics industries within the functional areas of quality management, research and development engineering, manufacturing engineering and operations, and quality assurance engineering and operations management.

6.      Integra is a global medical device manufacturing company with, upon information and belief, an approximate market capitalization of $1.49 billion. Integra manufactures products for skin regeneration, neurosurgery, reconstructive and general surgery. Integra artificial skin became the first commercially reproducible skin tissue used to treat severe burns and other skin wounds.

7.      In or about the summer of 2023, Myers, who was working as a senior director of commercial product quality at Siemens Healthineers, was recruited by representatives of Integra to become the company's senior director, site head of quality operations at its Boston, Massachusetts location.

2

8.      During his recruiting conversations and subsequent interviews with Integra representatives, Myers learned that Integra's Boston, Massachusetts location manufactures various products comprised primarily of bovine collagen from cow hides (hereinafter, the "Products") with intended uses in reconstructive surgeries and the treatment of burn victims and patients with skin damage (Integra leaders also told Myers that the company planned to close the Boston facility in 2025 and would move Myers, along with his colleagues, to the company's Braintree facility).

9.      Integra representatives informed Myers that the company had experienced significant compliance, manufacturing and legal issues related to the manufacture and production of the Products, including, among other things:

a.   <u>Having to issue a global recall to remove all of the Products produced at the Boston location from the market</u>. This occurred after a series of whistleblower complaints revealed that the Products had been contaminated by bacterial endotoxin. Such contamination could lead to serious patient infection up to and including death.

b.   <u>Being investigated by the FDA</u>. The investigation resulted in the FDA issuing two warning letters to Integra in March, 2019 and July, 2023. See <u>Exhibit A</u>. The July, 2023 FDA letter states, among other things, that:

> The United States Food and Drug Administration (FDA) conducted an inspection of your firm's medical device operations, TEI Biosciences, Inc., an Integra LifeSciences Company, located at 7 Elkins Street, Boston, MA, from March 1 through May 17, 2023. During the inspection, FDA investigators determined that your firm is a medical device manufacturer of collagen based medical devices, that are used for wound care, soft tissue repair and reconstruction surgery, including Durepair. Under section 201(h) of the Federal Food, Drug, and Cosmetic Act (the Act), 21 U.S.C. § 321(h), these products are devices because they are intended for use in the diagnosis of disease or other conditions or in the cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body.
>
> This inspection revealed that the above devices are adulterated within the meaning of section 501(h) of the Act, 21 U.S.C. § 351(h), in that the methods used in, or the facilities or controls used for, their manufacture,

3

packing, storage, or installation are not in conformity with the current good manufacturing practice requirements of the Quality System regulation found at Title 21, Code of Federal Regulations (CFR), Part 820.

c. <u>Having to defend against a class action securities lawsuit</u>. The lawsuit alleges that Integra leadership made false statements and/or concealed that the company had failed to take sufficient measures to remediate the violations identified in the FDA warning letters (Myers has also recently learned that Integra is being sued for product deficiencies that cause serious health issues in patients. See <u>Kinnee v. TEI Biosciences Inc.</u>, No. 22-CV-604 JLS (DDL), 2023 U.S. Dist. LEXIS 210495 (S.D. Cal. Nov. 27, 2023)).

10. Integra leaders made it clear to Myers that, if he were hired, he would be responsible for ensuring that Integra close all quality management systems compliance gaps identified by the FDA.

11. Integra wanted to achieve several near term goals, including:

a. Ensuring that a new bovine collagen based product called SurgiMend, intended for breast reconstructive surgery, would receive premarket approval, or PMA, from the FDA by the end of 2024. Without such approval, the new product could not be brought to market; and

b. Ensuring that Integra could restart the manufacturing of the Products in November, 2023 and begin commercial manufacturing in June, 2024.

12. Integra leaders assured Myers that he would have the full backing of Integra management in seeking to establish a culture of quality and compliance and that safety and adherence to industry principles and FDA rules would take precedence over realizing market goals.

13. Myers relied on these representations when he accepted Integra's offer of employment and started working for the company on or about August 28, 2023.

14. In or about November, 2023, several Integra employees expressed concerns with the planned manufacturing process for the Products.

15. Among other things, the employees worried that Integra's Boston location was

4

not ready for a manufacturing restart of the Products for a host of reasons, including a finding that the software validation for the data logger used to collect refrigeration data during the transport of the raw cow hides to the Boston site was incomplete and that a nonconformance report had to be issued.

16. On or about November 10, 2023, Myers stated in a senior leadership meeting that the target November manufacturing restart needed to be pushed back in order to properly address the manufacturing concerns.

17. However, other senior leaders at the meeting disagreed, and instead recommended *accelerating* the manufacturing timetable so that commercial manufacturing would commence in December, 2023, not June 2024 as originally scheduled.

18. Myers felt it would be impossible to manufacture safe products on this accelerated timeframe and became increasingly concerned that Integra leadership was more interested in shipping product than patient safety.

19. Despite Myers' stated concerns, commercial manufacturing on the Products commenced on January 9, 2024.

20. On or about February 26, 2024, contamination in the form of cow hair, iron particulate and fibers of unknown origin were discovered within ninety-seven percent of the freshly manufactured lyophilized "sheets," or product batches, of several of the Products, including SurgiMend, ReVize, PriMatrix, and TissueMend.

21. Pursuant to industry standards as well as the FDA warning letters remediation requirements, Integra was required to produce a nonconformance report regarding this issue and to take corrective and preventive action, or CAPA (CAPA requires that a thorough root cause analysis of a nonconformance be conducted in the form of a corrective action plan before any

5

corrective action can be taken).

22. However, rather than perform a thorough investigation and root cause analysis before acting, as is required, Integra leadership instructed its employees to bypass this process and begin implementing corrections in order to resume manufacturing in direct violation of the CAPA process requirements.

23. Not only was this directive improper and in direct violation of one of the FDA warning letter requirements, but it was also dangerous given that it is impossible to cut the contamination out of the product sheets due to the complexities involved with microbiological contamination as a result of human handling and because the validation of such rework cannot be performed.

24. Nevertheless, during a site leadership meeting, Integra leadership pressured Myers to allow "rework" of the product by means of cutting around the contaminated portions.

25. Myers insisted that such rework was not viable because there was no possible way to guarantee that such a process would remove all contamination.

26. At the end of February, 2024, during a subsequent leadership teleconference, Integra leaders told Myers that a medical officer should be consulted to assess the true health risk to patients of the contamination despite the fact that a medical health risk assessment had already been documented that stipulated that no particulate contamination is permissible.

27. Accordingly, it was clear to Myers that if Integra leadership could find a medical affairs professional to state that the particulate was acceptable then he would be forced to approve the release of the Products, despite the findings of the prior existing health risk assessment.

28. Myers later reported to his superior, Susan Krause ("Krause"), who was Integra's

senior vice president of quality and chief quality officer, that he was "appalled" at such a request.

29. After this teleconference, Steven Leonard, an Integra executive, told Myers that company employees had identified a source of the contamination and that he "felt good about this" because "then we can find a way to cut around the contamination to remove it."

30. Myers again reiterated that cutting around the contamination was not an ethical or viable option.

31. In a subsequent text message, Ken Allen, Integra's senior director of operations, expressed anger at Myers for his unwillingness to restart manufacturing and/or investigate ways to rework the contaminated product.

32. Despite Integra leadership's insistence on "reworking" the contaminated Products, Myers consistently maintained that the sheets must be destroyed and advised Integra leadership that the manufacturing process be shut down until the root cause investigation was conclusive and all sources of contamination were corrected.

33. Myers made it clear that he was concerned for the health and safety of the public.

34. However, the sheets were not destroyed.

35. Instead, Myers was again pressured by both Integra's site head of operations as well as its corporate vice president of operations to find ways to use the contaminated Products.

36. On or about March 7, 2024, during an executive team meeting, Myers and Krause again told the company's leadership that manufacturing of the Products needed to immediately shut down.

37. Myers and Krause also stated that representatives from GreenLeaf Health (part of Eliquent) ("Greenleaf"), a company that was tasked with measuring the state of Integra's compliance with the FDA's remediation requirements set forth in its previous warning letters, be

notified of these developments.

38.     Myers subsequently ordered the shutdown of manufacturing and notified Greenleaf representatives.

39.     In notifying Greenleaf of the Products contamination, Myers ensured that the FDA would also be notified and Integra would not be able to bring the contaminated Products to market.

40.     On or about March 12, 2024, Krause suddenly and without notice resigned her position.

41.     On or about March 14, 2024, a GreenLeaf auditor asked Myers and other senior Integra leaders whether Integra had a process to allow rework of a contaminated product.

42.     Integra leadership had pressured Myers to deceive GreenLeaf auditors by responding to this question evasively, which Myers refused to do.

43.     Instead, Myers responded by stating that "we will not rework the product. The only rework that would be permissible would be to rework packaging and/or labeling."

44.     Myers further stated that it was not feasible to rework biological products to remove microbial contamination.

45.     On or about March 15, 2024, the Greenleaf audit was completed.

46.     Greenleaf's audit report included twenty-five nonconformance findings, many of which concerned Integra's failed cleaning and contamination controls.

47.      The focus areas of the audit findings pertaining to microbiological controls for bacterial endotoxin testing, water testing and manufacturing cleaning and contamination controls were not within Myers's subject matter expertise domain. Likewise, the other areas of audit findings pertaining to design controls, manufacturing processes, and complaint management

8

Case 3:23-cv-20324-MAS-JB Document 298 Filed 09/15/24 Page 9 of 26
Case 3:23-cv-20324-MAS-JB Document 298 Filed 09/16/24 Page 10 of 27
PageID: 3591

processes were also outside of Myers' domain of control and knowledge.

48.     On or about March 18, 2024, an Integra leadership meeting was held in which a "recidivist letter" that the FDA sent to Integra was discussed.

49.     The recidivist letter was sent to Integra in the summer of 2023, but Myers was not aware of this letter and Integra leadership had never notified him of its existence.

50.     The FDA recidivist letter requested a written affidavit from Integra's CEO stating that all findings within the GreenLeaf audit report would be resolved prior to the manufacture and commercial distribution of the Products.

51.     If the FDA had not been previously informed of Integra's resumption of manufacturing in January, 2024, and if the FDA then discovered that Integra had resumed manufacturing, Integra would be in violation of the terms of the recidivist letter and the FDA could issue a consent decree and halt all of operations concerning the Products and deny Integra a PMA for SurgiMend.

52.     More seriously, if Integra's non-compliance with industry and FDA remediation requirements were to go undiscovered and the Products were to proceed to market, it would pose a significant risk of harm to the general public as a result of the Product's contamination (and Myers, were he to have acceded to Integra leadership's desire to violate state and federal laws and push the product to market, would have exposed himself to legal liability).

53.     Throughout the week of March 18, 2024, Myers was under such stress due to the pressure of finding a way to rework and use the contaminated product that he held two mandatory staff meetings in which he told the Quality teams that they would come under intense pressure from Integra management to find any and all means to resume production and rework the contaminated product, but that they should respond with, "no, we have to do things right."

9

54. On or about March 25, 2024, an Integra senior leadership meeting was held in which Myers again stated that the contaminated sheets could not be reworked and that it "all has to be scrapped."

55. Yet, senior Integra leadership insisted that the sheets must be saved by reworking them because a scrapping of the sheets would be costly, would significantly set back the manufacturing process, and would likely doom Integra's ability to receive PMA on SurgiMend.

56. In fact, Integra's CEO had made a commitment to the investment community that Boston would resume distribution of the Products by June, 2024.

57. Accordingly, Myers' decision to scrap the Products sheets meant that this commitment could not be kept, the ramifications of which would be costly to Integra.

58. At all times material hereto, Myers performed in an exemplary manner.

59. At all times material hereto, Myers objected to steps that senior leadership at Integra wanted to take that were illegal and posed a direct threat to the public.

60. On March 26, 2024, Myers was notified that his employment with Integra was being terminated effective immediately.

61. Myers lost more than $120,000 in stock options including $50,0000 in stock equity that would have vested in September, 2024.

62. Myers also lost 2013 restricted stock units valued at $70,000 that had been awarded to him based on his performance.

63. Myers insurance lapsed within five days of his termination, which was particularly painful given that his wife suffers from debilitating and life threatening multiple sclerosis, which Integra representatives knew.

64. Myers also lost his salary and other benefits.

10

65.     Integra leadership retaliated against Myers because he would not accede to their violations of state and federal laws by putting to market Products that were contaminated, which would have put the lives of patients at risk.

66.     As a result of Integra's retaliation, Myers is now without a job, without insurance to care for his family, and without any realistic opportunity for gainful employment in the short term given that he is fifty-nine years old.

67.     As a result of Myer's refusal to participate in Integra leadership's scheme to salvage the contaminated Products and his notification regarding the same to Greenleaf auditors, Integra cannot bring the Products to market.

68.     Were it not for Myers' efforts, the Products would have been placed in the stream of commerce and the general public would have been at a substantial risk of injury or death (upon information and belief, Integra has still not scrapped the contaminated Products).

69.     The conduct of Integra described above was grossly reckless and with a conscious disregard for law and the health and safety of patients. It was done with malice and oppression and with conscious disregard for Myers' rights and with the intent, design and purpose of injuring him.

70.     Integra, through its officers, managing agents and/or supervisors, authorized, condoned and/or ratified the unlawful conduct directed towards Myers.

71.     By virtue of the conduct alleged above, Integra participated in a pattern and practice of violating Myers' rights through acts of retaliation.

72.     Integra retaliated against Myers after he engaged in protected activities and there was a direct causal connection between Myers' protected activities and Integra's retaliation.

73.     As a direct and proximate result of Integra's actions and/or inactions, including its

11

willful, knowing and intentional retaliation, Myers' suffered and continues to suffer damages including but not limited to lost wages, lost promotional opportunities, lost commissions and other benefits.

74. As a further direct and proximate result of Integra's conduct, Myers has also suffered and continues to suffer emotional and mental distress with objective symptomology, anguish, embarrassment, humiliation and reputational damages.

**COUNT I**
**WHISTLEBLOWER RETALIATION IN VIOLATION OF MASSACHUSETTS GENERAL LAWS c. 149, § 185**

75. All allegations set forth above are restated and realleged as if set forth in full herein.

76. As set forth above, Integra management retaliated against Myers and terminated his employment because he reported concerns regarding the manufacture and production of a contaminated product that Integra wished to bring to market despite its life threatening risk to the general population.

77. In reporting his concerns, Myers was fulfilling a legal duty by seeking to expose the manufacture and production of a contaminated product that had (and still has) the potential to harm the general public.

78. Had Myers not reported Integra's illegal conduct, he could have been subject to criminal charges.

79. After exhausting Integra's internal reporting process, Myers brought his concerns to the attention of Greenleaf and, by extension, the FDA.

80. By retaliating against Myers and terminating his employment, Integra sought to stop Myers from performing this important public deed.

81.     Accordingly, Myers was terminated in violation of G.L. c. 149, § 185 and a causal relationship exists between Myers' protected activity and the adverse actions taken against him by Integra management.

82.     As a result of Integra's actions, Myers has suffered substantial damages as hereinbefore alleged.

## COUNT II
## WHISTLEBLOWER RETALIATION IN VIOLATION OF RHODE ISLAND GENERAL LAWS § 28-50-3

83.     All allegations set forth above are restated and realleged as if set forth in full herein.

84.     As set forth above, Integra management retaliated against Myers and terminated his employment because he reported concerns regarding the manufacture and production of a contaminated product that Integra wished to bring to market despite its life threatening risk to the general population.

85.     In reporting his concerns, Myers was fulfilling a legal duty by seeking to expose the manufacture and production of a contaminated product that had (and still has) the potential to harm the general public.

86.     Had Myers not reported Integra's illegal conduct, he could have been subject to criminal charges.

87.     After exhausting Integra's internal reporting process, Myers brought his concerns to the attention of Greenleaf and, by extension, the FDA.

88.     By retaliating against Myers and terminating his employment, Integra sought to stop Myers from performing this important public deed.

89.     Accordingly, Myers was terminated in violation of G.L. § 28-50-3 and a causal

relationship exists between Myers' protected activity and the adverse actions taken against him by Integra management.

90. As a result of Integra's actions, Myers has suffered substantial damages as hereinbefore alleged.

## COUNT III
## BREACH OF IMPLIED CONTRACT

91. All allegations set forth above are restated and realleged as if set forth in full herein.

92. Myers duly performed all conditions in his employment agreement with Integra required to be performed.

93. Integra breached its contract with Myers by, among other things, hiring him as a quality and regulatory expert and firing him for refusing to violate the regulatory law.

94. As a result of Integra's breaches of contract, Myers has suffered substantial damages as hereinbefore alleged.

## COUNT IV
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

95. All allegations set forth above are restated and realleged as if set forth in full herein.

96. By reason of the foregoing, Integra has breached the covenants of good faith and fair dealing, which were implied in the employment relationship between it and Myers.

97. Even at-will employment contains an implied covenant of good faith and fair dealing and a termination not made in good faith constitutes a breach of the contract.

98. By reason of the foregoing, Integra has breached the implied covenant of good faith and fair dealing which was implied in its relationship with Myers and in the agreements

14

with him, by, among other things, hiring Myers as a quality and regulatory expert and firing him for refusing to violate the regulatory law.

99. As a result of Integra's breaches of the implied covenant of good faith and fair dealing, Myers has suffered substantial damages as hereinbefore alleged.

## PRAYERS FOR RELIEF

WHEREFORE Myers respectfully requests that this Honorable Court:

1. Enter judgment against Integra in such amount as the Court deems proper and just;

2. Award Myers damages and lost wages and benefits in an amount according to proof at trial;

3. Award Myers damages for lost stock;

4. Award Myers reasonable attorney's fees, costs and interest allowable by law;

5. Award Myers emotional distress damages;

6. Award Myers punitive damages according to proof; and

7. Grant such further relief as may be equitable and just.

## DEMAND FOR JURY TRIAL

Myers respectfully demands a trial by jury on all counts and all issues so triable.

Respectfully submitted,

THOMAS MYERS

Plaintiff

By his attorney,


/s/ Travis T. Pregent
Travis T. Pregent, Esq. (BBO #682998)
PREGENT LAW
Fifty Milk Street, 16th Floor
Boston, MA 02108
(978) 381-3256
travis@pregentlaw.com

Date: September 24, 2024

CERTIFICATION

I certify that I have served this document via Notice of Electronic Filing for parties and
counsel on the date set forth below in accordance with the Federal Rules of Civil Procedure and
this Court's Local Rules.

/s/ Travis T. Pregent_____
Travis T. Pregent

Date: September 25, 2024

16

# Exhibit A

Case 3:23-cv-20321-MAS-TJB   Document 98-44   Filed 09/25/24   Page 19 of 27 PageID: 3600

**WARNING LETTER**

# Integra LifeSciences Corporation

**MARCS-CMS 660960 — JULY 17, 2023**

---

**Delivery Method:**

United Parcel Service

**Product:**

Medical Devices

---

**Recipient:**

Mr. Jan De Witte

President and CEO

Integra LifeSciences Corporation

1100 Campus Road

Princeton, NJ 08540

United States

✉ jan.dewitte@integralife.com (mailto:jan.dewitte@integralife.com)

**Issuing Office:**

Division of Medical Device and Radiological Health Division I

United States

---

**WARNING LETTER**
**CMS # 660960**

July 17, 2023

Dear Mr. DeWitte:

The United States Food and Drug Administration (FDA) conducted an inspection of your firm's medical device operations, TEI Biosciences, Inc., an Integra LifeSciences Company, located at 7 Elkins Street, Boston, MA, from March 1 through May 17, 2023. During the inspection, FDA investigators determined that your firm is a medical device manufacturer of collagen based medical devices, that are used for wound care, soft tissue repair and reconstruction surgery, including Durepair. Under section 201(h) of the Federal Food, Drug, and Cosmetic Act (the Act), 21 U.S.C. § 321(h), these products are devices because they are intended for use in the diagnosis of disease or other conditions or in the cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body.

This inspection revealed that the above devices are adulterated within the meaning of section 501(h) of the Act, 21 U.S.C. § 351(h), in that the methods used in, or the facilities or controls used for, their manufacture, packing, storage, or installation are not in conformity with the current good manufacturing practice requirements of the Quality System regulation found at Title 21, Code of Federal Regulations (CFR), Part 820.

We received your response dated June 8, 2023 from Susan Krause, Corporate Vice President, Chief Quality Officer, Integra Lifesciences Corporation, which responded to the Form FDA 483, List of Inspectional Observations issued to your firm on May 17, 2023. On May 23, 2023, our office also confirmed that TEI initiated a recall of all finished goods manufactured within expiry from March 1, 2018 through May 22, 2023, (RES 92481). We also understand that you have committed to not distributing product until the TEI Bioscience site is operating in substantial conformity with Quality System regulations (QSR). We address your June 8, 2023 response below.

These violations include, but are not limited to, the following:

1. Failure to establish and maintain procedures to control product that does not conform to specified requirements, as required by 21 CFR 820.90(a). Specifically:

- On June 19, 2019, your firm released a lot of Durepair,# 1904005 for distribution that indicated a bacterial endotoxin (BET) result of 9.98 EU/Device. This result exceeded your acceptance criteria of **(b)(4)** device as specified in your procedure, QCP-037 - Performance of the **(b)(4)** Endotoxin Assay. The device history record for this lot of product showed that the lot was approved and released by your firm without an investigation or product risk assessment for the BET result that was out of specification (OOS).

We reviewed your firm's response and conclude it is not adequate. Your response indicated that NC 23-042 was initiated during the inspection when the above Durepair OOS result was brought to your attention. On May 30, 2023, your firm determined the above OOS result was the result of a transcription error and the 9.98 EU result was for a different lot of product where this was an acceptable result (specification was **(b)(4)**). Your response indicated that CAPA 23-026 was opened to address the above nonconformance deficiencies, yet you have not provided a copy of the CAPA nor have you identified all necessary corrective actions to demonstrate that your quality system will ensure controls are in place to prevent the release of non-conforming product. We remain concerned that your quality system will be capable of identifying similar OOS errors when you resume operations and will prevent the release of non-conforming products.

2. Failure to establish and maintain procedures for implementing corrective and preventive actions, including requirements for analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product, or other quality problems, as required by 21 CFR 820.100(a)(1). Specifically:

- On October 20, 2022, your firm received an internal complaint that alleged quality issues in **(b)(4)** manufacturing areas including your **(b)(4)** inspection process, bacterial endotoxin testing, bovine hide/skin thickness measurements, and control of sterilized devices. As the result of your initial investigation, your firm initiated a production hold on December 14, 2022 and also placed **(b)(4)** lots of product on hold. You initiated a CAPA to address the **(b)(4)** issue, however, CAPAs were not opened to address the remaining **(b)(4)** areas of concern, including endotoxin issues. Your CAPA procedure, GSOP-758, rev 005, indicates that "CAPA investigations and any corrections, corrective and/ or preventive actions should be **(b)(4)**".

- During the inspection, you initiated a health hazard evaluation, 2023-HHE-005 to address the endotoxin concerns and the potential health risk. This HHE, completed on April 12, 2023, was not comprehensive and did not include all complaints that may have been associated with this issue. For example, two complaints of meningitis, complaint #'s 198786 and 198790, associated with your Durepair product were not included in your initial HHE assessment that concluded a field action was not recommended. Your HHE SOP, GSOP-908, rev 015 indicates that the criteria for a HHE initiation would be when "**(b)(4)**".

- Your firm failed to **(b)(4)** as required per your procedure, GSOP-801 rev 3, **(b)(4)**; Rev 03. On December 14, 2022, a hold was placed on **(b)(4)** lots identified in the complaint but failed to identify the potential impact on **(b)(4)** lots manufactured during the same time frame.

We reviewed your firm's response and conclude it is not adequate. We are aware that this is a repeat CAPA deficiency from our 2019 Warning Letter to this facility. Your response indicated that **(b)(4)** CAPAs will be initiated to address the above deficiency, however you have not yet identified all necessary corrective actions, nor have you provided a copy of your CAPAs to ensure they will be comprehensive and capable of addressing the systemic issues that have been identified. We understand that you have taken a series of corrective actions, including a recall and production hold, however your response does not indicate how you will prevent such errors from recurring when you resume operations. In response to this Warning Letter, you will need to provide evidence that an effective and sustainable CAPA system will be implemented at your firm.

3. Failure to validate with a high degree of assurance, a process whose results cannot be fully verified by subsequent inspection and test, as required by 21 CFR 820.75(a). Specifically:

- Your firm failed to adequately validate your test method for testing bacterial endotoxin (BET) of finished medical devices, or the **(b)(4)** used during the manufacture of these devices. Review of your BET test method validation, TMVR-009; revealed the following:

o The TMVR-009 assay reports failed to meet **(b)(4)** testing.

**(b)(4)**, dated January 28, 2019, excluded **(b)(4)** with "Sample Descriptions" of "Negative Control", invalidating BET test method verification runs for product lots # **(b)(4)**, and **(b)(4)**.

**(b)(4)**, dated January 2, 2019, excluded **(b)(4)** with sample descriptions "Negative Control", invalidating BET test method verification runs for product lots # **(b)(4)**, and **(b)(4)**.

**(b)(4)**, dated January 29, 2019, excluded **(b)(4)** with lot sample description "**(b)(4)**", "Sample **(b)(4)**", invalidating the BET test method verification for product lot # **(b)(4)**.

o Your BET test method protocol, section 7.4 Execution and Documentation of BET Assay, cannot be followed as written, to accurately **(b)(4)** for BET analysis of device product testing. For example, Section 7.4, step 4., states, "**(b)(4)**." However, the referenced table lists the **(b)(4)**.

o During routine BET testing, your firm introduced a **(b)(4)**, in calculating the Endotoxin Limit which may cause the BET test method to be performed at **(b)(4)** to detect bacterial endotoxins. The use of this **(b)(4)** was not included in your endotoxin test method validation, TMVR-009.

- Your firm failed to adequately validate your test method for bioburden testing of finished medical devices. Review of TMVP-014, Revision 00, Test Method Validation Report for Bioburden Testing; Effective Date April 3, 2020, revealed:

o Your report failed to meet the product bioburden recovery Acceptance Criteria **(b)(4)** to monitor device **(b)(4)** bioburden loads.

- Your firm failed to adequately validate your test method for bacterial endotoxin of **(b)(4)** used in the manufacture of your finished medical devices. Review of **(b)(4)**; Rev 00; Effective Date: April 25, 2019 revealed the following:

o For BET Report # **(b)(4)**, Run Date: 3/27/2019, the negative control replicate original data from **(b)(4)** and **(b)(4)** were excluded.
o **(b)(4)** sample and negative control results are evident on the BET analytical result printouts in **(b)(4)**, Attachment D. Your firm failed to meet **(b)(4)**, requirement, "Perform re-test for invalid assays/and or samples and document rationale as appropriate."**(b)(4)**

We reviewed your firm's response and conclude it is not adequate at this time. Your response indicates that TEI Biosciences has outsourced all BET testing that was previously performed in-house, covering both product and **(b)(4)**

testing. We also acknowledge that corrective actions include your recent recall and production hold. However, your response also indicated that you initiated CAPA 23-028 to investigate all testing, inspection and method validations at your facility, beyond just BET and bioburden testing. We will need to review this CAPA to ensure it is comprehensive and will be effective in preventing similar failures from recurring when you resume distribution. In response to this Warning Letter, you will need to provide evidence that you have reviewed all your operations to ensure that you have validated processes in place.

4. Failure to store devices in a manner to facilitate proper stock rotation and to assess its condition as appropriate, as required by 21 CFR 820.150(a). Specifically:

- On March 2, 2023, sterile lots of implantable devices were observed by our FDA investigator on an unsecure open shelf located in the QC Quarantine area and were labeled as "non-Sterile". Your procedure, Shipping and Receiving EBM Products for Sterilization; MBP 300-102, Rev 21, does not adequately prevent mix-ups of sterile/non-sterile material. Section 7.1.5 states **(b)(4)**. We are aware that a complaint received by your firm on October 20, 2022, also described an example where non-sterile product was being handled in the same area as sterile product. We acknowledge that a CAPA was not initiated at the time to address this issue and to prevent its recurrence.

We reviewed your firm's response and conclude it is not adequate. Your response indicated CAPA 23-031 has been opened to address this deficiency, however you have not yet completed your investigation, nor have you provided a copy of your CAPA. We will need to review your CAPA to ensure it is comprehensive and will be effective in preventing similar failures from recurring when you resume distribution. In response to this Warning Letter, you should provide confirmation that all proposed corrective actions are appropriate and effective.

Your firm should take prompt action to address any violations identified in this letter. Failure to adequately address this matter may result in regulatory action being initiated by the FDA without further notice. These actions include, but are not limited to, seizure, injunction, and civil money penalties.

Other federal agencies may take your compliance with the FD&C Act and its implementing regulations into account when considering the award of federal contracts. Additionally, should FDA determine that you have Quality System regulation violations that are reasonably related to premarket approval applications for Class III devices, such devices will not be approved until the violations have been addressed. Should FDA determine that your devices or facilities do not meet the requirements of the Act, requests for Certificates to Foreign Governments (CFG) may not be granted.

We are requesting that you submit to this office on the schedule below, certification by an outside expert consultant that he/she has conducted an audit of your establishment's manufacturing and quality assurance systems relative to the requirements of the device QS regulation (21 CFR, Part 820). You should also submit a copy of the consultant's report, and certification by your establishment's Chief Executive Officer (if other than yourself) that he or she has reviewed the consultant's report and that your establishment has initiated or completed all corrections called for in the report. The initial certifications of audit and corrections and subsequent certifications of updated audits and corrections (if required) should be submitted to this office by the following dates:

- Initial certifications by consultant and establishment – March 31, 2024
- Subsequent certifications – March 31, 2025 and March 31, 2026

Please notify this office in writing within fifteen business days from the date you receive this letter of the specific steps your firm has taken to address the noted violations, as well as an explanation of how your firm plans to prevent these violations, or similar violations, from occurring again. Include documentation of the corrections and/or corrective actions (which must address systemic problems) that your firm has taken. If your firm's planned corrections and/or corrective actions will occur over time, please include a timetable for implementation of those activities. If corrections and/or corrective actions cannot be completed within fifteen business days, state the reason for the delay and the time within which these activities will be

completed. Your firm's response should be comprehensive and address any violations included in this Warning Letter. If you believe that your products are not in violation of the FD&C Act, include your reasoning and any supporting information for our consideration as part of your response.

Your firm's response should be sent to: Gina Brackett, Director of Compliance Branch, at oradevices1firmresponse@fda.hhs.gov. Refer to CMS # 660960 when replying. If you have any questions about the contents of this letter, please contact Compliance Officer, Karen Archdeacon at 781-587-7491 or at karen.archdeacon@fda.hhs.gov.

Finally, you should know that this letter is not intended to be an all-inclusive list of the violations at your firm's facility. It is your firm's responsibility to ensure compliance with applicable laws and regulations administered by FDA. The specific violations noted in this letter and in the Inspectional Observations, FDA 483, issued at the close of the inspection may be symptomatic of serious problems in your firm's manufacturing and quality management systems. Your firm should investigate and determine the causes of any violations and take prompt actions to address any violations and bring the products into compliance.

Sincerely,

/S/

Joseph Matrisciano, Jr.

Program Division Director

Office of Medical Device and Radiological Health

Division 1

Cc: Susan Krause, Corporate Vice President, Chief Quality Officer, susan.krause@integralife.com

⊖ More Warning Letters (/inspections-compliance-enforcement-and-criminal-investigations/compliance-actions-and-activities/warning-letters)

**WARNING LETTER**

# TEI Biosciences, Inc.

### MARCS-CMS 573474 — MARCH 06, 2019

**Delivery Method:**

United Parcel Service

**Product:**

Medical Devices

**Recipient:**

Peter Arduini

CEO

TEI Biosciences, Inc.

311 Enterprise Drive

Plainsboro, NJ 08536

United States

**Issuing Office:**

Center for Devices and Radiological Health

One Montvale Avenue

Office of Medical Device and Radiological Health Operations Division 1

Stoneham, MA 02180

United States

Dear Mr. Arduini:

The United States Food and Drug Administration (FDA) conducted an inspection of your firm's medical device operations, TEI Biosciences, Inc., an Integra LifeSciences Company, located at 7 Elkins Street, Boston, MA, from October 9 through November 2, 2018. During the inspection, an FDA investigator determined that your firm is a medical device manufacturer of collagen based medical devices, that are used for wound care, soft tissue repair and reconstruction surgery, including Xenform Soft Tissue Repair Matrix, Product Code 830-241 (2cm x 7cm) and 830-243 (4cm x 7cm). These devices were previously cleared by FDA via K060984 and K051190. Under section 201(h) of the Federal Food, Drug, and Cosmetic Act (the Act), 21 U.S.C. § 321(h), these products are devices because they are intended for use in the diagnosis of disease or other conditions or in the cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body.

This inspection revealed that the above devices are adulterated within the meaning of section 501(h) of the Act, 21 U.S.C. § 351(h), in that the methods used in, or the facilities or controls used for, their manufacture, packing, storage, or installation are not in conformity with the current good manufacturing practice requirements of the Quality System regulation found at Title 21, Code of Federal Regulations (CFR), Part 820.

Case 3:23-cv-03424-MAS-JB Document 98-44 09/15/24 Page 25 of 27
PageID: 3606

We received your responses dated November 27, 2018, December 27, 2018, January 31, 2019 and February 28, 2019, from John Giantsidis, Senior Director, Quality Assurance, Integra Lifesciences Corporation, which responded to the Form FDA 483, List of Inspectional Observations issued to your firm on November 2, 2018. On December 7, 2018 our office also confirmed that **(b)(4)** while corrective actions were underway and were in the process of performing endotoxin testing of all finished goods in your inventory. We address your November 27, 2018 response below.

These violations include, but are not limited to, the following:

1.  Failure to validate with a high degree of assurance, a process whose results cannot be fully verified by subsequent inspection and test, as required by 21 CFR 820.75(a). During the inspection we observed.

• Your firm failed to adequately validate the **(b)(4)** process used in the manufacture of your extracellular bovine matrix (EBM) medical devices, including Xenform Soft Tissue Repair Matrices. For example:

o Your Validation Protocol (VP)-147 Final Report, dated 12.13.13, section 1.1 states, "Skins were processed up to the **(b)(4)**(VP-134)." During the inspection, TEI personnel confirmed that all EBM medical devices, including Xenform Soft Tissue Repair Matrix, currently use a **(b)(4)** prior to **(b)(4)**.
o Your Validation Protocol (VP-147), dated 11.16.13, section 10.4.1 states "A lot will be deemed acceptable if **(b)(4)**." However, during the inspection we observed that your current procedure allows the **(b)(4)**.

• Your firm did not have any data to demonstrate bacterial endotoxin testing of the EBM medical devices, including Xenform Soft Tissue Repair Matrix, has been validated adequately. For example, comparison of your current procedure, QCP-055 - Performance of the **(b)(4)**, Quality Control Procedure with your previous **(b)(4)** for EBM Process Validation revealed the following discrepancies:

o Your firm failed to use the medical device with the largest surface area as "worst case" sampling for the **(b)(4)** bacterial endotoxin verification study. Xenform Soft Tissue Repair Matrix, with product code 830-247, measures 8 cm x 12 cm with a surface area of 96 cm2. This exceeds the sampling size of "**(b)(4)**" with a surface area of **(b)(4)** as documented in section 8.8, Endotoxin Sample Preparation, in the firm's procedure, **(b)(4)**.
o The revision history of QCP-055, Rev: 05 shows that in March 2017, you modified the **(b)(4)** instructions for running routine samples. Specifically, "Sections 8.10.2.1 and 8.10.2.2 removed instructions to **(b)(4)**. Your firm did not have any data to demonstrate this step did not affect the finished test results.

2.  Failure to establish and maintain procedures to prevent contamination of equipment or product by substances that could reasonably be expected to have an adverse effect on product quality, as required by 21 CFR 820.70(e). For example:

• Your firm did not have any data to demonstrate your **(b)(4)** Water System, used to manufacture **(b)(4)** EBM (extracellular bovine matrix) medical devices, including Xenform Soft Tissue Repair Matrix, included bacterial endotoxin testing. TEI personnel confirmed your firm was not routinely performing microbial identifications on the bioburden recovered from the firm's **(b)(4)** Water System which would identify the presence of gram negative and potential bacterial endotoxin contamination.

We reviewed your firm's response to FDA 483 observations 1-3 (Warning Letter cite 1 and 2 above) and conclude they are not adequate to address the above violations. We acknowledge that after the inspection, your **(b)(4)** of all products, so you can test individual lots for endotoxin. We also understand that you opened additional CAPA's to address FDA's above findings and are in the process of implementing a number of corrective actions to address these items. However, the above deficiencies observed during our inspection are significant and demonstrate a systemic failure of your firm's quality systems. As you are aware, finished product testing is not a substitute for a thorough validation of your manufacturing processes. In response to this Warning Letter, you should confirm that your firm has assessed all of your firm's operations and products to ensure all necessary validations have been successfully completed. FDA will need to conduct a re-inspection to verify that all promised corrective actions have been implemented appropriately.

3. Failure to establish and maintain procedures to adequately control environmental conditions, where environmental conditions could reasonably be expected to have an adverse effect on product quality, as required by 21 CFR 820.70(c). For example:

• A sporicidal disinfectant has not been used in the ISO 7 clean rooms since March 2017. We understand that your EBM medical devices, including Xenform Soft Tissue Repair Matrix, are manufactured in the ISO 7 clean room. We are aware that your firm identified spore-forming bacteria and fungal organisms (such as *Bacillus thuringiensis* and *Cladosporium halotoerans*), during routine Xenform Soft Tissue Repair Matrix bioburden testing.
• The number of times that ISO 7 clean room gowns may be re-used has not been established. TEI personnel stated that gowns are re-used until they are "visibly dirty" and then placed in the gown cleaning bin to be laundered.
• Personnel were not restricted from entering the cleaner manufacturing rooms, after exiting higher contamination manufacturing rooms in the ISO 7 clean room. During a walk-through of the ISO 7 clean room on 10/10/2018, we observed personnel walking from the EBM **(b)(4)** manufacturing areas into the cleaner areas such as the manufacturing **(b)(4)** rooms.
• Your procedure, Cleaning of the Clean Rooms, FCP-001 does not describe the frequency or process in sufficient detail to prevent cross-contamination of separate areas during the cleaning process.

We reviewed your firm's responses and conclude they are not adequate. You indicated you have opened CAPA's 18-009, 18-010 and 18-011 to address these deficiencies and are in the process of implementing corrective actions. In response to this Warning Letter, you should provide confirmation that these proposed corrective actions are appropriate and effective. We will need to verify these corrective actions during a FDA re-inspection.

4. Failure to establish and maintain procedures for verifying or validating the corrective and preventive action, to ensure that such action is effective and does not adversely affect the finished device, as required by 21 CFR 820.100(a)(4). For example,

• During our inspection we reviewed CAPA 17-004, dated 8/4/17. This CAPA 17-004, dated 8/4/17 was opened to address 19 non-conforming material reports related to tears found on **(b)(4)** pouches during the lyophilization process. Your firm implemented corrective actions on 11/30/17. The CAPA verification step indicated that if no tears were found in a **(b)(4)** month period, the corrective action would be verified as effective. We observed your firm closed the CAPA in March 2018 even though your firm identified 6 additional tears during this time.

We reviewed your firm's response and conclude that it is not adequate. You indicated you are in the process of re-evaluating the above CAPA. You also indicated that your recently revised CAPA process has demonstrated a substantial improvement in CAPA timeliness and aging. In response to this Warning Letter you should describe any additional actions you are taking for CAPA 17-004 and the results of any retrospective review that was conducted during your CAPA re-evaluation process. You should also provide evidence that an effective and sustainable CAPA system will be implemented at your firm.

Your firm should take prompt action to correct the violations addressed in this letter. Failure to promptly correct these violations may result in regulatory action being initiated by the FDA without further notice. These actions include, but are not limited to, seizure, injunction, and civil money penalties. Also, federal agencies may be advised of the issuance of Warning Letters about devices so that they may take this information into account when considering the award of contracts. Additionally, premarket approval applications for Class III devices to which the Quality System regulation violations are reasonably related will not be approved until the violations have been corrected. Requests for Certificates to Foreign Governments will not be granted until the violations related to the subject devices have been corrected.

Please notify this office in writing within fifteen business days from the date you receive this letter of the specific steps your firm has taken to correct the noted violations, as well as an explanation of how your firm plans to prevent these violations, or similar violations, from occurring again. Include documentation of the corrections and/or corrective actions (which must

Case 3:23-cv-30321-MAS-LB Document 98-44 Filed 09/25/2024 Page 27 of 27
PageID: 3608

address systemic problems) that your firm has taken. If your firm's planned corrections and/or corrective actions will occur over time, please include a timetable for implementation of those activities. If corrections and/or corrective actions cannot be completed within fifteen business days, state the reason for the delay and the time within which these activities will be completed. Your firm's response should be comprehensive and address all violations included in this Warning Letter.

If you have questions regarding any issues in this letter, please contact Compliance Officer, Karen Archdeacon at 781-587-7491 or at karen.archdeacon@fda.hhs.gov (mailto:karen.archdeacon@fda.hhs.gov). Please send your reply electronically to Gina Brackett, Director of Compliance Branch, at gina.brackett@fda.hhs.gov (mailto:gina.brackett@fda.hhs.gov).

Finally, you should know that this letter is not intended to be an all-inclusive list of the violations at your firm's facility. It is your firm's responsibility to ensure compliance with applicable laws and regulations administered by FDA. The specific violations noted in this letter and in the Inspectional Observations, FDA 483, issued at the close of the inspection may be symptomatic of serious problems in your firm's manufacturing and quality management systems. Your firm should investigate and determine the causes of the violations, and take prompt actions to correct the violations and bring the products into compliance.

Sincerely,

/S/

Joseph Matrisciano, Jr.
Program Division Director
Office of Medical Device and Radiological Health
Division 1

Cc: Brenda M. Romero, Sr. Manager, Quality Assurance
TEI Biosciences, Inc.
7 Elkins St
Boston, MA 02127-1601

◓ More Warning Letters (/inspections-compliance-enforcement-and-criminal-investigations/compliance-actions-and-activities/warning-letters)