**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
James E. Cecchi
5 Becker Farm Road
Roseland, New Jersey 07068
Tel.: (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com

*Liaison Counsel for Lead Plaintiffs*

[*Additional counsel on signature page*]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE INTEGRA LIFESCIENCES HOLDINGS CORPORATION SECURITIES LITIGATION | Case No.: 3:23-cv-20321-MAS-TJB<br><br>District Judge Michael A. Shipp<br>Magistrate Judge Tonianne J. Bongiovanni<br><br>Oral Argument Requested<br><br>Motion Day: February 17, 2026 |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND STRIKE THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................................1

STATEMENT OF FACTS ....................................................................................................4

I.       THE BOSTON FACILITY WAS THE EXCLUSIVE MANUFACTURING SITE
         FOR INTEGRA'S HIGHLY PROFITABLE BIOLOGIC MESH PRODUCTS ................4

II.      LEADING UP TO THE CLASS PERIOD, DEFENDANTS LEARNED OF
         SERIOUS cGMP DEFICIENCIES AT THE BOSTON FACILITY ...................................4

III.     IN CONTRAST TO EXISTING INTERNAL CONDITIONS, DEFENDANTS
         REPEATEDLY ISSUED POSITIVE ASSURANCES TO INVESTORS.........................5

IV.      IN TRUTH, DEFENDANTS ACTIVELY OBSTRUCTED MEANINGFUL
         REMEDIATION OF THE BOSTON FACILITY................................................................6

         A.      Integra's Senior-Most Quality Executives at the Boston Facility Confirm
                 that Defendants Sought to Conceal Integra's Pervasive cGMP Violations.............7

         B.      Many FEs Confirm that Defendants Deliberately Prevented Remediation
                 of the Systemic cGMP Violations Identified by the FDA ......................................11

         C.      Instead of Remediating the Boston Facility's Severe Compliance Issues,
                 Defendants Quietly Made Plans to Relocate to a New Facility in Braintree.........13

V.       THE TRUTH IS GRADUALLY REVEALED.................................................................13

LEGAL STANDARD...........................................................................................................14

ARGUMENT........................................................................................................................14

I.       THE AC RAISES A STRONG INFERENCE OF DEFENDANTS' SCIENTER............14

         A.      The AC's New Allegations Support a Strong Inference of Scienter ......................16

                 1.       Krause And Myers Support a Strong Inference of Scienter ......................16

                 2.       The AC's New FE Allegations Strengthen the Scienter Inference............27

         B.      The AC's Remaining Allegations Strengthen the Inference of Scienter ...............29

         C.      The Inference of Scienter Is at Least as Compelling as Defendants'
                 Unsupported, Non-Culpable Explanations .............................................................33

i

II.   THE COMPLAINT ADEQUATELY ALLEGES THAT THE DEFENDANTS MADE MATERIALLY FALSE AND/OR MISLEADING STATEMENTS ...................35

    A.   The Complaint Adequately Alleges Facts Rendering Defendants' Statements Materially False or Misleading When Made ......................................36

    B.   Defendants' Remediation Arguments Fail...............................................................40

    C.   Defendants' Capacity Arguments Fail.....................................................................43

    D.   Defendants' Compliance Arguments Fail................................................................44

    E.   Defendants' Statements Are Not Protected by the Safe Harbor ............................46

    F.   Defendants' Statements Are Not Inactionable Opinions .......................................48

III.   THE COMPLAINT ADEQUATELY ALLEGES SCHEME LIABILITY......................49

IV.   THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION ...........................51

CONCLUSION.................................................................................................................................53

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*380544 Canada, Inc. v. Aspen Tech., Inc.*,
    544 F. Supp. 2d 199 (S.D.N.Y. 2008)......................................................................................22

*In re Able Labs. Sec. Litig.*,
    2008 WL 1967509 (D.N.J. Mar. 24, 2008).............................................................................45

*In re Alstom SA Sec. Litig.*,
    253 F.R.D. 266 (S.D.N.Y. 2008) ............................................................................................53

*In re Anadigics, Inc., Sec. Litig.*,
    2011 WL 4594845 (D.N.J. Sept. 30, 2011),
    *aff'd,* F. App'x 742 (3d Cir. 2012)........................................................................................44

*In re Apollo Grp., Inc. Sec. Litig.*,
    2011 WL 5101787 (D. Ariz. Oct. 27, 2011)...........................................................................23

*Baer v. Shift4 Payments, Inc.*,
    2024 WL 3836676 (E.D. Pa. Aug. 14, 2024) .........................................................................51

*Bartesch v. Cook*,
    941 F. Supp. 2d 501 (D. Del. 2013).......................................................................................23

*Bricklayers of W. Pa. Pension Plan v. Hecla Mining Co.*,
    2013 WL 5423875 (D. Idaho Sept. 26, 2013).........................................................................25

*Bucks Cnty. Emps. Ret. Sys. v. Norfolk S. Corp.*,
    775 F. Supp. 3d 1275 (N.D. Ga. 2025)...................................................................................18

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004)...................................................................................................34

*In re Campbell Soup Co. Sec. Litig.*,
    145 F. Supp. 2d 574 (D.N.J. 2001) ..................................................................................15, 16

*Chew v. Moneygram Int'l, Inc.*,
    2024 WL 4346522 (N.D. Ill. Sept. 30, 2024) ........................................................................49

*Christian v. BT Grp. PLC*,
    2020 WL 1969941 (D.N.J. Apr. 24, 2020) .............................................................................31

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
    450 F. Supp. 3d 379 (S.D.N.Y. 2020).....................................................................................21

*City of Southfield Fire & Police Ret. Sys. v. Hayward Holdings, Inc.*,
2025 WL 1577315 (D.N.J. June 4, 2025)................................................................35

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
70 F.4th 668 (3d Cir. 2023) ................................................................ 22, 35-36, 48

*City of Warwick Ret. Sys. v. Catalent, Inc.*,
2024 WL 3219616 (D.N.J. June 28, 2024)........................................................42, 48

*Clugston v. Nationwide Mut. Ins. Co.*,
2006 WL 1290450 (M.D. Pa. May 10, 2006)........................................................20

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
2020 WL 3026564 (D.N.J. June 5, 2020).................................................... *passim*

*In re Coinbase Glob., Inc. Sec. Litig.*,
2024 WL 4053009 (D.N.J. Sept. 5, 2024) ................................................... *passim*

*In re Connetics Corp. Sec. Litig.*,
542 F. Supp. 2d 996 (N.D. Cal. 2008) ..................................................................23

*Cont'l Gen. Ins. Co. v. Olafsson*,
2024 WL 4263211 (D.N.J. Sept. 23, 2024) ...........................................................48

*Curran v. Freshpet, Inc.*,
2018 WL 394878 (D.N.J. Jan. 12, 2018).................................................................47

*Dalberth v. Xerox Corp.*,
766 F.3d 172 (2d Cir. 2014)....................................................................................53

*In re Dr. Reddy's Lab. Ltd. Sec. Litig.*,
2019 WL 1299673 (D.N.J. Mar. 21, 2019)................................................... *passim*

*In re Eastman Kodak Co. Sec. Litig.*,
632 F. Supp. 3d 169 (W.D.N.Y. 2022)...................................................................50

*Eden Alpha CI LP v. Polished.com Inc.*,
763 F. Supp. 3d 270 (E.D.N.Y. 2025) ...................................................................51

*Emps. Ret. Sys. of Puerto Rico Elec. Power Auth. v. Conduent Inc.*,
2020 WL 3026536 (D.N.J. June 5, 2020)...............................................................46

*In re Enzymotec Sec. Litig.*,
2015 WL 8784065 (D.N.J. Dec. 15, 2015).............................................................47

*In re EQT Corp. Sec. Litig.*,
504 F. Supp. 3d 474 (W.D. Pa. 2020).....................................................................19

iv

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*,
    778 F.3d 228 (1st Cir. 2015)........................................................................24

*In re Firstenergy Corp. Sec. Litig.*,
    2022 WL 681320 (S.D. Ohio Mar. 7, 2022)...............................................50

*Flora v. Cnty. of Luzerne*,
    776 F.3d 169 (3d Cir. 2015)..........................................................23, 26, 41

*Flores v. Forster & Garbus, LLP*,
    2020 WL 5603486 (S.D.N.Y. Sept. 17, 2020).........................................20

*Gaer v. Educ. Mgmt. Corp.*,
    2011 WL 7277447 (W.D. Pa. Aug. 30, 2011) ...........................................20

*Gov't of Guam Ret. Fund v. Invacare Corp.*,
    2014 WL 4064256 (N.D. Ohio Aug. 18, 2014)....................................39, 45

*In re Great Atl. & Pac. Tea Co. Sec. Litig.*,
    103 F. App'x 465 (3d Cir. 2004) ...............................................................35

*Hall v. Johnson & Johnson*,
    2019 WL 7207491 (D.N.J. Dec. 27, 2019)...........................................52, 53

*Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*,
    2022 WL 889158 (E.D. Pa. Mar. 25, 2022)........................................... 48-49

*Handal v. Innovative Indus. Props., Inc.*,
    157 F.4th 279 (3d Cir. 2025) ....................................................................50

*In re Hertz Glob. Holdings Inc.*,
    905 F.3d 106 (3d Cir. 2018).......................................................................15

*IBT Emp. Grp. Welfare Fund v. Compass Mins. Int'l, Inc.*,
    723 F. Supp. 3d 1053 (D. Kan. 2024).......................................................19

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
    620 F. Supp. 3d 167 (D.N.J. 2022) ................................................26, 39, 48, 53

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
    2020 WL 1479128 (E.D. Pa. Mar. 24, 2020)...........................................46

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)...........................................................29, 30, 32, 46

*Jastram v. NextEra Energy, Inc.*,
    2025 WL 3293701 (11th Cir. Nov. 26, 2025)...........................................53

*Joyce v. Amazon.com, Inc.*,
  2023 WL 8370101 (W.D. Wash. Dec. 4, 2023) .......................................................32

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
  19 F.4th 601 (4th Cir. 2021) .......................................................................................34

*Khoja v. Orexigen Therapeutics, Inc.*,
  189 F. Supp. 3d 998 (S.D. Cal. 2016)........................................................................50

*Krause v. Integra LifeSciences Corp.*,
  2025 WL 2654165 (D. Minn. Sept. 16, 2025)...........................................................49

*Lako v. Loandepot, Inc.*,
  2023 WL 444151 (C.D. Cal. Jan. 24, 2023) ..............................................................22

*Lewakowski v. Aquestive Therapeutics, Inc.*,
  2023 WL 2496504 (D.N.J. Mar. 14, 2023)...........................................................19, 20

*Lipsky v. Commonwealth United Corp.*,
  551 F.2d 887 (2d Cir. 1976)........................................................................................19

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ....................................................................................45

*Lopes v. Fitbit Inc.*,
  2020 WL 1465932 (N.D. Cal. Mar. 23, 2020),
  *aff'd,* 848 F. App'x 278 (9th Cir. 2021)...................................................................53

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
  363 F. Supp. 3d 476 (D. Del. 2019).................................................................20, 21, 29

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  601 U.S. 257 (2024).....................................................................................................36

*In re Mattel, Inc. Sec. Litig.*,
  2021 WL 1259405 (C.D. Cal. Jan. 26, 2021) ............................................................22

*McCabe v. Ernst & Young, LLP*,
  494 F.3d 418 (3d Cir. 2007)................................................................................... 51-52

*McClain v. Iradimed Corp.*,
  111 F. Supp. 3d 1293 (S.D. Fla. 2015) ......................................................................44

*McDermid v. Inovio Pharms., Inc.*,
  520 F. Supp. 3d 652 (E.D. Pa. 2021) .................................................................... 46-47

*In re Merck & Co. Sec., Deriv., & ERISA Litig.*,
  2011 WL 3444199 (D.N.J. Aug. 8, 2011) .............................................................36, 41

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*,
     218 F.R.D. 76 (S.D.N.Y. 2003) .......................................................................................19

*Meyer v. Greene*,
     710 F.3d 1189 (11th Cir. 2013) .....................................................................................53

*MicroCapital Fund LP v. Conn's Inc.*,
     2019 WL 3451153 (S.D. Tex. July 24, 2019) ), *R. & R. adopted*, 2019 WL
     4673209 (S.D. Tex. Sept. 24, 2019) ...............................................................................22

*Miller v. Sonus Networks, Inc.*,
     636 F. Supp. 3d 245 (D. Mass. 2022) .............................................................................19

*Mulligan v. Impax Labs., Inc.*,
     36 F. Supp. 3d 942 (N.D. Cal. 2014) .......................................................................*passim*

*In re Mylan N.V. Sec. Litig.*,
     2023 WL 3539371 (W.D. Pa. May 18, 2023)..................................................18, 25, 45, 49

*In re Mylan N.V. Sec. Litig.*,
     2025 WL 1874621 (W.D. Pa. July 8, 2025) ...............................................................52, 53

*In re Novo Nordisk Sec. Litig.*,
     2018 WL 3913912 (D.N.J. Aug. 16, 2018) .....................................................................32

*In re Ocular Therapeutix, Inc. Sec. Litig.*,
     2019 WL 1950399 (D. Mass. Apr. 30, 2019) ..................................................................45

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
     575 U.S. 175 (2015)........................................................................................................44

*In re OSG Sec. Litig.*,
     12 F. Supp. 3d 619 (S.D.N.Y. 2014)........................................................................... 19-20

*In re Overstock Sec. Litig.*,
     2021 WL 4267920 (D. Utah Sept. 20, 2021),
     *aff'd,* 119 F. 4th 787 (10th Cir. 2024).............................................................................25

*Pathfinder Mgmt., Inc. v. Mayne Pharma, Inc.*,
     2009 WL 4250061 (D.N.J. Nov. 25, 2009) .....................................................................28

*In re PolarityTE, Inc., Sec. Litig.*,
     706 F. Supp. 3d 1343 (D. Utah 2020)..............................................................................44

*Rahman v. Kid Brands, Inc.*,
     736 F.3d 237 (3d Cir. 2013)............................................................................................15

vii

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*,
  2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ...................................................38, 40

*Roofer's Pension Fund v. Papa*,
  2018 WL 3601229 (D.N.J. July 27, 2018)........................................15, 27, 35, 36

*Salim v. Mobile Telesystems PJSC*,
  2021 WL 796088 (E.D.N.Y. Mar. 1, 2021)..............................................................31

*Schaeffer v. Nabriva Therapeutics PLC*,
  2020 WL 7701463 (S.D.N.Y. Apr. 28, 2020)...........................................................48

*Schwab Cap. Tr. v. Celgene Corp.*,
  2021 WL 1085474 (D.N.J. Mar. 22, 2021)........................................................20, 22

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
  351 F. Supp. 3d 874 (E.D. Pa. 2018) .......................................................................48

*SEC v. SolarWinds Corp.*,
  741 F. Supp. 3d 37 (S.D.N.Y. 2024).........................................................................51

*Shah v. Zimmer Biomet Holdings, Inc.*,
  2019 WL 762510 (N.D. Ind. Feb. 20, 2019).............................................................21

*Sherman v. Abengoa, S.A.*,
  156 F.4th 152 (2d Cir. 2025) .......................................................................20, 21, 22

*SLF Holdings LLC v. Uniti Fiber Holdings, Inc.*,
  499 F. Supp. 3d 49 (D. Del. 2020),
  *aff'd,* 2022 WL 3442353 (3d Cir. Aug. 17, 2022) ................................................53

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
  2024 WL 456745 (S.D.N.Y. Feb. 5, 2024)........................................................ 31-32

*Stichting Pensioenfonds ABP v. Merck & Co.*,
  2012 WL 3235783 (D.N.J. Aug. 1, 2012) .................................................................50

*Strougo v. Barclays PLC*,
  105 F. Supp. 3d 330 (S.D.N.Y. 2015)................................................................. 22-23

*Strougo v. Mallinckrodt Pub. Ltd. Co.*,
  2022 WL 17740482 (D.N.J. Dec. 16, 2022)........................................ 29, 32, 41-42

*Takata v. Riot Blockchain, Inc.*,
  2020 WL 2079375 (D.N.J. Apr. 30, 2020) ...............................................................51

*Takata v. Riot Blockchain, Inc.*,
  2023 WL 7133219 (D.N.J. Aug. 25, 2023) ...............................................................50

*In re Talis Biomedical Corp. Sec. Litig.*,
2022 WL 17551984 (N.D. Cal. Dec. 9, 2022) .................................................................48

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ............................................................................... 14-15, 33

*In re Teva Sec. Litig.*,
512 F. Supp. 3d 321 (D. Conn. 2021) .................................................................50

*Trustcash Holdings, Inc. v. Moss*,
668 F. Supp. 2d 650 (D.N.J. 2009) ...................................................................51

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
625 F. Supp. 3d 164 (S.D.N.Y. 2022) .................................................. 18-19, 50, 51

*U.S. v. Schiff*,
602 F.3d 152 (3d Cir. 2010) ...........................................................................36

*In re Universal Health Servs., Inc., Deriv. Litig.*,
2019 WL 3886838 (E.D. Pa. Aug. 19, 2019) .......................................................23

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
57 F. Supp. 3d 950 (D. Minn. 2014) .................................................................50

*Weiner v. Quaker Oats Co.*,
129 F.3d 310 (3d Cir. 1997) ...........................................................................26

*Wilkof v. Caraco Pharm. Labs., Ltd.*,
2010 WL 4184465 (E.D. Mich. Oct. 21, 2010) ..............................................31, 45

*Wu v. GSX Techedu Inc.*,
738 F. Supp. 3d 527 (D.N.J. 2024) ...................................................................30

**Other Authorities**

17 C.F.R. § 240.10b-5(b) .......................................................................................36

Fed. R. Civ. P. 11 .................................................................................................3, 22

Fed. R. Civ. P. 12(f) ..............................................................................................19

## TABLE OF ABBREVIATIONS[1]

| Term | Definition |
|---|---|
| ¶ __ | Paragraphs of the AC (defined herein) |
| 2018 Form 483 | FDA Form 483 privately issued to Integra on November 2, 2018 |
| 2018 EIR | EIR (defined herein) privately issued to Integra on November 28, 2018 |
| 2018 Inspection Reports | 2018 Form 483 and 2018 EIR (defined herein) |
| 2019 Warning Letter | FDA Warning letter issued to Integra on March 6, 2019 |
| 2021 Form 483 | FDA Form 483 privately issued to Integra in November 2021 |
| 2023 Form 483 | FDA Form 483 privately issued to Integra on May 17, 2023 |
| 2023 Warning Letter | Warning letter privately issued to Integra on July 17, 2023 |
| AC | Consolidated Amended Class Action Complaint (Dkt. No. 92), filed August 14, 2025 |
| Anderson | Defendant Carrie L. Anderson, Integra's Executive Vice President and Chief Financial Officer from June 24, 2019 to February 2, 2023 |
| Arduini | Defendant Peter J. Arduini, Integra's Chief Executive Officer and a director from January 3, 2012 to December 1, 2021, and President and Chief Operating Officer from October 2010 to December 2011 |
| Boston Facility | Integra's manufacturing facility located in Boston, Massachusetts |
| CAPA | Corrective and Preventative Action |
| CCO | Chief Compliance Officer |
| CEO | Chief Executive Officer |
| cGMP | Current Good Manufacturing Practices |
| Coleman | Defendant Glenn Coleman, Integra's Chief Operating Officer from June 14, 2019 to September 23, 2022 |
| Company or Integra | Defendant Integra LifeSciences Holdings Corporation |

---

[1] Unless otherwise noted, all other capitalized terms shall have the meanings set forth in the AC.

| Term | Definition |
|------|------------|
| Consolidated Complaint | Consolidated Class Action Complaint (Dkt. No. 53), filed September 6, 2024 |
| CQO | Chief Quality Officer |
| Davis | Defendant Robert T. Davis, Jr., Integra's Executive Vice President and President of the Tissue Technologies division since March 2020, and Corporate Vice President and President of the Orthopedics and Tissue Technologies division since December 2016 |
| Defendants | Integra, Anderson, Arduini, Coleman, Davis, De Witte, Knight, Leonard, Redondo, Schwartz |
| De Witte | Defendant Jan D. De Witte, Integra's Chief Executive Officer and a director since December 2021 |
| EBM | Extracellular Bovine Matrix |
| EIR | Establishment Inspection Report |
| Ex. __ | Exhibit attached to the Declaration of James E. Cecchi in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss and Strike Plaintiffs' Consolidated Amended Class Action Complaint |
| Forms 483 | The 2018 Form 483, 2021 Form 483, and 2023 Form 483 |
| FDA | The U.S. Food and Drug Administration |
| FE | Former Employee |
| Karin Ex. __ | Exhibits attached to the Declaration of John I. Karin dated October 14, 2025 (Dkt. No. 97-2) |
| Knight | Defendant Lea Knight, Integra's Executive Vice President and Chief Financial Officer since June 2023 |
| Krause | Susan Krause, Integra's former Corporate Vice President and Chief Quality Officer |
| Lead Counsel | Bernstein Litowitz Berger & Grossmann LLP, Saxena White P.A., and Kessler Topaz Meltzer & Check, LLP |

| Term | Definition |
|------|-----------|
| Leonard | Defendant Steve Leonard, Integra's Vice President, Global Operations and Supply Chain since August 2020, and Senior Vice President Operations from May 2019 to August 2020 |
| Motion or Br. | Defendants' Memorandum of Law in Support of Their Motion to Dismiss and Strike Plaintiffs' Consolidated Amended Class Action Complaint (Dkt. No. 97-1) |
| Myers | Thomas Myers, Integra's former Senior Director, Site Head of Quality Operations at the Boston Facility |
| Opinion or Op. | The Court's June 30, 2025 Memorandum Opinion Granting Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (Dkt. No. 83) |
| Plaintiffs or Lead Plaintiffs | Lead Plaintiffs San Antonio Fire and Police Pension Fund, Pembroke Pines Firefighters & Police Officers Pension Fund, City of Birmingham Retirement and Relief System, and Operating Engineers Construction Industry and Miscellaneous Pension Fund |
| QSR | Quality System Regulations |
| Redondo | Defendant Tracy Redondo, Integra's Vice President and Chief Compliance Officer since May 2021 |
| Rule | Federal Rule of Civil Procedure |
| Schwartz | Defendant Eric I. Schwartz, Integra's Executive Vice President and Chief Legal Officer from November 12, 2018 to May 26, 2025 |
| TEI | TEI Biosciences, Inc. and TEI Medical, Inc. |
| Warning Letters | The 2019 Warning Letter and 2023 Warning Letter |

## INTRODUCTION[2]

This case arises out of Defendants' deliberate efforts to misrepresent and conceal serious and pervasive quality, safety, and compliance deficiencies at Integra's all-important Boston Facility. Throughout the Class Period, Defendants made repeated statements to investors about the Boston Facility's adherence to cGMP guidelines, Defendants' remediation of cGMP deficiencies identified by the FDA at the Boston Facility, and the Boston Facility's ability to safely manufacture lucrative EBM products at scale. At the time these statements were made, Defendants knew that Integra was neither adhering to cGMP nor remediating the Boston Facility's longstanding deficiencies, and that it could not safely manufacture EBM products there without incurring substantial remediation costs and production delays. Yet Defendants concealed these facts in furtherance of a pervasive, top-down scheme to prioritize corporate profits over patient safety.

On June 30, 2025, this Court dismissed Plaintiffs' claims on scienter grounds. The Court held that while Plaintiffs had demonstrated that Defendants "knew about the cGMP violations throughout the Class Period," (Op. at 27) and may have engaged in "some reckless conduct" (*id.* at 36), the Consolidated Complaint did not justify "the leap from knowledge to intent" (*id.*).

The AC satisfies the Court's concerns. Powerful new facts provided by seven additional former employees—including ***the top two officers*** responsible for quality and safety at the Boston Facility—demonstrate that Defendants not only knew of the Boston Facility's pervasive cGMP violations, they were ***directly responsible*** for the failure to remediate those deficiencies. Susan Krause, Integra's CQO for much of the Class Period, confirmed that while Defendants were publicly assuring investors that Integra was "upgrad[ing]" the Boston Facility and making

---

[2]     Unless otherwise noted, all emphasis is added, and all internal quotations and citations are omitted.

"significant investments in quality," they were intentionally interfering with her attempts to remediate the Boston Facility. In addition, Defendants deliberately prevented Krause from participating in critical internal investigations, buried internal reports of serious safety and quality issues at the Boston Facility, directed manufacturing to continue using unlawful and dangerous procedures, and even went so far as to pressure her and other Integra employees to *lie to the FDA* about serious safety and quality issues. Krause refused to do so because that "*would have been false and required her to commit fraud*." She was constructively terminated soon thereafter.

The AC bolsters Krause's explosive statements with corroborative facts from Thomas Myers, the former Senior Director and Site Head of Quality Operations at the Boston Facility. Myers confirmed that Defendants decided to restart manufacturing at the Boston Facility in late 2023 despite knowing full well of the "life threatening [safety] risks" plaguing the Facility. He also confirmed that at the time Defendants touted the Boston Facility's restart as "successful," they knew that nearly every recently-manufactured product was contaminated and could not be sold without violating basic quality standards, FDA regulations, and the law. Yet Defendants pressured Myers to illegally cut around that contamination and market these products anyway. After Myers defied Defendants' directive and caused the Boston Facility to be shut down, he was terminated.

The accounts of Krause and Myers are corroborated by 20 FEs, including five new FEs not included in the Consolidated Complaint. These FEs confirmed that Defendants participated in a deliberate scheme to prioritize profits over safety, manipulated test processes to conceal contamination, downplayed Integra's serious quality deficiencies, attempted to circumvent FDA regulations, and pressured employees to deceive the FDA. These allegations demonstrate, in stark and corroborative detail, the false and misleading nature of Defendants' statements and raise a strong inference of their scienter. Indeed, ordering senior officers to violate FDA regulations and

lie to the FDA—and firing them when they refuse to do so—is the definition of fraudulent intent.

Recognizing that the facts provided by Krause and Myers demonstrate scienter, Defendants ask the Court to disregard them because they are contained in federal whistleblower complaints. In essence, Defendants contend that even though it would be appropriate for the Court to credit these facts if Krause and Myers were confidential FEs, it is not permissible when they are identified by name and their accounts are contained in a pleading subject to Rule 11. Their argument is illogical, unsupported, and ignores recent authority that contradicts their position. In truth, courts in this Circuit and elsewhere permit securities plaintiffs to plead facts asserted in third-party complaints. Defendants' attempts to dispute the facts proffered by Krause and Myers likewise fail, as they mischaracterize Krause's and Myers' accounts, misstate Plaintiffs' claims, and improperly ask the Court to draw implausible inferences in their favor.

Defendants' falsity arguments are equally baseless. Contrary to their claim, Defendants did not merely represent that Integra "had made the effort" to remediate the Boston Facility. Instead, Defendants assured investors that Integra was genuinely working to remediate the Boston Facility, *and* that those efforts were "progress[ing] well" and ultimately "complete," at a time when (as this Court has recognized) they "clearly knew about the cGMP violations" and that "the Company was not doing everything it could to remediate" them. Likewise, far from accurately "updat[ing] investors on the Company's struggles and setbacks," Defendants concealed the substantial efforts needed to remediate the Boston Facility and omitted the single largest impediment to remediation: their own deliberate refusal to do so. These allegations suffice to plead falsity.

Defendants' loss causation challenges also fail. Contrary to their claim that no loss causation can exist after May 23, 2023, the AC adequately alleges that Defendants continued to conceal material information after that date. Moreover, the final three corrective disclosures

3

revealed new information to the market regarding the seriousness and extent of Defendants' fraud.

At bottom, the AC plausibly alleges that while Defendants were publicly describing Integra's remediation efforts and cGMP compliance, they were privately thwarting those efforts and intentionally refusing to do what was necessary to bring the Boston Facility into compliance. Further, while Defendants De Witte, Schwartz and Redondo were publicly touting patient safety as "paramount" and "non-negotiable," they were privately pressuring employees to sell contaminated product and lie to the FDA, and terminating employees who tried to expose their misconduct. Defendants did not "underestimate[]" Integra's remediation challenges, they deliberately deceived investors—and as the market learned the truth, nearly $4 billion in shareholder value evaporated. That is securities fraud. The Motion should be denied.

## STATEMENT OF FACTS

### I.   THE BOSTON FACILITY WAS THE EXCLUSIVE MANUFACTURING SITE FOR INTEGRA'S HIGHLY PROFITABLE BIOLOGIC MESH PRODUCTS

Integra manufactures surgical and wound care medical devices. ¶¶ 1, 43. In 2015, Integra acquired TEI, including its highly profitable "biologic mesh" portfolio and established the Boston Facility as the products' exclusive manufacturing site. ¶¶ 44-45. Integra hailed the addition of these products, including the SurgiMend and PriMatrix EBM devices, as "a significant opportunity to . . . accelerate Integra's overall growth." ¶ 44. Throughout the Class Period, investors were focused on Integra's ability to manufacture enough biologic mesh product to meet the strong demand for such devices. ¶¶ 46-47. This depended on Integra's ability to adhere to cGMP. ¶¶ 2, 48-59.

### II.   LEADING UP TO THE CLASS PERIOD, DEFENDANTS LEARNED OF SERIOUS cGMP DEFICIENCIES AT THE BOSTON FACILITY

In the fall of 2018, the FDA conducted a seven-day inspection of the Boston Facility and discovered significant violations of cGMP requirements for preventing endotoxin contamination. ¶ 61. The FDA detailed these violations, which included gross deficiencies in Integra's

4

contamination, environmental, and process validation controls, in a Form 483 privately issued to Integra on November 2, 2018, and in the 2018 EIR issued to Integra four weeks later. ¶¶ 61-68.

On March 6, 2019, the FDA issued the 2019 Warning Letter to Integra and Defendant Arduini, Integra's CEO at the time. ¶¶ 71, 367. The 2019 Warning Letter repeated the observations detailed in the 2018 Inspection Reports, informed Integra that such deficiencies "*are significant* and demonstrate a *systemic failure* of your firm's quality systems," and characterized Integra's remedial measures since receiving the 2018 Form 483 as inadequate. ¶¶ 73, 367. The FDA demanded Integra "take prompt action to correct the violations" for failure to do so "may result in regulatory action being initiated by the FDA without further notice." *Id.*

## III.    IN CONTRAST TO EXISTING INTERNAL CONDITIONS, DEFENDANTS REPEATEDLY ISSUED POSITIVE ASSURANCES TO INVESTORS

Knowing that the FDA would be publishing the 2019 Warning Letter, Defendants disclosed it on March 11, 2019, the first day of the Class Period. ¶ 74. However, in their public statements on that day and thereafter, Defendants downplayed the impact the FDA's findings would have on Integra's business, assuring investors they were: (i) successfully remediating the identified deficiencies; (ii) building ample safety stock to continue meeting demand for its EBM products; and (iii) adhering to cGMPs and industry standards for safety and quality. ¶¶ 389-485.

**Remediation Misstatements**. On the first day of the Class Period, Integra filed a Form 8-K stating that "since the conclusion of the [FDA] inspection, [Integra] *has undertaken significant efforts to remediate* the observations and continues to do so." ¶ 391. Defendants made similar representations throughout the Class Period. *See, e.g.*, ¶ 393 (Integra had "been doing *quality remediation efforts* throughout 2019" and "[t]here are *no patient safety issues* here [at the Boston Facility]"); ¶ 395 (Integra had "*strengthened* [its] quality operating mechanisms and *reduced* quality risk with enhanced rigor" and its "work is *now complete*"); ¶ 399 (Integra had "been

5

working for the past couple of years *to upgrade our Boston facility based on FDA observations*");

¶ 411 ("*Boston remediation continues to progress well*" and was "*absolutely on the right path*").

Defendants stated that Integra was undertaking these remediation efforts because safety and

quality were "*paramount*" (¶ 447) and "*non-negotiable*" (¶ 404).

**Capacity Misstatements**. Defendants also assured investors that the FDA's findings were

not materially impacting Integra's manufacturing capacity at the Boston Facility. For example, on

March 11, 2019, Integra stated that the 2019 Warning Letter "*does not restrict* the Company's

ability to manufacture or ship products or require the recall of any products." ¶ 454; *see also, e.g.*,

¶ 460 (remediation efforts were designed to "*get [the Company] 50% more capacity as [it] enter[s]*

*2020*"); ¶ 464 (Boston Facility was "pretty much running [at] normal capacity"); ¶ 469 (Integra

was "continuing to run [the Boston Facility] as before"). Defendants also represented that Integra

was using this capacity to "build up safety stock" to satisfy pent-up demand for its EBM products.

*Id. See, e.g.*, ¶ 464 (Integra was "*building safety stock*" and had "*plenty of safety stock to support*

*that ramp*" to "*double-digit growth*"); ¶ 469 ("We're continuing to run [the Boston Facility] as

before *in order for us to use this time to build up safety stock*"); ¶ 472 ("*[W]e've actually built*

*more safety stock for those regenerative products. So we're in very good shape*.").

**Compliance Misstatements**. Defendants also made representations about Integra's quality

assurance and cGMP compliance, claiming that Integra had implemented "numerous mechanisms

and processes" "to protect and ensure product quality." *See, e.g.*, ¶ 437 (Integra "*adheres to*"

cGMPs and QSRs); ¶ 441 (Integra had "*made significant investments in quality* across all of our

manufacturing sites with a focus on accelerating our quality project in Boston").

## IV.    IN TRUTH, DEFENDANTS ACTIVELY OBSTRUCTED MEANINGFUL REMEDIATION OF THE BOSTON FACILITY

Contrary to their public statements, Defendants engaged in a deliberate, years-long scheme

to prioritize profits over safety by foregoing critical remediations to the Boston Facility. In furtherance of this fraudulent scheme, Defendants: (i) *prevented* Integra from implementing necessary remedial measures that would have been costly or disrupted manufacturing; (ii) *instructed* Integra employees to conceal and sell contaminated product; (iii) *pressured* Integra executives to *lie* to the FDA, Integra's Board and its external auditor regarding Integra's purported compliance efforts, manufacturing, and commercial distribution; and (iv) *retaliated* against executives who refused to participate in their unlawful scheme and threatened to alert the FDA to Defendants' misconduct. *See* ¶¶ 5, 98-267. Defendants engaged in this scheme in an effort to maintain the marketability of Integra's most lucrative products, and they concealed the truth from investors even as senior quality personnel warned senior executives that Integra needed to halt production and expend significant capital to remediate the dilapidated Boston Facility. *See id.*

### A. Integra's Senior-Most Quality Executives at the Boston Facility Confirm that Defendants Sought to Conceal Integra's Pervasive cGMP Violations

The accounts of Integra's two highest-ranking officials responsible for quality at the Boston Facility—Krause and Myers—substantiate that Integra's remediation failures were not the product of failed execution, but rather a deliberate scheme to *actively obstruct* any remedial efforts that required significant cost or production delays. *See* ¶¶ 187-222; *see also* ¶¶ 132-48.

After becoming Integra's CQO in June 2021, Krause—who had over 30 years of experience—learned that Integra had not come close to addressing the issues flagged in the 2019 Warning Letter. ¶ 188; Facts § IV.B. Following a Fall 2021 inspection, the FDA ordered a "regulatory meeting" with Integra "due to the seriousness of these repeat findings." ¶ 188. At the January 26, 2022 meeting, the FDA required Integra to "develop a solid remediation plan or it would be issued further action in the form of a warning letter or consent decree." *Id.*

Rather than devote meaningful resources to develop the required plan, De Witte, Schwartz,

7

Redondo, and others repeatedly interfered with Krause's attempts to develop a "solid remediation plan." *Id.* Between May and July 2022, and without consulting Krause, De Witte and Anderson "cut the Remediation Budget for the Boston location by $7.5 million and reduced the overall Quality staff by approximately 75 employees despite" previously "informing the FDA that it would be increasing staff to address remediation." Ex. A at ¶ 20.[3] In August, Defendants implemented a hiring freeze, making it "nearly impossible to address the necessary quality work." *Id.*

At the same time, Defendants systemically concealed internal quality and safety complaints from Krause. ¶ 191. Remarkably, during Krause's nearly three-year tenure, she was informed of just one internal quality-related report within the requisite 24-hour period, even though Integra received approximately 90 such reports. *Id.* In October 2022, Integra failed to timely inform Krause of a complaint—i.e., the 2022 whistleblower complaint—alleging that sterile and non-sterile products were mixed at the Boston Facility and that site management instructed employees to ignore the potential contamination. ¶ 192. Krause did not learn about the complaint until weeks after it was filed, and even then, she was falsely told that it "focused on an issue that Integra was already purportedly resolving." *Id.* In mid-November, Redondo closed Integra's investigation— without seeking input from Krause or the FDA—due to "insufficient information." ¶¶ 192-93.

Despite Defendants' efforts to bury the whistleblower complaint, Krause learned of its details in December 2022 when notes were placed under the Boston Facility manager's door. ¶ 194. One note cited "37 different lot numbers" with quality issues. *Id.* Krause ordered all new manufacture to cease as of December 14, 2022, but Integra kept processing "work in progress

---

[3]     On October 23, 2025, Krause filed a less-redacted version of her complaint, which reveals additional facts that were not public when Plaintiffs filed the AC. *See* Ex. A. The Court can consider these newly-unredacted facts because, as Defendants have acknowledged, "Plaintiffs have incorporated Krause's complaint by reference." Br. at 11 n.4 (collecting cases).

manufacturing" until January 11, 2023, to avoid discarding costly inventory. ¶ 195. On January 17, 2023, Krause notified the FDA of the whistleblower complaint, triggering an immediate "for cause" inspection.  ¶¶ 195-96. The FDA conducted that inspection between March 1 and May 16, 2023. ¶ 196. By March 16, 2023, the FDA had identified serious issues with Integra's methodology for measuring endotoxin levels at the Boston Facility. *Id.* As a result, production and distribution of all products manufactured at the Boston Facility was placed on hold, making a product recall inevitable. ¶ 152. Yet, on April 26, 2023, De Witte falsely told investors that an audit "***confirms we're on the right track with***" the Boston Facility's remediation plan. ¶ 399.

On April 27, 2023, outside lab results revealed certain products contained endotoxin levels that were "***27 times higher than the levels detected by Integra's internal testing***." ¶ 196. The FDA's investigation revealed over ***80 complaints*** from patients reporting "high fevers, inflammation, revision surgical intervention, infection, and meningitis"— symptoms of potential endotoxin exposure. *Id.* It also led to another Form 483 on May 17, 2023, which cited Integra for violations that corroborated the whistleblower's complaint and mirrored the deficiencies identified in the 2018 Form 483, the 2019 Warning Letter, and the 2021 Form 483. ¶¶ 153-63.

During a July 18, 2023 meeting, the Board expressed "shock[]" after learning that, just 30 days after Krause started her remediation project, her resources were cut in half, and 60 days later, her headcount was cut by about 75 people. Ex. A at ¶ 49. Meanwhile, De Witte demanded that Krause lower risk assessments in her Board presentations, and when Krause pushed back, De Witte and Schwartz "threaten[ed] to withhold compensation from her." ¶ 200. On July 27, 2023, De Witte lied to investors again—this time stating that Integra "ha[d] no specific indications of any product complaints related to high endotoxin levels." ¶ 404.

Krause's allegations were confirmed by Myers, who was a seasoned quality professional

with 30+ years of experience. In the summer of 2023, Integra recruited Myers with promises that "safety and adherence to industry principles and FDA rules would take precedence" over market goals. ¶ 211. Again, none of this was true. Less than three months after joining Integra, Myers told executives that the targeted manufacturing restart for the Boston Facility "needed to be pushed back" to avoid distributing contaminated product. ¶ 212. At a November 10, 2023 leadership meeting, senior leaders instead **accelerated** the restart date to January 2024, thus confirming that "Integra leadership was more interested in shipping product than patient safety." ¶¶ 212-13. On February 26, 2024, Integra discovered that **97%** of the newly-manufactured EBM sheets were contaminated (¶ 213), yet two days later, De Witte falsely told investors that the Boston Facility's "dress rehearsal" was "***successful***" (¶ 425). Further, to avoid discarding the contaminated sheets, Defendants instructed employees to simply "cut the contamination out" of the product" and sell it. ¶ 214. Myers insisted that "such rework was not viable because there was no possible way to guarantee that [it] would remove all contamination," but leadership continued pressuring him. *Id.*

On March 7, 2024, Myers and Krause together told leadership that manufacturing "needed to immediately shut down" in light of these serious quality and patient safety deficiencies. ¶ 215. That same day, a whistleblower filed an FDA report over concerns Integra was "not taking action to protect patient safety" across its manufacturing facilities. ¶ 206. The next day, Krause received "over 100 pages of documents," including pictures of employees falsifying records and destroying evidence, confirming "over 40 quality issues that directly impacted patient safety" at Integra's Plainsboro site. *Id.* Rather than reporting these issues to the FDA, De Witte demanded Krause "sign and send a letter to the FDA" stating "that the whistleblower's allegations were false." *Id.* Krause refused because the letter "would have been false and required her to commit fraud." *Id.*

On March 11, 2024, Krause resigned, citing Integra's "demand that she provide false

10

information to the FDA." ¶ 207. On March 14, 2024, Myers ordered the shutdown of manufacturing at the Boston Facility and notified Greenleaf of the dangerous "cut around" plan. ¶¶ 216-18. The next day, Greenleaf completed its audit and found "twenty-five nonconformance findings, many of which concerned Integra's failed cleaning and contamination controls"—the same issues the FDA had previously flagged. ¶ 218. Two weeks later, Myers was fired. ¶ 221.

**B.      Many FEs Confirm that Defendants Deliberately Prevented Remediation of the Systemic cGMP Violations Identified by the FDA**

Twenty FEs, including those newly featured in the AC, corroborate the accounts of Krause and Myers that Defendants knew about the Boston Facility's problems and *were directly responsible* for Integra's failure to fix them. ¶¶ 223-67. According to these FEs, Defendants routinely *rejected* remedial measures that were costly or time consuming in favor of "the lowest budget option" to "squeez[e]" profits and avoid manufacturing disruptions. ¶ 392; *see also* ¶¶ 102-03 (Defendants implemented "a million Band Aids" to avoid incurring remediation costs); ¶ 266 (when remediation measures were proposed, management responded that Integra needed to "find a way to do it without taking time or money"); ¶¶ 228, 230 (Defendants only implemented remediation measures that did not negatively impact profits).[4]

Former employees similarly confirm that, because of this top-down directive, Defendants failed to take corrective action as to *any* of the fundamental "systemic failure[s]" identified by the FDA years earlier. ¶ 73; *see, e.g.*, ¶¶ 40, 343-63. Remarkably, this includes a host of rudimentary deficiencies. *First*, the retesting of initially failed endotoxin testing until receiving passing results—i.e., testing into compliance (a practice prohibited by core cGMP requirements)—

---

[4]      Multiple FEs confirmed that quality systems problems were a systemic, company-wide issue impacting its facilities in Ohio, Massachusetts, New Jersey, and Texas.  ¶¶ 121-24.

remained rampant. *E.g.*, ¶¶ 116, 134, 214 (FE 5: issues with endotoxin testing were swept "under the rug"; FE 13: Integra never adequately investigated endotoxin contamination; Myers: management directed employees to "cut [] contamination out of product sheets").

*Second*, the Boston Facility still failed to appropriately disinfect, sterilize, and test clean rooms. *E.g.*, ¶¶ 117, 141-42, 147 (FE 6: ***repeated issues*** with the sterilization procedures; FE 14: EBM products "came out of the clean room and then went back into the clean room" and bovine skins were improperly stored in the "rat room"; FE 8: Company relied on "low budget" sterilization methods). *Third*, Integra never addressed the CAPA and process validation control violations, deeming them too costly to correct. *E.g.*, ¶¶ 120, 143, 214, 239-40 (FE 9: "shocking[ly]" long CAPA implementation, "no way near close to where they should have been"; FE 14: no CAPA training, "no meetings or formal training" on addressing 2021 Form 483; Myers: Integra leadership instructed employees to bypass mandatory FDA remediation requirements, including CAPAs, in order to avoid investigations, root cause analyses, destroying contaminating product, and costly production stoppages; FE 17: management rejected scaled up endotoxin testing due to cost); *see also* Ex. A at ¶¶ 20, 49 (Krause: De Witte and Anderson cut the remediation budget in half and terminated 75 employees making it impossible to address the necessary quality work).

The FE accounts are fully corroborated by multiple sources. The FDA identified these same issues during its 2021 and 2023 inspections. ¶¶ 125-30 (2021 Form 483 found same cGMP control deficiencies, such as that Integra documented failing results as "passing" under its acceptance criteria, even where "fungal growth results were recorded" as "[t]oo numerous to count"), ¶¶ 154-63 (2023 Form 483 found Integra still failed to adequately detect and prevent contamination from dangerous bacterial endotoxin). Additionally, in October 2022, an employee lodged an internal whistleblower complaint alleging that sterile and non-sterile products were being mixed at the

Boston Facility—the same issues identified by the FDA and FEs—and that management had instructed employees to ignore potential contamination. ¶¶ 149-52. Further, while Defendants continually downplayed their significance, these violations were so severe that they ultimately necessitated a production halt in April 2023 (¶¶ 268-75), a "voluntary global recall" of all products manufactured at the Boston Facility over the preceding five-plus years in May 2023 (¶¶ 277-93), the disclosure in July 2024 of systemic compliance deficiencies requiring shipping holds across the Company, and the creation of "compliance master plan" and dedicated Board committee to "bolster our manufacturing quality compliance processes across the organization" (¶¶ 311-21).

> **C.** **Instead of Remediating the Boston Facility's Severe Compliance Issues, Defendants Quietly Made Plans to Relocate to a New Facility in Braintree**

In truth, Defendants refused to commit resources to remediating the Boston Facility because they knew that it would result in lost sales and significant costs. ¶¶ 175-82. Instead, by 2021, Defendants decided to relocate manufacturing operations to the state-of-the-art Braintree Facility, a decision that rendered remediation of the Boston Facility a "non-issue." *Id.* While plans to open the Braintree Facility could have been made in conjunction with remediating the Boston Facility, no such remediation efforts were made—a fact underscored by FE 9, who stated that as early as mid-2021, management told employees at a "town-style meeting" of the plan to relocate manufacturing operations from the dilapidated Boston Facility to Braintree. ¶ 177.

**V.     THE TRUTH IS GRADUALLY REVEALED**

On April 26, 2023, Integra announced a production pause at the Boston Facility to "make the changes in process and physical layouts that are needed" (¶¶ 268-69, 489). That day, Integra's stock price fell $4.64 per share, nearly 8%. ¶¶ 271, 489.

On May 23, 2023, Integra issued a global recall of all products manufactured at the Boston Facility during the past five years "to implement additional detection and quality controls" and

13

revealed that the recall would have a significant impact on profitability. ¶¶ 277-79, 489. That day, Integra's stock price fell $10.24 per share, or 22.5%. ¶¶ 280, 489.

On February 28, 2024—just days after Integra learned that virtually all product manufactured at the Boston Facility was contaminated—Integra disclosed: (i) De Witte's surprise "retirement" after less than two years as CEO; (ii) disappointing 2023 financial results and 2024 guidance driven by the recall and prolonged Boston Facility shutdown; (iii) an extended timeline for resuming production; and (iv) that the reopening would not include any private label business. ¶¶ 294-97, 489. Integra's stock price fell over $7.36 per share, or 16%. ¶¶ 298, 489.

On May 6, 2024, Integra cut its full-year EPS guidance and disclosed that it would not "resume commercial distribution in 2024" at the Boston Facility. ¶¶ 300-01. Over the next two trading days, Integra's stock price fell $5.75 per share, or 22.5%. ¶ 306.

Finally, on July 29, 2024, Integra announced the implementation of a "compliance master plan," including a production halt on all key production lines across *all* Integra facilities to address compliance deficiencies, the immediate undertaking of costly preventative and corrective actions overseen by management and a dedicated Board committee for at least two fiscal years, and its impact on Integra's financial condition. ¶¶ 311-19. Defendants admitted these extraordinary steps were driven by their interactions with the FDA throughout the Class Period. ¶ 313. Over the next two trading days, Integra's stock price fell $6.01 per share, or 21%. ¶ 320.

Between April 26, 2023 and July 29, 2024, Integra's stock price fell by over 65%. ¶ 15.

## LEGAL STANDARD

The Court set forth the appropriate legal standard in its prior Order. *See* Op. at 18-20.

## ARGUMENT

### I.    THE AC RAISES A STRONG INFERENCE OF DEFENDANTS' SCIENTER

Scienter concerns Defendants' "intention to deceive, manipulate, or defraud." *Tellabs, Inc.*

14

*v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). In evaluating whether the AC raises a strong inference of scienter, the Court must evaluate Plaintiffs' allegations "collectively," not in isolation. *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 114 (3d Cir. 2018); *In re Coinbase Glob., Inc. Sec. Litig.*, 2024 WL 4053009, at *15 (D.N.J. Sept. 5, 2024). The inference of scienter "need not be irrefutable, *i.e.*, of the smoking gun genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324. Instead, it need only be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314.

Scienter may be established by facts "constitut[ing] circumstantial evidence of either recklessness or conscious behavior." *See Roofer's Pension Fund v. Papa,* 2018 WL 3601229, at *15 (D.N.J. July 27, 2018); *Coinbase*, 2024 WL 4053009, at *15 (same). A strong inference of recklessness exists if the AC alleges that Defendants "should have known that they were misrepresenting material facts" to investors. Op. at 23-24 (quoting *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001)). Allegations that Defendants had "knowledge of facts or access to information contradicting their public statements" are sufficient to raise a strong inference of recklessness. *Id.*; *see also Coinbase*, 2024 WL 4053009, at *15-16. "[I]t is not necessary to plead motive to establish . . . scienter." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013); *Tellabs*, 551 U.S. at 325 ("While it is true that motive can be a relevant consideration, . . . the absence of a motive allegation is not fatal.").

The Court previously concluded that the Consolidated Complaint supported an inference that: (i) "Defendants clearly knew about the cGMP violations" at the Boston Facility "throughout the Class Period"; (ii) "remediation at the Boston Facility would have been costly and time-consuming"; and (iii) Integra "was not doing everything it could to remediate the cGMP violations that the FDA found." Op. at 27-28, 31. In the Court's view, however, Plaintiffs had not alleged

15

sufficient facts for it to "take the leap from knowledge to intent." *Id.* at 36.

The AC's new allegations, including the damning accounts of Krause and Myers, remedy this issue by demonstrating that Defendants were aware of material facts and engaged in deliberate conduct that directly contravened their Class Period statements. *See* ¶¶ 183-221, 327-42. Nothing more is required. *See, e.g.*, *Campbell Soup*, 145 F. Supp. 2d at 599 (scienter adequately pled by alleging "knowledge of facts or access to information contradicting their public statements").

**A.      The AC's New Allegations Support a Strong Inference of Scienter**

The new facts in the AC, including the firsthand accounts of Krause, Myers, and five new former employees, support a strong inference of Defendants' scienter.

**1.      Krause And Myers Support a Strong Inference of Scienter**

Krause and Myers, two former high-ranking Quality executives at the Boston Facility, identify specific instances of misconduct by Defendants, including De Witte, Schwartz, and other members of Integra's executive leadership, in furtherance of a systemic scheme to elevate profits and production over quality and safety. ¶¶ 41-42, 183-221. Their accounts, which were verified by Lead Counsel and corroborated by 20 other FEs, confirm that Defendants were not only aware of Integra's remediation and safety problems—they acted with intent to deceive by ***deliberately impeding and undermining*** Integra's remediation efforts. This intentional conduct included:

- obstructing numerous attempts to remediate the Boston Facility;

- concealing and recklessly disregarding serious safety and quality issues;

- directing employees to bring knowingly contaminated products to market in violation of FDA regulations;

- pressuring employees to make false statements to the FDA; and

- firing and otherwise retaliating against Integra employees who attempted to derail their fraudulent scheme.

According to Krause, at the same time Defendants were publicly assuring investors that

16

Integra had "been working for the past couple of years to upgrade our Boston [F]acility based on FDA observations" (¶ 399), and "made significant investments in quality" at the Boston Facility (¶ 441), they were *repeatedly interfering with* Krause's efforts to remediate the Boston Facility and slashing Integra's remediation budget and headcount. *See, e.g.*, ¶ 189; Ex. A at ¶¶ 20, 49. Similarly, while Defendants were publicly stating that safety was "paramount" (¶ 447) and "non-negotiable" (¶ 404), and that Integra "adheres to" cGMPs (¶ 437), Defendants were "actively engag[ed] in *a concerted effort to downplay* quality control issues, *avoid* [FDA] regulations and *risk* patient safety in violation of multiple applicable laws and regulations." ¶¶ 187-89. These efforts included: (i) pressuring Krause to bring contaminated product to market despite clear patient safety risks (¶ 190); (ii) concealing critical safety and quality concerns from her, the Board, and the FDA (¶¶ 191-93 200-04); (iii) directing her to violate FDA regulations (¶ 199); and (iv) "demand[ing] that she provide false information to the FDA" (¶¶ 206-07).

Krause stated that Defendants were aware of additional, highly material facts—beyond their own conduct—that contradicted their public statements. For example, by April 27, 2023—one week before Leonard assured investors that Integra was "on a path to reach world-class quality assurance across all manufacturing sites" (¶ 441)—Integra knew that products manufactured at the Boston Facility contained unacceptable endotoxin levels that were *27x higher* than the levels it detected internally (¶ 196). Likewise, by May 16, 2023—weeks before De Witte stated that Integra had "no specific indications of any product complaints related to high endotoxin levels" (¶ 404)—Integra knew that it had received *over 80 patient complaints* reporting symptoms like "high fevers," "infection," and "meningitis," which can result from endotoxin exposure (¶ 196).

Myers fully corroborates Krause's account. Contrary to Defendants' 2024 statements (¶¶ 425, 434), Myers stated that Defendants: (i) decided in November 2023 to restart

17

manufacturing at the Boston Facility despite being aware of "life threatening risks" to patients (¶ 212); (ii) attempted to conceal the fact that ***virtually all*** products manufactured at the Boston Facility in January 2024 were contaminated (¶ 213); (iii) devised an unlawful plan to bring contaminated products to market on an accelerated basis to meet the timetable they represented to investors (¶¶ 214-16); and (iv) pressured Myers to deceive the FDA about Integra's manufacturing and marketing of contaminated product to further their fraudulent scheme (¶¶ 216-20). Indeed, Myers' statements confirm that when De Witte publicly described Integra's restart efforts at the Boston Facility as "successful" (¶ 425), Integra already knew that ***nearly every*** product manufactured at the Boston Facility following the restart was contaminated and thus could not be sold without violating basic cGMP, FDA regulations, and other applicable laws (¶ 213).

Allegations like these, which demonstrate that Defendants engaged in a deliberate and pervasive course of conduct that contradicted their public statements, raise a strong inference of scienter. *See, e.g.*, *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *17-18 (W.D. Pa. May 18, 2023) (scienter pled based on "pervasive, top-down scheme to dupe the FDA and ignore regulatory compliance best practices in the name of juicing manufacturing output and increasing corporate profits" after receiving FDA warnings); *In re Dr. Reddy's Lab. Ltd. Sec. Litig.*, 2019 WL 1299673, at *15-16 (D.N.J. Mar. 21, 2019) (allegations that "Defendants had no intention of adequately addressing the violations of cGMP detailed in the [FDA] Warning Letter" raised inference of scienter); *Bucks Cnty. Emps. Ret. Sys. v. Norfolk S. Corp.*, 775 F. Supp. 3d 1275, 1293-94 (N.D. Ga. 2025) (scienter pled where company's "deprioritization" of known safety issues "was comprehensive" and "pervaded every aspect of the company's operations").

Defendants' retaliatory efforts against Krause and Myers further strengthen that inference. *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 244 (S.D.N.Y. 2022) (employee's

termination after raising concerns supported inference of scienter); *Miller v. Sonus Networks, Inc.*, 636 F. Supp. 3d 245, 248, 252-53 (D. Mass. 2022) (efforts to silence dissenters supported the inference of scienter); *In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 497-98 (W.D. Pa. 2020) (resistance to dissenting opinions that would reveal fraud strengthened inference of scienter).

**Krause's and Myers' Allegations Should Be Accorded Full Weight**. In a ploy to prevent the Court from considering these detailed and damning facts, Defendants claim that facts sourced from their complaints must be struck or steeply discounted. Br. at 9-11. Defendants' arguments are meritless and fail to meet their heavy burden under Rule 12(f).

Only "redundant, immaterial, impertinent, or scandalous matter" may be struck from a pleading under Rule 12(f). *See* Fed. R. Civ. P. 12(f). "To prevail on a motion to strike, the movant must show that the allegations being challenged are so unrelated to Plaintiff's claims as to be unworthy of any consideration and that their presence in the pleadings will be prejudicial." *Lewakowski v. Aquestive Therapeutics, Inc.*, 2023 WL 2496504, at *13 (D.N.J. Mar. 14, 2023).

Defendants do not attempt to satisfy either requirement. Instead, they argue that unadjudicated allegations from other complaints are *per se* immaterial under Rule 12(f). However, Defendants tether their argument to outdated cases that have been discredited for misapplying Second Circuit law. In particular, *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003), and the case it is based upon, *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893-94 (2d Cir. 1976), concerned "very narrow holding[s]" limited to their specific facts and lacked any reasoned analysis. *IBT Emp. Grp. Welfare Fund v. Compass Mins. Int'l, Inc.*, 723 F. Supp. 3d 1053, 1058-59 (D. Kan. 2024) (denying motion to strike and rejecting reliance on *Merrill Lynch*, *Lipsky*, and their progeny as providing "zero analysis of this issue, much less a persuasive one"); *see also In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 620-22 (S.D.N.Y. 2014)

19

(denying motion to strike, finding that "no Second Circuit precedent indicates such a broad rule," and permitting amendment with allegations from third party complaint). In fact, in a recent decision conspicuously omitted from Defendants' Motion, the Second Circuit reaffirmed: "we explicitly limited our holding in *Lipsky* to the facts of that case," "we certainly did not foreclose plaintiffs from relying on facts and allegations incorporated in another proceeding," and "***[f]or the avoidance of all doubt, we hold that a complaint may rely on factual allegations or reports incorporated in complaints from other proceedings***." *Sherman v. Abengoa, S.A.*, 156 F.4th 152, 165-66 (2d Cir. 2025).[5]

Third Circuit law is in accord. *See, e.g.*, *Lewakowski*, 2023 WL 2496504, at *13 (denying motion to strike unadjudicated allegations from two unrelated actions in securities fraud action governed by the PSLRA); *Schwab Cap. Tr. v. Celgene Corp.*, 2021 WL 1085474, at *1 (D.N.J. Mar. 22, 2021) (approving plaintiffs' reliance on third-party complaint allegations in securities fraud action governed by the PSLRA); *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 494 (D. Del. 2019) (refusing to "deeply discount, or decline to consider" third-party complaint allegations in securities fraud action governed by PSLRA).

Equally meritless is Defendants' argument that Krause's and Myers' factual allegations are "inherently unreliable" and should be "heavily discounted." Br. at 10. Courts in this Circuit and

---

[5]    Defendants' assertion that "district courts within the Second Circuit are split on this issue" (Br. at 10 n.2) is thus highly misleading.  Defendants' other authorities are inapposite.  In *Flores v. Forster & Garbus, LLP*, 2020 WL 5603486, at *1 (S.D.N.Y. Sept. 17, 2020), and *Gaer v. Education Management Corp.*, 2011 WL 7277447, at *10 (W.D. Pa. Aug. 30, 2011), *R. & R. adopted,* 2011 WL 7277578 (W.D. Pa. Sept. 29, 2011), plaintiffs sought to use the fact that a defendant had been *sued*—not the underlying *facts* alleged—to bolster their claims. In *Clugston v. Nationwide Mutual Insurance  Co.*, 2006 WL 1290450, at *4 (M.D. Pa. May 10, 2006), the plaintiff sought to use an alleged conversation he had with an administrative employee of Pennsylvania's Department of Insurance about his insurer's claims handling to show culpability in the handling of his claims in a lawsuit against the insurer.

nationwide "***regularly*** permit[] plaintiffs to incorporate allegations made in other complaints or proceedings" and credit those allegations under the same standards applicable to any other source. *See Sherman*, 156 F.4th at 165-67 (reversing district court for "disregarding" allegations sourced from another proceeding and finding that "[u]pon consideration of those allegations, we are persuaded that Plaintiffs have plausibly alleged" a securities fraud claim). The reasoning of these cases is simple: "It makes little sense to say that information . . . which [the AC] could unquestionably rely on if it were mentioned in a news clipping" or another third-party source "is immaterial simply because it is conveyed in an unadjudicated complaint." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 414 (S.D.N.Y. 2020) (ellipsis in original); *see Shah v. Zimmer Biomet Holdings, Inc.*, 2019 WL 762510, at *8 (N.D. Ind. Feb. 20, 2019) ("[I]t is hard to say how facts taken from the allegations of another case's complaint are materially different from alleging facts from any other third-party source, such as a leaked internal document, a news article, an academic journal, a witness interview, or even an SEC filing.").

Here, the factual information alleged by Krause and Myers is highly reliable and should be given significant weight. These federal court complaints—subject to Rule 11 sanctions[6]—collectively provide the percipient accounts of Integra's two senior-most Quality officials at the Boston Facility, and are replete with detailed facts that are within their personal knowledge and plainly relevant to this case. Such highly particularized details include names, dates, meetings, conversations, documents, and specific actions taken by Defendants evidencing their intent to defraud, including illegal directives by De Witte and other senior executives to lie to the FDA and

---

[6]   *See, e.g., Lord Abbett*, 363 F. Supp. 3d at 493 (crediting "specific factual allegations" sourced from third party complaint, "which must under Fed. R. Civ. P. 11 be based on a reasonable inquiry, to corroborate similar factual allegations in [plaintiff's] own complaint").

its external auditor, and efforts to undermine necessary and timely remediation at the Boston Facility. ¶¶ 183-221. The reliability of facts asserted by Krause and Myers "exceeds that of *confidential* sources" that courts, including this Court,[7] "find sufficiently reputable." *In re Mattel, Inc. Sec. Litig.*, 2021 WL 1259405, at *8 (C.D. Cal. Jan. 26, 2021) (crediting account of senior executive "due to his disclosed identity, elevated position, and first-hand knowledge of many pertinent events" and rejecting as "untenable" argument that his account should be discredited).[8]

The facts alleged by Krause and Myers are internally consistent, mutually corroborative, and further supported by the detailed, coextensive, eyewitness accounts of 20 other FEs, all of whom describe how cGMP violations were endemic at the Boston Facility and other Integra facilities, and resulted in a "revolving door" of employees who quit or were fired for raising these exact issues. ¶¶ 222-67; *see Sherman*, 156 F.4th at 157 (noting that allegations from third party proceedings were corroborated by plaintiffs' "independent investigation"). Finally, the veracity of all FE allegations—including individuals identified by name and individuals identified by position, tenure, and responsibility—were confirmed by Lead Counsel. *See, e.g.*, *Lako v. Loandepot, Inc.*, 2023 WL 444151, at *6 (C.D. Cal. Jan. 24, 2023) ("Finding evidence of adequate independent investigation by Plaintiffs' counsel, the Court will not strike allegations drawn from the Richards Complaint."); *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 343 (S.D.N.Y. 2015) (denying

---

[7]     Op. at 26-27 (account must be credited if it provides sufficient "detail," "the sources' basis of knowledge," "the reliability of the sources," "the corroborative nature of other facts alleged," and "the coherence and plausibility of the allegations"); *see also City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 691-92 (3d Cir. 2023) (similar).

[8]     Courts in this District and nationwide routinely credit "unadjudicated" allegations sourced from complaints in other actions with *far* less independent investigation and support. *See, e.g.*, *Schwab Cap.*, 2021 WL 1085474, at *10 (crediting FE allegations copied verbatim, from securities class action complaint); *MicroCapital Fund LP v. Conn's Inc.*, 2019 WL 3451153, at *14 n.28 (S.D. Tex. July 24, 2019), *R. & R. adopted*, 2019 WL 4673209 (S.D. Tex. Sept. 24, 2019) (same); *380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 224-25 (S.D.N.Y. 2008) (same).

22

motion to strike where "[t]he facts [were] derived from a credible complaint" and "counsel for plaintiffs have indicated that they have reached out to attorneys . . . to verify the allegations").[9]

**Defendants' Attacks on Krause are Meritless**. Defendants' efforts to undermine Krause's claims fail. *First*, Defendants mischaracterize Plaintiffs' allegations regarding the 2022 whistleblower complaint. Plaintiffs do not contend simply that Krause was informed of the complaint "within six days, as opposed to one day." Br. at 13.[10] Rather, they allege that: (i) even after Krause was notified of the complaint, she was not informed of its details and was told only that it "focused on an issue that Integra was already purportedly resolving" (¶ 192), despite the FDA requirement that "the [CCO] disclose all information that is patient, product, or quality related to the Chief Quality Officer" (Br. at 13); (ii) she was excluded from Integra's investigation even though it was her mandated responsibility to investigate it (¶ 193); and (iii) the investigation was closed by CCO Redondo after three weeks without the knowledge or involvement of Krause or the FDA (¶ 192). Thus, the AC does not allege a mere timing issue, but rather a deliberate

---

[9]      Defendants' cases do not support their position. *See In re Apollo Grp., Inc. Sec. Litig.*, 2011 WL 5101787, at *10 n.5 (D. Ariz. Oct. 27, 2011) (permitting securities class action plaintiffs to rely on allegations from a *qui tam* action provided they independently verified alleged facts); *In re Universal Health Servs., Inc., Deriv. Litig.*, 2019 WL 3886838, at *36 (E.D. Pa. Aug. 19, 2019) (holding that knowledge of *qui tam* lawsuits "on their own" was insufficient to impute knowledge of misconduct to board); *Rahman*, 2012 WL 12294490, at *15 (discounting FE allegations not pled with the requisite particularity); *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (plaintiff "rel[ied] *entirely* on another complaint as the *sole* basis for his or her allegations") (emphasis in original); *Bartesch v. Cook*, 941 F. Supp. 2d 501, 507 (D. Del. 2013) (rejecting allegations taken from voluntarily dismissed complaint "devoid of any information concerning the *qui tam* plaintiff's relationship to [defendant] or whether the plaintiff has firsthand knowledge of his allegations against [the defendant]").

[10]      In arguing that "Integra's policy [in 2022] did not require notification in '24 hours'" (Br. at 13), and that Plaintiffs "conflate internal reports . . . with adverse event reports" (Br. at 14), Defendants improperly ask the Court to make factual findings. *Flora v. Cnty. of Luzerne*, 776 F.3d 169, 175-76 (3d Cir. 2015).

scheme to conceal critical patient safety risks, avoid remediation, and disregard FDA mandates.[11]

*Second*, Defendants claim that the inference of scienter is undermined because they "ultimately accepted [Krause's] recommendations." Br. at 12. Not so. The AC alleges that Defendants **rejected** Krause's December 2022 directive to institute a manufacturing hold and continued manufacturing product for another month. ¶ 195. In addition, Defendants only disclosed the whistleblower complaint to the FDA **after** Krause notified the FDA of its existence—prior to that, they sidelined Krause from Integra's investigation and quietly closed it without alerting the FDA. ¶¶ 195-97.[12] Further, the AC does **not** allege that Defendants actually "disposed of contaminated inventory" in response to the Product Safety Board's recommendation or that they "did not relabel products after Krause refused." Br. at 12.

*Third*, Defendants are wrong to suggest that Krause's statements "are consistent with [their] public disclosures." *Id.* at 11. For one thing, Krause did not state that **Integra** implemented "new, more effective processes" between 2021 and 2024. *Id.* Krause stated that "**[s]he** established new, more effective processes" (Karin Ex. 47 ¶ 11), but that Defendants "**undermined** her efforts to ensure safety and compliance at every turn," (*id.* ¶¶ 12-13) including by slashing Quality's budget and headcount (Ex. A ¶ 20). Further, Krause's statement that Integra "believed [in August 2021] that the FDA warning letter would be removed" (Br. at 11 (citing Karin Ex. 47 ¶ 16)), does not reflect a good faith belief on the part of Defendants. Rather, as Krause's statements make clear,

---

[11]    As discussed below, these new allegations amply address the Court's prior findings and show that, far from exonerating Defendants, their response to the 2022 Whistleblower Report bolsters the strong inference they intentionally misled investors.

[12]    Defendants' reliance on *Fire & Police Pension Association of Colorado v. Abiomed, Inc.*, 778 F.3d 228 (1st Cir. 2015) is misplaced. Br. at 12. In that case, "[i]t was Abiomed which asked for meetings with the FDA." *Abiomed*, 778 F.3d at 244-45. Here, by contrast, the AC alleges that Integra repeatedly tried to **conceal** material information from the FDA.

it was premised on a ***knowingly false*** statement made to her by management that "Integra had finished remediating" the Boston Facility's quality issues. Karin Ex. 47 ¶ 15.[13]

*Fourth*, Defendants' misconduct at the Plainsboro facility and their efforts to override safety recalls of other products support the inference of scienter. *See* Br. at 12-13. These facts corroborate Plaintiffs' other allegations and reflect a pervasive, company-wide practice of deliberately disregarding patient safety, quality concerns and FDA mandates. *See Mylan*, 2023 WL 3539371, at *18-19 (scienter met when executives "balked at implementing meaningful changes to address the [FDA] violations, and instead internally demanded that [the facility] increase its annual production goals and cut its regulatory compliance and quality control budget").[14] *Finally*, as discussed below, the non-fraudulent inferences Defendants posit cannot rationally be drawn from Krause's allegations and thus cannot be credited. *See* Argument § I.C.

**Defendants' Attacks on Myers are Meritless**. Defendants' efforts to undermine Myers' claims are equally infirm. *First*, Myers' statements do not "bear only on Statements 26-28." Br. at 16. Myers was employed by Integra when Statements 22 through 28 were made. His firsthand accounts bear directly on Defendants' scienter for those statements. Moreover, Myers corroborates

---

[13]     In any event, no such belief could have existed after November 12, 2021, when the FDA's inspection of the Boston Facility "resulted in 483 adverse findings being issued." Karin Ex. 47 ¶ 17. None of the alleged misstatements was made between August and November 12, 2021.

[14]     Defendants' cases are inapposite because these allegations relate directly to alleged misstatements, including that "adheres to" cGMP (¶ 437), "product safety and quality are paramount" (¶ 447), Integra was "on a path to reach world-class quality assurance ***across all manufacturing sites***" (¶ 441), and "[p]atient safety is non-negotiable for us" (¶ 404). *See In re Overstock Sec. Litig.*, 2021 WL 4267920, at *12 (D. Utah Sept. 20, 2021), *aff'd,* 119 F. 4th 787 (10th Cir. 2024) ( (rejecting scienter allegations that did not "relate in any way to the[] challenged statements"); *Bricklayers of W. Pa. Pension Plan v. Hecla Mining Co.*, 2013 WL 5423875, at *8 (D. Idaho Sept. 26, 2013) (scienter not pled where facts were "unrelated and irrelevant" to misstatements). Here, Defendants themselves admit that certain of the alleged misstatements were "about Integra as a whole." Br. at 33.

25

the accounts of Krause and the 20 FEs cited in the AC, supporting "the pervasive and systemic nature of [Integra's] problems and the purposefulness in failing to address and remed[iate]" them throughout the *entire* Class Period. *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 963 (N.D. Cal. 2014); *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 193-95 (D.N.J. 2022) (corroborative FE accounts bolstered inference of scienter); *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *30 (D.N.J. June 5, 2020) (same).

*Second*, in arguing that Integra engaged in "test manufacturing" in January 2024 and not "commercial manufacturing" (Br. at 16), Defendants improperly ask this Court to make a factual finding in their favor based on rank speculation. *See Weiner v. Quaker Oats Co.*, 129 F.3d 310, 315 (3d Cir. 1997). In truth, Myers stated (and Plaintiffs alleged) the exact opposite. *See* Br. at 16 (acknowledging Myers' statement that Integra resumed production "for commercial distribution"); ¶ 212 (alleging that Integra accelerated the timeline for commercial manufacturing).[15] Moreover, Defendants' claim that they conducted test manufacturing "to identify gaps before commercial manufacturing could restart" (Br. at 16), is not credible given that they *ignored* and *concealed* the severe safety and compliance gaps that quickly materialized (¶¶ 213-16). At best, Defendants raise factual disputes that "the court may not resolve." *Flora*, 776 F.3d at 175-76.

*Finally*, Defendants contend that Myers "undermine[s] any inference of scienter" by stating that Integra "sought an independent medical officer review to assess" the "cut around" plan. Br. at 17. This claim is not credible. Myers never stated that Defendants sought an "independent" review. He stated that a medical review had *already* been performed, which concluded that "no particulate

---

[15]     Defendants are not asking the Court to draw a non-culpable inference about their state of mind from the facts alleged in the AC. Rather, they are asking the Court to *rewrite* the facts alleged in the AC to make them "consistent with Integra's [public] disclosure[s]." Br. at 16.

contamination is permissible" (¶ 215), and that Defendants were trying to "find a medical affairs professional" to **override** that conclusion. Karin Ex. 45 ¶ 27. Far from suggesting that "management took [Myers' concerns] seriously" (Br. at 17), Defendants' attempt to manipulate the medical review process is another example of profits being prioritized over safety.[16]

### 2. The AC's New FE Allegations Strengthen the Scienter Inference

The AC contains five new FE accounts that—together with Krause and Myers—bolster the inference of scienter and amply address the Court's prior concerns. FEs 16 through 20 corroborate the accounts of Krause and Myers and provide additional examples of Defendants deliberately: (i) prioritizing profits over safety and compliance; and (ii) downplaying Integra's serious quality issues and circumventing FDA regulations. *See* ¶¶ 171, 224-62. FE 17, for example, describes Defendants' deliberate efforts to manipulate Integra's internal testing processes so that endotoxin contamination would go undetected. ¶¶ 238-42. Like Krause and Myers, FE 17 also stated that he was pressured to lie to the FDA. ¶ 243; *see also* ¶ 265 (FE 12 was given an "insane" instruction in 2020 to change, without reexamination, the validation date on Integra's sterilization and microbiology validations). Further, FE 19 and FE 20 recounted that numerous Defendants, including Davis, Leonard, and Miller, attended monthly meetings where the Boston Facility's serious quality issues and remediation failures were discussed. ¶¶ 254-58. During these meetings, Integra's senior executives were briefed on Integra's ongoing failure to meet remediation timelines

---

[16] Defendants' claim that Myers' allegations are vague is also unpersuasive. Br. at 16-17. For example, Defendants criticize Myers for not alleging "when Defendants learned of the alleged contamination" discovered on February 26, 2024. *Id.* at 17. But **two days later**, De Witte spoke about the purported success of the Boston Facility's "dress rehearsal." ¶ 425. De Witte either knew about the contamination at the time of this statement or was reckless in discussing Integra's "success[]" without reviewing the February 26 test results. *See Papa*, 2018 WL 3601229, at *23 (statements about "success" of business strategy were "indicative of personal knowledge").

27

and milestones such that by Fall 2023, Integra had made no progress remediating the Boston Facility, was definitely not on track with its remediation plan, and management's approach to remediation was not serious and meant only to mollify the FDA in the short term. *Id.*

Importantly, the FEs also demonstrate that the pattern of deliberate misconduct recounted by Krause and Myers ***predated*** their tenures at Integra, thus confirming Defendants' scienter for earlier statements. For example, FE 17 confirmed that Defendants' misconduct began by no later than ***2015*** (¶ 228), and that Integra had been employing its dangerous, unethical, and illegal "cut around" practice ***since 2018*** (¶¶ 246-47). Corroborative FE accounts like these, which demonstrate that patient safety was ignored, strengthen the inference of scienter. *See Mulligan*, 36 F. Supp. 3d at 963 (corroborative FE accounts support scienter by "demonstrat[ing] the pervasive and systemic nature of [the company's] problems and the purposefulness in failing to address and remedy these problems"); *Cognizant*, 2020 WL 3026564, at *30 (corroborative FE allegations "further support[ed] the inference that widespread or pervasive fraud existed within [company]").

Defendants' criticisms of these FEs are meritless. *First*, the FEs do not merely suggest that Defendants: (i) "knew of quality systems issues at Boston"; and (ii) "should have invested more resources into remediation earlier." Br. at 19-20.[17] Rather, they, like Krause and Myers, support the inference that Defendants engaged in pervasive and deliberate conduct—including attempts to mislead the FDA and others about compliance and patient safety—that contradicted their public statements. *Mulligan*, 36 F. Supp. 3d at 963; *Cognizant*, 2020 WL 3026564, at *30.

---

[17] *Pathfinder Management, Inc. v. Mayne Pharma, Inc.*, 2009 WL 4250061, at *8 (D.N.J. Nov. 25, 2009) is inapposite. Unlike the plaintiffs in that case, Plaintiffs do not contend that Defendants' focus on profits constitutes a motive to commit securities fraud. Rather, Plaintiffs contend that Defendants' prioritization of profits over safety ***contradicted their public statements***, including statements that "product safety and quality are paramount" and "non-negotiable."

*Second*, Defendants' attacks on the FEs' positions within Integra are unpersuasive. An employee need not be responsible for disclosure decisions to support an inference of scienter. *See* Br. at 18-19. Rather, the relevant question is "whether [p]laintiffs have properly alleged . . . that the confidential witnesses have personal knowledge about the incidents they address." *Mulligan*, 36 F. Supp. 3d at 963; *Lord Abbett*, 363 F. Supp. 3d at 492-93 (crediting allegations of "low-level" FEs that "were not employed for the full class period" where allegations "support the probability that the [FE] has personal knowledge"). Here, the AC demonstrates each FE's personal knowledge of the facts attributed to them. FE 17's statements are based on his 15+ years at the Boston Facility, his extensive interactions with Krause and other executives, and his attendance at internal meetings and meetings with the FDA. ¶¶ 228-49. FE 18's statements are based on his firsthand knowledge of the matters discussed by Myers, including the Greenleaf audit, and his work on CAPAs related to contamination. ¶ 225. FE 19's statements are based in part on monthly meetings he attended with Anderson and Davis. ¶¶ 251-55. Similarly, FE 20's statements are based on his role as an executive-level employee who attended meetings with Davis, Leonard, and De Witte. ¶¶ 257-61; *see Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 263 (3d Cir. 2009) (crediting FEs where complaint "described the duration of each CW's employment, the time period during which the CWs acquired the relevant information, and how each CW had access to such information").

### B.    The AC's Remaining Allegations Strengthen the Inference of Scienter

The AC also pleads other categories of allegations that support that Defendants acted knowingly or recklessly when issuing false statements. While Defendants note that the Court did not credit certain of these allegations in its Opinion, these allegations when considered holistically alongside newly pled facts discussed above provide further support for Defendants' knowledge or "access to information" that—at the very least—"support a finding of recklessness." *Strougo v. Mallinckrodt Pub. Ltd. Co.*, 2022 WL 17740482, at *7-8 (D.N.J. Dec. 16, 2022).

**FEs 1 through 15**. The AC realleges statements attributable to FEs 1 through 15, which the Court previously concluded supported an inference that Defendants "clearly knew about the cGMP violations [at the Boston Facility] throughout the Class Period" (Op. at 27), and that Defendants may have engaged in "some *reckless* conduct" (*id.* at 36). While the Court concluded these FE allegations alone did not raise a strong inference of scienter, it neither "rejected" them nor held that they do not contribute to such an inference. Br. at 9; *Avaya*, 564 F.3d at 267-68 (scienter inquiry is to assess whether allegations *collectively* raise a strong inference of scienter— not to accept or reject individual allegations). When viewed collectively with the new, highly particularized scienter facts, these allegations support the overall strong inference of scienter. *See Wu v. GSX Techedu Inc.*, 738 F. Supp. 3d 527, 563 (D.N.J. 2024) ("newly-added allegations" and corroborative FE allegations "strengthen the inference here of scienter").[18]

**FDA Inspections and Correspondence**. Defendants' Motion relies heavily on the Court's prior finding that Integra's disclosures regarding receiving FDA Warning Letters and Forms 483 undercut the inference of scienter. Br. at 1, 9, 21. Rather than being exculpatory, however, Defendants' disclosures about these documents were central to the alleged fraud.

Critically, Defendants did ***not*** publish or publicly disclose the contents of the 2021 Form 483 or the 2023 Form 483. They simply acknowledged Integra's receipt of the Forms while misleadingly downplaying their significance by stating that Integra "adhere[d]" to cGMP and concealing that the Forms addressed the ***same*** compliance deficiencies Defendants claimed to have remediated or to be "on track" to remediate. ¶¶ 87, 126-31, 154-69, 284-85, 368-70, 385-87, 391-

---

[18]   Plaintiffs have neither "distort[ed]" nor "twist[ed]" FE 5's statements. Br. at 20-21. Plaintiffs have simply included in the AC additional context provided by FE 5 before the filing of Krause's complaint, which corroborates the new allegations attributable to Krause. *See* ¶ 139.

30

485. *See, e.g.*, *Wilkof v. Caraco Pharm. Labs., Ltd.*, 2010 WL 4184465, at *2, *4 (E.D. Mich. Oct. 21, 2010) (sustaining shareholder claims despite argument that "Form 483s were public").

Further, Defendants only disclosed the 2019 and 2023 Warning Letters because they knew the FDA "regularly publishes warning letters on its website shortly after they are privately issued to the manufacturer." ¶ 58; *see also* ¶ 74. In fact, Defendants only disclosed their receipt of the 2023 Form 483 ***after*** it received the 2023 Warning Letter, which they knew the FDA was going to publish. And like their disclosures regarding the Forms 483, Defendants used their Warning Letter disclosures to convey materially false and misleading information to investors. *See, e.g.*, ¶¶ 74-97, 115-69, 284-88, 385-87, 391-485. These false and misleading disclosures thus contribute to— rather than undermine—the strong inference of Defendants' scienter.

**Defendants' Interference with the 2022 Whistleblower Investigation**. While the Court previously held that "an internal investigation tends to undermine any inference of scienter" (Op. at 25-26), the AC now alleges that Defendants recklessly disregarded Company policy and FDA requirements when conducting this investigation (¶ 191), including by excluding Krause, and that underlying problems identified by the whistleblower related to pervasive issues about endotoxin contamination that Defendants knew or recklessly disregarded in their April and May 2023 statements (¶¶ 399, 441).[19]

**The Importance of cGMP Compliance, SurgiMend, and PriMatrix**. Defendants' false statements support the inference of scienter because they concerned topics that were "central to their business." *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *5 (S.D.N.Y.

---

[19]    *Christian v. BT Group PLC*, 2020 WL 1969941, at *5-6 (D.N.J. Apr. 24, 2020), and *Salim v. Mobile Telesystems PJSC*, 2021 WL 796088, at *14 (E.D.N.Y. Mar. 1, 2021) are distinguishable because there, unlike here, the complaints did not allege that (i) defendants ended the investigation prematurely; or (ii) the investigation's findings would have revealed the alleged fraud.

Feb. 5, 2024). The Court previously held this did not support scienter without facts contradicting Defendants' public statements. Op. at 37. The AC cures this deficiency. Argument §§ I.A-B, II.A.

**Defendants' False Statements About Remediation.** Defendants, including De Witte and Knight, frequently discussed the Boston remediation—and their discussions about these statements further support their awareness of contemporaneous facts rendering their statements false or misleading. *Avaya*, 564 F.3d at 269 (statements can be "the most powerful evidence of scienter"); S*trougo*, 2022 WL 17740482, at *8. While the Court previously rejected Plaintiffs' argument that "Defendants' [false] assurances to investors demonstrate scienter" on the grounds that it "blurs the distinction between falsity and scienter" (Op. at 38), the specific content of their statements—when considered with the new allegations from Krause, Myers, and five additional FEs—support the inference of their knowledge of contradictory facts at the time of their challenged statements. Argument §§ I.A, II.A; *see Dr. Reddy's*, 2019 WL 1299673, at *16 ("[W]hen the FDA tells a company about a problem with a product, and the company nonetheless continues to make confident predictions about a product, courts have inferred scienter and falsity.").[20]

**De Witte's Sudden Resignation**. That De Witte suddenly resigned from Integra in February 2024 (¶ 294), together with allegations that he purposefully lied to Integra's Board about the "risk level" of the Boston Facility (¶ 203), supports that he intentionally or recklessly misled Integra's shareholders during the Class Period. *See In re Novo Nordisk Sec. Litig.*, 2018 WL 3913912, at *8 (D.N.J. Aug. 16, 2018) (departures of officers "contribute to a finding of scienter").

---

[20]    The authority cited by the Court is not to the contrary, as Defendants' statements here suggest their first-hand involvement and knowledge. *Compare Joyce v. Amazon.com, Inc.*, 2023 WL 8370101, at *13 (W.D. Wash. Dec. 4, 2023) (challenged statements did "not evince any particular defendant's first-hand knowledge or state of mind") *with e.g.*, ¶ 425 (De Witte informing investors that the Boston Facility had undergone a "successful dress rehearsal").

**Defendants' Relocation Plans**. The AC's new allegations contradict the inference that Integra's plans to relocate "could be done in conjunction with the remediation of the Boston Facility." Op. at 37; *see* ¶¶ 190-97. For example, new facts from FE 17 confirmed that, once Integra decided to move to Braintree, remediating the Boston Facility became a "non-issue." ¶ 248.

**C.    The Inference of Scienter Is at Least as Compelling as Defendants' Unsupported, Non-Culpable Explanations**

While the Court is permitted to consider competing, non-fraudulent inferences as part of its scienter analysis, it may only consider inferences that are "***rationally drawn from the facts alleged***." *Tellabs*, 551 U.S. at 314. Here, none of Defendants' proffered inferences can rationally be drawn from the AC's allegations—which draw a direct line between Defendants and the persistent, pervasive, and severe problems at the Boston Facility.

Defendants claim that rather than trying to sweep the issues at the Boston Facility under the rug without incurring any significant cost or production delays, it is "more plausible" to infer that they "underestimated how difficult it would be to remediate Boston and disclosed challenges as Integra encountered them." Br. at 21. But far from supporting such an inference, the AC alleges the opposite—that Defendants knew *exactly* how costly and time-consuming it would be to remediate the Boston Facility and took deliberate steps to avoid incurring those costs and delays. *See, e.g.*, ¶¶ 74, 82, 98-267. Indeed, De Witte and Anderson slashed the remediation budget and headcount without consulting Krause, and implemented a hiring freeze. Ex A. ¶ 20. When Krause revealed these budget cuts to the Board in July 2023—explaining that her resources were cut in half 30 days into the project and "her overall budget was cut by 75 people" 60 days later—"[t]he Board had no idea about these cuts and was shocked." *Id.* ¶ 49. These are not the actions of executives who "underestimated" remediation difficulties; these are the deliberate actions of executives who prioritized short-term revenues over patient safety and regulatory compliance.

33

Similarly, the inference that Defendants criticized Krause because they "wanted to see more progress on remediation" (Br. at 14), cannot rationally be drawn from the AC's core allegation that Defendants *repeatedly interfered* with her remediation efforts (¶¶ 189-207), improperly *concealed* quality-related internal complaints from her (¶ 191), and explicitly *directed* her to violate the law. When Krause told De Witte she did not want to break the law to save contaminated product, De Witte responded "Why not?" ¶ 198; *see also* ¶¶ 199, 206.

Further, the AC does not allege any facts indicating that Defendants believed Krause was "involve[d] in the alleged misconduct" referenced in the 2022 whistleblower complaint, that the delay in providing the complaint to the FDA was due to "privilege considerations," or that Krause believed she would be fired because of Integra's non-compliance. Br. at 13-14. These purported inferences are the product of rank speculation, not Plaintiffs' allegations. Nor does the AC support an inference that Krause and Defendants had a "good faith disagreement" over a "business decision." *Id.* at 14-15. While the AC is replete with facts suggesting that Integra was "at high risk of receiving an FDA warning letter for noncompliance" (¶ 200), nothing alleged indicates that Defendants had a good faith opposing viewpoint. Instead, Defendants attempted to silence Krause and conceal the truth from the market.[21] The AC also does not support an inference that the Board was "attempting to smooth over disagreements among executives." Br. at 15. Instead, it alleges that the Board knew about Defendants' misconduct and allowed it to persist. *See* ¶¶ 202-03.

---

[21] Unlike the FEs in *KBC Asset Management NV v. DXC Tech. Co.*, 19 F.4th 601, 610 (4th Cir. 2021), who believed simply that management "made unwise business decisions," Krause and Myers indicate that Defendants engaged in misconduct and concealed material facts from the market. Defendants' reliance on *California Public Employees' Retirement System v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004) is also misplaced. In that case, the purported "distort[ion]" stemmed from plaintiffs "ignor[ing]" parts of defendants' statements and defendants' purported full disclosure of the alleged behavior. *Id.* at 156-58.

34

As for Myers, nothing in the AC supports the claim that he was let go because he "failed in his charge." Br. at 17. To the contrary, the AC alleges that Myers repeatedly pushed back on executives' efforts to flout basic quality and safety standards, avoid undertaking desperately needed remediation, and resume manufacturing using deeply flawed processes that resulted in near ubiquitous contamination of product. *See* ¶¶ 208-20. The timing of Myers' termination—***less than two weeks*** after he thwarted Defendants' "cut around" strategy and ***one day*** after he rebuffed their continued efforts to market contaminated product (¶¶ 218-21)—raises a compelling inference that he was fired because he, like Krause, attempted to blow the whistle on Defendants' misconduct.[22]

Finally, Integra's share repurchases do not negate an inference of scienter. *See, e.g.*, *Papa*, 2018 WL 3601229, at *17 n.15 ("[S]tock repurchase plan weighs neither in favor of nor against an inference of scienter."); *City of Southfield Fire & Police Ret. Sys. v. Hayward Holdings, Inc.*, 2025 WL 1577315, at *15 (D.N.J. June 4, 2025) (same).[23]

## II.   THE COMPLAINT ADEQUATELY ALLEGES THAT THE DEFENDANTS MADE MATERIALLY FALSE AND/OR MISLEADING STATEMENTS

Under SEC Rule 10b-5, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Plaintiffs need not provide "irrefutable evidence of a statement's falsity at the pleading stage; rather, a complaint must contain particularized factual allegations that plausibly allege that a statement was

---

[22] Defendants' authorities are inapposite. *See, e.g.*, *In re Great Atl. & Pac. Tea Co. Sec. Litig.*, 103 F. App'x 465, 467, 470 (3d Cir. 2004) (complaint contained "no specific allegations regarding how [fired] employees were involved in the accounting irregularities or whether they knew that the accounting policies violated GAAP before the restatement was issued").

[23] This argument also raises factual disputes. For example, Integra may not have used its own funds to repurchase shares, but rather funds it raised from investors through a convertible note offering. *See, e.g.*, Karin Ex. 10 at 41-42; Karin Ex. 11 at 41; *Hayward*, 2025 WL 1577315, at *15.

misleading." *Prudential*, 70 F.4th at 681. "Some statements, although literally accurate, can become through their context and manner of presentation, devices which mislead investors." *In re Merck & Co. Sec., Deriv., & ERISA Litig.*, 2011 WL 3444199, at *9 (D.N.J. Aug. 8, 2011).

The materiality inquiry is a mixed question of law and fact. Thus, "[o]nly if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Coinbase*, 2024 WL 4053009, at *9.

"Absent a duty to disclose, silence is not fraudulent or misleading under Rule 10b-5," but "[w]hen you speak . . . you are bound to speak truthfully." *U.S. v. Schiff*, 602 F.3d 152, 162 (3d Cir. 2010); *see also Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263-65 (2024) ("half-truths" are actionable under Section 10(b)); *Papa*, 2018 WL 3601229, at *13 ("The law does not permit corporate executives to mislead investors through half-truths.")

### A.    The Complaint Adequately Alleges Facts Rendering Defendants' Statements Materially False or Misleading When Made

Throughout the Class Period, Defendants made statements concerning Integra's purported successful remediation of the Boston Facility's cGMP deficiencies, commitment to cGMPs and established industry standards for quality assurance, and capacity to build ample safety stock of EBM. ¶¶ 389-485. These statements were materially false and misleading when made.

**The Remediation Statements Were Actionably Misleading**. Defendants repeatedly told investors that Integra had implemented meaningful remedial measures at the Boston Facility and that those remediation efforts were proceeding as planned. *See* ¶¶ 390-435. After the 2019 Warning Letter, Defendants stated they had "undertaken significant efforts to remediate the observations and continue[d] to do so" (¶ 391), that the "quality remediation efforts" were underway, that they faced "no patient safety issues" (¶ 393), and that the "work" at the Boston Facility "is now

36

complete" such that it was "able to produce quality products" (¶ 395). And in response to later negative news about Boston, Defendants repeatedly downplayed the problems and reinforced confidence that they were correcting them. *See, e.g.*, ¶ 399 (De Witte, 4/26/2023: "[w]e had an audit early in March [2023] that confirms we're on the right track with our execution"); ¶ 404 (De Witte, 7/27/2023: "we have no specific indications of any product complaints related to high endotoxin levels"); ¶ 411 (Knight, 9/6/2023: "Boston remediation continues to progress well"); ¶ 425 (De Witte, 2/28/2024: Boston Facility had undergone a "successful dress rehearsal").

The AC alleges, through multiple interlocking sources, that these statements were materially false and misleading. *First*, Integra's continued receipt of FDA warnings throughout the Class Period—which essentially raised the same contamination and validation deficiencies identified in the 2019 Warning Letter—demonstrate that, contrary to their statements, Defendants had not remediated the deficiencies. Facts § IV. Indeed, the Company's systematic violation of cGMP regulations ultimately necessitated a global recall of five years of production (¶ 277), complete shutdown of the Boston Facility (¶ 310), and over $90 million in lost revenue (¶ 316).

*Second*, the AC plausibly alleges numerous facts regarding the escalating severity of Boston's non-compliance and that Defendants ***deliberately obstructed*** efforts to remediate the non-compliance, including: (i) reducing the Boston remediation budget and obstructing Krause's "solid remediation plan" following the January 26, 2022 FDA meeting (Ex. A ¶ 20; ¶¶ 188-89); (ii) the October 2022 internal whistleblower complaint identifying adulterated lots—including "37 different lot numbers" with quality issues—that triggered the March 2023 for-cause FDA inspection (¶¶ 149-153, 194-195); (iii) the FDA's identification of serious endotoxin measurement by March 16, 2023 (¶ 196); (iv) the April 27, 2023 outside lab results revealing endotoxin levels that were "27 times higher than levels detected by Integra's internal testing" (*id.*); and (v) the

February 26, 2024 discovery that 97% of freshly manufactured EBM sheets were contaminated and thereafter pressuring Myers to allow quality to cut around contaminated portions (¶¶ 213-14).

Because the alleged facts "call into question whether there was ever a true commitment to remedy the manufacturing and quality control problems," including facts regarding "the pervasive, recurring, and long-standing nature of the alleged problems," Defendants' remediation statements are actionable. *Mulligan*, 36 F. Supp. 3d at 946-57, 960-62 (finding statements that defendants had "taken a number of steps to thoroughly review our quality control and manufacturing systems" and "made significant quality improvements" actionable); *see also City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *21 (N.D. Ill. Feb. 13, 2013) (similar).

**The Capacity Statements Were Actionably Misleading**. Defendants assured investors that cGMP violations identified by the FDA presented no material issues to significantly increasing EBM production capacity. *See* ¶¶ 453-85. For example, they claimed that manufacturing of SurgiMend and PriMatrix products at the Boston Facility could "get [Integra] 50% more capacity as [it] enter[s] 2020" (¶ 459), and that Integra was "building safety stock" (¶ 464). Defendants also downplayed the FDA's concerns, stating that they did "not restrict [Integra's] ability to manufacture or ship products or require the recall of any products." ¶ 454; *see also* ¶¶ 469, 472, 474, 480. These assurances were highly material to investors given that SurgiMend and PriMatrix were some of the Company's most lucrative products driving its financial performance. ¶ 44.

In truth, Defendants' continued production of SurgiMend and PriMatrix, including the production of any "safety stock," was only achieved by refusing to meaningfully remediate the Boston Facility and disregarding severe patient safety risks. Indeed, numerous FEs confirmed that Defendants refused to correct contamination risk due to concerns it would slow down production. *See, e.g.*, ¶¶ 102, 116, 228, 266. Defendants "actively engage[d] in a concerted effort to downplay

38

quality-control issues, avoid [FDA] regulations, and risk patient safety" (¶ 187)—and implemented quality measures only "to the extent that it did not affect profit." ¶ 228. The 2024 global recall of all products manufactured at Boston during the past five years confirmed the Company's manufacturing practices were violative and presented unacceptable patient risk. ¶ 277.

By failing to disclose that Integra's production volumes depended on non-compliant, unsafe manufacturing practices, Defendants misled investors. *See Gov't of Guam Ret. Fund v. Invacare Corp.*, 2014 WL 4064256, at *7 (N.D. Ohio Aug. 18, 2014) (finding statements that "downplayed and mischaracterized [FDA concerns] in disclosures to the investing public" actionable); *Becton*, 620 F. Supp. 3d at 187 (fact that FDA did not "require[] BD to cease shipping Alaris products" did not permit defendants "to issue misleading statements that failed to recognize the serious, immediate, and known risks" they faced).

**The Compliance Statements Were Actionably Misleading**. To reassure investors, Defendants also touted Integra's purported adherence "to [g]ood [m]anufacturing [p]ractices (GMPs)" and commitments to "product safety and quality." ¶¶ 436-52.  Defendants even went so far as to describe product safety and quality as "paramount" (¶ 447), patient safety as "non-negotiable" (¶ 404), and, despite numerous facts to the contrary, stated that the Company was "on a path to reach world-class quality assurance across all manufacturing sites" in May 2023. ¶ 441.

These statements cannot be squared with the AC's interlocking, corroborative sources of Defendants' disregard of quality manufacturing at Boston detailed above—and thus falsity is met. *See, e.g.*, *Dr. Reddy's*, 2019 WL 1299673, at *2-6, *9, *13 (statement that "[w]e take quality and compliance matters seriously and stand by our commitment to fully comply with the cGMP quality standards across all of our facilities" actionable based, in part, on FE statements, Forms 483, and warning letter citing "recurrent" and "long-standing" violations).

39

### B.    Defendants' Remediation Arguments Fail

Defendants' efforts to defend their remediation statements fail. *First*, Defendants' principal contention—that the remediation statements voiced "only that Integra had made the effort" to remediate and accurately "detail[ed] the Company's remediation struggles" (Br. at 31)—is unpersuasive. Defendants did not simply state that Integra was "ma[king] the effort"—they stated, among other things, that Integra had "been working for the past couple of years to upgrade our Boston facility based on FDA observations in 2018 and 2021" (¶ 399), that the remediation "continue[d] to progress well" and was "on the right path" (¶ 411), and that the Company's "work is now complete" (¶ 395).[24] *See Dr. Reddy's*, 2019 WL 1299673, at *9, *18 (remediation statements actionable where defendants knew problems had not been corrected). Moreover, these statements were contradicted by contemporaneous facts. *See* Facts § IV; Argument § I.A-B (e.g., Myers confirmed 97% of products manufactured after the restart were contaminated ***before*** De Witte's statement that Integra had a "successful dress rehearsal").

Nor did Defendants accurately "update[] investors on the Company's struggles and setbacks." Br. at 1. None of Defendants' statements disclosed the substantial costs and production delays necessary to remediate the Boston Facility's severe cGMP violations or Integra's failure to implement those remediation measures. *See Hospira*, 2013 WL 566805, at *21 (sustaining remediation statements where company "only began to 'dabble' in remediation efforts").

---

[24]    Defendants contend that "[n]o reasonable investor" would have understood this statement to mean that remediation efforts were in fact completed at Boston (Br. at 33), but this argument ignores Coleman's actual words and improperly relies on the 2021 Form 483, which (i) the FDA had ***not*** yet issued; and (ii) was ***never*** provided to investors. In any event, the context Defendants point to only reinforces that it was materially misleading for Coleman to tout that its "investments" in the Boston plant were "now complete" when, in reality, the Facility suffered from chronic remediation failures and Integra was slashing remediation budgets and headcount.

Moreover, Defendants failed to disclose the ***biggest*** impediment of all to remediating the Boston Facility—***their own refusal*** to do so. *See, e.g.*, ¶ 189 ("De Witte, Schwartz, and other senior Integra executives repeatedly interfered with Krause's efforts to develop a 'solid remediation plan.'").

*Second*, Defendants' suggestion that they "did significantly invest in Boston remediation" (Br. at 31-32) raises a premature factual dispute, as it refers to Integra's total expenditure across ***four*** different facilities, and cannot establish the requisite investment commensurate with the underlying problems at Boston. *Flora*, 776 F.3d at 175-76. This argument is also undermined by Krause's revelations that Defendants cut the Boston remediation budget ***after*** the 2021 Form 483. Ex. A ¶ 20. Defendants' attempt to show the literal truth of their statements overlooks the context and omission of material facts rendering them actionable. *Merck*, 2011 WL 3444199, at *9.

*Third*, Defendants claim that their statement about "strengthen[ing] [its] quality operating mechanisms and reduc[ing] quality risk" concerned "Integra as a whole, not Boston." Br. at 33. But when made, Integra had only one FDA warning letter—for the Boston Facility. Moreover, at the time this statement was made, Defendants were obstructing quality improvements at the ***only*** manufacturing site that produced Integra's all-important EBM devices by chasing profits over safety. *See* Facts § IV; *see Dr. Reddy's*, 2019 WL 1299673, at *15-16 (sustaining claims where "Defendants had no intention of adequately addressing the violations of cGMP").

*Fourth*, Defendants claim that De Witte's April 2023 statement about Integra's audit (¶ 399) was not misleading because "[t]he Complaint alleges no facts about that March audit." Br. at 33. But this argument ignores that De Witte's statement omitted facts rendering the statement misleading—including the significant problem with Integra's measurement of endotoxin levels identified weeks earlier (¶ 196)—and "[s]uch an omission would be both material and actionable for failure to address the ongoing . . . ." deficiencies at Boston. *Strougo*, 2022 WL 17740482, at

41

*10 (citing *Odeh v. Immunomedics, Inc.*, 2020 WL 4381924, at *6-7 (D.N.J. July 31, 2020) (finding actionable a failure to disclose an event that could have jeopardized FDA approval when discussing the FDA's review of a drug)); *see also* ¶¶ 192-95.

*Fifth*, Defendants effectively concede that De Witte's February 2024 "successful dress rehearsal" statement was false, acknowledging that "two days before" De Witte made this claim, Integra identified 97% of products manufactured were contaminated. Br. at 34 (citing ¶ 213). Their attempt to argue that De Witte did not "kn[o]w" about this contamination is not a credible inference and nonetheless ignores other compelling allegations of his knowledge. *See* Argument § I.

*Sixth*, in addressing Statement 17, Defendants **do not even attempt** to defend De Witte's representation that "[p]atient safety is non-negotiable for us." Br. at 35. Nor could they, as the AC alleges by the time De Witte made this statement, Integra had repeatedly prioritized profits over safety and knew of at least 80 patients complaining of negative physical reactions consistent with endotoxin exposure. ¶¶ 333, 343-63.[25] Statements 3 and 17 were also misleading because they were made in the context of assuring investors that Integra was remediating the Boston Facility at a time when Defendants were deliberately ***not*** making necessary enhancements. *See* Facts § IV.[26]

*Seventh*, Defendants' assertion that Statement 29, which represented that Integra made leadership changes "to ensure the right focus" on quality, was "undeniably true" (Br. at 36), ignores

---

[25] Defendants claim that these complaints were not specifically attributed to endotoxins. Br. at 35. But the AC alleges that high endotoxin levels can cause "high fever, sepsis, meningitis or death," and the patient complaints concerned "high fevers . . . infection, and meningitis." ¶ 196.

[26] Defendants' reliance on *City of Warwick Retirement System v. Catalent, Inc.*, 2024 WL 3219616 (D.N.J. June 28, 2024) (Br. at 35) is misplaced because the court found that certain statements touting compliance with cGMP standards were—as here—"more than mere puffery" because "they make determinable, verifiable claims of compliance with CGMP and are more specific than vaguely optimistic hopes for the future of the business." *Id.* at *5.

that Krause resigned and Myers was fired because they refused to, for example, (i) "***provide the FDA with false and deceptive information***" (¶¶ 200-07); and (ii) support dangerous and unlawful manufacturing practices that would result in Integra marketing contaminated products (¶¶ 218-21). Having chosen to speak about Krause's and Myers' departures, Defendants' omission of critical details "that would have presented a complete and less favorable" account to investors rendered their statements misleading. *Coinbase*, 2024 WL 4053009, at *13.

*Finally*, Defendants' attacks on the FEs fail because, as described in Argument §§ I.A-B, the AC sets forth each witness's knowledge base in detail, and their accounts are corroborated by other FE statements, FDA findings, and other well-pled allegations. Defendants' contention that the FEs need to "have participated in the remediation" (Br. at 32) also fails because the FEs "demonstrate the pervasive and systemic nature of [Integra's] problems and the purposefulness in failing to address and remedy these problems." *Mulligan*, 36 F. Supp. 3d at 963.

### C.      Defendants' Capacity Arguments Fail

Defendants' arguments concerning the capacity statements misstate both Plaintiffs' allegations and Defendants' disclosure duties. *First*, regarding Statements 2 and 11, Plaintiffs' claim is not that the 2019 Warning Letter put specific restrictions on Integra's EBM production capacity (Br. at 39), but rather that Defendants misled investors about Integra's ability to safely manufacture EBM products at capacity given the fundamental quality control deficiencies flagged by the FDA. *Coinbase*, 2024 WL 4053009, at *10-11 (sustaining plaintiffs' misleading-by-omission theory and rejecting the defendants' argument that the statements were literally true). Contrary to Defendants' statements, their production practices resulted in endotoxin levels that were "***27 times higher than the levels detected by Integra's internal testing***" (¶ 196), resulting in potential endotoxin exposure (*id.*) that eventually required a voluntary global recall (¶ 210).

*Second*, Defendants argue that no reasonable investor could have understood the statements

to mean that the FDA warning letters and Forms 483 "posed no risk to Integra's manufacturing capacity." Br. at 39. This ignores context. *See Mulligan*, 36 F. Supp. 3d at 961 ("Court must view allegedly false statements in full and in context at the time it was made."). A reasonable "investor takes into account the customs and practices of the relevant industry." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015). Here, investors would have understood Defendants' statements to convey that Integra could meet demand while complying with cGMP. Moreover, Defendants' purported risk warning—that "failure to successfully remediate the [FDA's] observations and findings could result in 'adverse regulatory action'" (Br. at 39)—misleadingly omitted that Defendants *did not intend* to remediate the FDA's findings.[27]

*Finally*, Statements 2 and 11 are actionable because they failed to warn investors about risks to production capacity that were known to Defendants. Instead, Defendants minimized those risks, stating for example that they "d[id] not expect to incur material incremental expense for remediation activities" (¶ 77), when in reality remediation required material expenditures that Defendants were unwilling to undertake. Facts § IV; Argument §§ I.A-B, II.A-B.

### D.   Defendants' Compliance Arguments Fail

Defendants' compliance arguments also fail for numerous reasons. *First*, Defendants suggest that the compliance statements are not actionable because they "merely explain Integra is obligated to comply with cGMP—not that Integra meets the obligation." Br. at 24. That is simply

---

[27]   Defendants' cases are distinguishable. The plaintiffs in *McClain v. Iradimed Corp.*, 111 F. Supp. 3d 1293, 1302-03 (S.D. Fla. 2015) and *In re PolarityTE, Inc., Sec. Litig.*, 706 F. Supp. 3d 1343, 1358 (D. Utah 2020) did *not* allege that the defendants never intended to remedy the alleged violations. Further, *In re Anadigics, Inc., Sec. Litig.*, 2011 WL 4594845 (D.N.J. Sept. 30, 2011), *aff'd,* F. App'x 742 (3d Cir. 2012), did not concern cGMP compliance, and the company was unaware of deficiencies at the time of the alleged misstatements.

untrue. *See, e.g.*, ¶¶ 437, 447 ("Integra ***adheres*** to Good Manufacturing Practices (GMPs)").[28]

Further, statements falsely addressing the "steps the company had purportedly taken to comply with the cGMP," are actionable. *See Dr. Reddy's*, 2019 WL 1299673, at *9, 17 (finding actionable statement that "[w]e take quality and compliance matters seriously and stand by our commitment to fully comply with the cGMP quality standards across all of our facilities"); *In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at *3, 16 (D.N.J. Mar. 24, 2008) (sustaining statements that company was "committed to [the FDA's [cGMP]] compliance," and "instituted operational procedures that enforce cGMP compliance"). Here, Defendants affirmatively stated Integra's adherence to cGMPs (¶¶ 437, 447), and its efforts to "continuously improve[]" its "Quality Management System" (¶ 447), at a time when Defendants were actively preventing Integra from doing so. Unlike the statements in Defendants' cases, which were "too vague to be verified" (Br. at 23-24),[29] Defendants' statements were verifiably false. *See, e.g.*, *Wilkof*, 2010 WL 4184465, at *2, *4, *6 (statement that company was "substantially cGMP compliant" was "subject to objective verification" and actionable given FE accounts of "rampant" non-compliance); *Invacare*, 2014 WL 4064256, at *3 (cGMP compliance statements are "verifiable" and "actionable").

*Second*, Defendants argue that a reasonable investor would have known that the Boston

---

[28]    Defendants' statements are far more concrete than the statement at issue in *In re Ocular Therapeutix, Inc. Sec. Litig.*, 2019 WL 1950399, at *6 (D. Mass. Apr. 30, 2019) (Br. at 25), which represented only that the company makes devices "***using*** cGMP." Further, in accord with *Ocular*, Plaintiffs allege "specific factual circumstances that show [Defendants'] deviation from [cGMP] standard[s]." 2019 WL 1950399, at *6-7; *see* Facts §IV.

[29]    *See, e.g.*, *Mylan*, 2023 WL 3539371, at *10-11 (statements concerning "operational excellence"); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016) (statements concerning "strong credit culture and underwriting integrity"). Defendants' reliance on cases not involving cGMP compliance (Br. at 23-24 n.11) overlooks that Integra operated in "an industry where regulatory compliance, not to mention consistency and sanitation in production, is essential." *Mulligan*, 36 F. Supp. 3d at 968. Statements on these topics are thus highly material to investors.

45

Facility was not in compliance with cGMPs and QSRs. Br. at 25-26. This argument again ignores context. Statements 11 through 13 were made after years of assurances that they had implemented quality remediations at the Boston Facility, and their statements about the 2021 Form 483 did not disclose the repeated violations of the same cGMP requirements. *See* Argument § I. Further, Defendants made Statements 20 and 21 less than one month after De Witte "assure[d]" Integra's "investors that we are highly focused on our remediation efforts." ¶ 404. That investors were misled about the Boston Facility's ongoing non-compliance is confirmed by Integra's stock price declines following the corrective disclosures. *See, e.g.*, ¶ 488; *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *15 (E.D. Pa. Mar. 24, 2020) (stock price declines "create[] reasonable inferences of the materiality of information not previously available on the market").

*Lastly*, Defendants' claim that the FEs merely confirm the deficiencies identified in the 2019 Warning Letter misses the point. Br. at 26. The FEs show that these cGMP failures ***remained unremediated*** throughout the Class Period. Thus, Defendants' cases are inapposite. *Id.*[30]

### E. Defendants' Statements Are Not Protected by the Safe Harbor

Defendants claim that certain of their remediation and capacity statements are protected by the PSLRA safe harbor. *See* Br. at 27-29, 36-37. They are wrong. *First*, statements concerning "historical facts or a then-present state of affairs" or that omit material information are not forward-looking. *Emps. Ret. Sys. of Puerto Rico Elec. Power Auth. v. Conduent Inc.*, 2020 WL 3026536, at *6 (D.N.J. June 5, 2020). The same is true for the present portion of a "mixed present/future statement." *Avaya*, 564 F.3d at 255; *see also McDermid v. Inovio Pharms., Inc.*, 520 F. Supp. 3d

---

[30] Defendants' assertions that both Krause's and Myers' allegations should be discounted ignore their allegations that upon arriving at Integra, it was clear that the Company had not remediated issues that existed as early as 2018, making Defendants' claimed adherence to cGMP implausible. *See, e.g.*, ¶¶ 188, 210.

652, 666 (E.D. Pa. 2021) (statements about current manufacturing capacity not forward looking).

Here, Defendants' statements addressed past events or current conditions. *See, e.g.*, ¶ 399 ("***we've been working for the past couple years*** to upgrade our Boston facility based on FDA observations" and this is "a project ***that's been*** ongoing")[31]; ¶ 441 ("***we made significant investments in quality*** across all of our manufacturing sites with a focus on accelerating our quality project in Boston"); ¶ 411 ("Boston remediation ***continues to*** progress well."); ¶ 418 ("[i]nterim external reviews ***confirm*** the adequacy of our remediation plan" and "***reflect*** significant steps ***made*** towards the resumption of manufacturing"). *See Curran v. Freshpet, Inc.*, 2018 WL 394878, at *4 (D.N.J. Jan. 12, 2018) ("we have enhanced our strategic manufacturing infrastructure capabilities" encompassed "representations of present fact").

*Second*, Defendants' statements were not accompanied by meaningful cautionary language. To be meaningful, cautionary language must be "substantive and tailored"—"vague" or "boilerplate" disclaimers are insufficient. *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *11 (D.N.J. Dec. 15, 2015). Here, Integra's generic risk warnings (Br. at 3-5, 27) do not address the actual risks it faced—including that Defendants were obstructing remediation. ¶¶ 184-221.[32]

*Finally*, for the reasons discussed at Argument § I, Defendants' statements are not protected by the safe harbor because Defendants had actual knowledge of their falsity. Br. at 27-29, 36-37.

---

[31] Defendants' argument cherry-picks the "on the right track" portion of De Witte's statement, but the full text confirms that he was talking about a historical fact: "***We had an audit early in March*** that confirms we're on the right track with our execution." ¶ 399. His statement was false because the March audit identified significant problems with Integra's mechanisms for measuring endotoxin contamination. ¶ 196.

[32] Defendants claim that the cautionary language warned investors that increased capacity hinged on being able to "successfully remediate." Br. at 37. Not so. Defendants themselves told investors that the FDA concerns did ***not*** restrict manufacturing capacity. *See* ¶¶ 454, 474.

*See Becton*, 620 F. Supp. 3d at 190 (forward-looking statements are actionable if made with "actual knowledge . . . that the statement was false or misleading").[33]

### F.      Defendants' Statements Are Not Inactionable Opinions

Defendants' arguments that many of their statements are non-actionable opinions (Br. at 24 n.12, 29-30, 37-38) are flawed. Many of these Defendants' statements were not expressing opinions, but instead were making "affirmative statement[s] that painted a favorable picture without including the details that would have presented a complete and less favorable one." *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 900 (E.D. Pa. 2018). For example, De Witte told investors: "we've been working for the past couple of years to upgrade our Boston facility based on FDA observations" (¶ 399)—which was "more than mere opinions [or] beliefs." *Cont'l Gen. Ins. Co. v. Olafsson*, 2024 WL 4263211, at *11 (D.N.J. Sept. 23, 2024).

Moreover, Defendants' statements are actionable because they were: "(i) [] not sincerely believed when made; (ii) contain[ed] an expressly embedded, untrue factual assertion; *or* (iii) reasonably implie[d] untrue facts and omit[ted] appropriate qualifying language." *Catalent*, 2024 WL 3219616, at *6 (quoting *Prudential*, 70 F.4th at 684–86). For example, De Witte misleadingly touted the Boston remediation as "on the right track" (¶ 399) while omitting material facts about the lack of remediation and its effect on production. Facts § IV.A; Argument § I.A.1. *See Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*, 2022 WL 889158, at *11 (E.D. Pa. Mar. 25, 2022) (statements about product's success actionable where they "omitted

---

[33]     The complaint in *In re Talis Biomedical Corp. Sec. Litig.*, 2022 WL 17551984, at *15, *23-25 (N.D. Cal. Dec. 9, 2022), unlike the AC, failed to allege facts demonstrating that the defendants' statements were false—let alone defendants' knowledge of falsity. Further, unlike the plaintiffs in *Schaeffer v. Nabriva Therapeutics PLC*, 2020 WL 7701463, at *10-12 (S.D.N.Y. Apr. 28, 2020), who initially sought to plead scienter "primarily" on the basis of a Form 483, Plaintiffs also cite over 20 FEs demonstrating Defendants' actual knowledge of falsity.

material facts supporting" speakers' understanding).[34]

Lastly, Defendants' attempt to rely on the dismissal of Krause's defamation claim arising from De Witte's statement that Integra made changes "to ensure the right focus and capabilities" fails. Br. at 30; *Krause v. Integra LifeSciences Corp.*, 2025 WL 2654165, at *6 (D. Minn. Sept. 16, 2025). The court upheld the majority of Krause's claims, but dismissed the defamation claim based on its view that De Witte's statement pertained to "the direction of the company's operations and quality leadership teams." *Id*. That is precisely what Plaintiffs here allege—De Witte falsely told investors that Integra's remediation efforts were working when they were not. ¶¶ 434-35.

## III. THE COMPLAINT ADEQUATELY ALLEGES SCHEME LIABILITY

The AC amply alleges "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Cognizant*, 2020 WL 3026564, at *16; *see* Argument §§ I, II, IV. Here, Defendants' scheme involved violating FDA cGMPs, falsifying data, and imposing "a pervasive, top-down scheme to dupe the FDA and ignore regulatory compliance best practices in the name of juicing manufacturing output and increasing corporate profits." *Mylan*, 2023 WL 3539371, at *18-20.

Defendants' arguments that Plaintiffs fail to plead the requisite "deceptive or manipulative acts" each fail. *First*, Defendants argue that "misstatements alone" cannot support scheme liability, but they concede Count II "include[s] a list of allegedly deceptive acts" that go beyond Defendants' alleged misstatements (Br. at 44 (citing ¶ 520)), including Defendants' newly pled efforts to deceive the FDA. *See, e.g.*, ¶ 520 (alleging that Defendants failed to inform Krause of

---

[34]    The AC's extensive contemporaneous facts distinguish this case from Defendants' authorities (Br. at 30, 38-39), which lacked such evidence. *See, e.g.*, *Chew v. Moneygram Int'l, Inc.*, 2024 WL 4346522, at *12 (N.D. Ill. Sept. 30, 2024) (no facts "the speaker had been notified" of problem).

whistleblower complaint, instructed employees to bypass FDA remediation requirements, and retaliated against employees who spoke up concerning compliance issues); *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950, 982-83 (D. Minn. 2014) (sustaining scheme claims where the defendants allegedly manipulated clinical studies in seeking FDA approval of medical device).[35] Importantly, by deceiving the FDA, Defendants **also** prevented investors from learning the truth. Indeed, as the Third Circuit recently reaffirmed, "[o]f course, *[scheme] liability may exist* when someone disseminates or otherwise *employs a false or materially misleading statement*" in a "device, scheme, or artifice to defraud." *Handal v. Innovative Indus. Props., Inc.*, 157 F.4th 279, 300 n.17 (3d Cir. 2025).

*Second*, Defendants wrongly suggest the facts underlying the misstatement and scheme claims cannot overlap. Br. at 42-43. They can. *See Cognizant*, 2020 WL 3026564, at *18 (scheme liability permitted to "overlap with misstatements or omissions"); *In re Firstenergy Corp. Sec. Litig.*, 2022 WL 681320, at *7 (S.D. Ohio Mar. 7, 2022) ("Scheme liability may rest in part on the same statements or omissions that trigger misstatement liability[.]").

*Third*, Defendants assert that there is no "connection between the alleged conduct and investors." Br. at 44. This argument ignores deceptive conduct that had the purpose of misleading investors about Integra's cGMP compliance and the status of Defendants' remediation, such as (i) deliberately withholding information about the 2022 whistleblower from Krause to avoid an FDA

---

[35]    Defendants' cases are distinguishable because the plaintiffs in those cases did not allege any deceptive conduct apart from the alleged misstatements. *See Khoja v. Orexigen Therapeutics, Inc.*, 189 F. Supp. 3d 998, 1021 (S.D. Cal. 2016); *In re Eastman Kodak Co. Sec. Litig.*, 632 F. Supp. 3d 169, 191 (W.D.N.Y. 2022); *In re Teva Sec. Litig.*, 512 F. Supp. 3d 321, 337 (D. Conn. 2021); *Turquoise Hill*, 625 F. Supp. 3d at 252; *Stichting Pensioenfonds ABP v. Merck & Co.*, 2012 WL 3235783, at *8 (D.N.J. Aug. 1, 2012); *Takata v. Riot Blockchain, Inc.*, 2023 WL 7133219, at *11 (D.N.J. Aug. 25, 2023).

inspection (¶¶ 192-96); and (ii) instructing Integra employees to disregard negative tests results and cut around contamination (¶ 214). These were acts designed to prevent regulators—and thus the market—from learning of Defendants' safety failures. *Cognizant*, 2020 WL 3026564, at *17 (sustaining scheme claim based on conduct designed to ensure truth "would remain undetected").

*Finally*, Defendants ignore that their deceptive acts ***did*** impact information relied upon by investors. Br. at 44. For example, through their efforts to impede the investigation into the 2022 whistleblower complaint, Defendants succeeded in ensuring the Boston Facility continued to manufacture tainted products until ***January 2023***, and they forestalled the FDA's investigation until ***March 2023*** and the product recall until ***April 2023***. ¶¶ 195-96. Suppressing the whistleblower accounts also had the effect of concealing the truth from investors—that Integra's highest margin business, which it repeatedly touted, was imploding. Unlike Defendants' cases, the "product" of their deceptive acts "***was . . . relied upon by investors***." *See Turquoise Hill*, 625 F. Supp. 3d at 254; Br. at 45. Investors were thus deceived by these acts. *See, e.g.*, *SEC v. SolarWinds Corp.*, 741 F. Supp. 3d 37, 87 (S.D.N.Y. 2024) (sustaining scheme liability claim based on deceptive acts targeting company's customers rather than investors directly).[36]

## IV.    THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION

"The loss causation inquiry asks whether the misrepresentation or omission proximately

---

[36]    Defendants' remaining cases are inapposite. *See, e.g.*, *Eden Alpha CI LP v. Polished.com Inc.*, 763 F. Supp. 3d 270, 317-18 (E.D.N.Y. 2025) (no allegations connecting claim of "improper business practices" against "customers, and credit card companies" to deception of investors); *Trustcash Holdings, Inc. v. Moss*, 668 F. Supp. 2d 650, 662 (D.N.J. 2009) (alleged violation of SEC reporting requirements was "not sufficiently causally connected" to deception of investors); *Baer v. Shift4 Payments, Inc.*, 2024 WL 3836676, at *15 (E.D. Pa. Aug. 14, 2024) (complaint lacked allegations defendants knew or had access to facts contradicting public statements); *Takata v. Riot Blockchain, Inc.*, 2020 WL 2079375, at *17-18 (D.N.J. Apr. 30, 2020) ("pundits' personal opinions" were not adequate corrective disclosures).

caused the economic loss." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d Cir. 2007). Loss causation is sufficiently pled if the revelation of truth about an alleged fraud is "a substantial factor in causing the plaintiff's economic loss." *Id.* at 425-26. Loss causation "is a fact-sensitive inquiry typically left to the trier of fact." *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *26 (D.N.J. Dec. 27, 2019). "[C]ourts of this district have consistently analyzed loss causation under Rule 8(a), rather than the more stringent requirements of Rule 9(b)." *Id.* at *27 (collecting cases).

Plaintiffs allege that the truth regarding Defendants' fraud was revealed through disclosures occurring on April 26, 2023, May 23, 2023, February 28, 2024, May 6, 2024 and July 29, 2024. *See* ¶¶ 268-325. Defendants do not challenge the first two disclosures, but they incorrectly contend that no loss causation exists after May 23, 2023 because, by then, investors knew the full truth. Br. at 40-41. *First*, Defendants ignore the AC's allegation that they continued to mislead investors after May 23, 2023 (¶¶ 287, 288, 290-92, 296, 297), and analysts continued to credit their misstatements (¶¶ 283, 289, 293). *See In re Mylan N.V. Sec. Litig.*, 2025 WL 1874621, at *5 (W.D. Pa. July 8, 2025). These allegations undermine Defendants' claim that the market knew the full truth by May 23, 2023, and, at best, raise factual disputes that are "reserved for the trier of fact." *Coinbase*, 2024 WL 4053009, at *17; *Hall*, 2019 WL 7207491, at *26.[37]

*Second*, Plaintiffs have alleged that, on the last three corrective disclosure dates, investors learned new information regarding the extent of Integra's compliance deficiencies and their impact on its business. On February 28, 2024, Integra disclosed De Witte's resignation and additional information about the financial impact of the Boston Facility's non-compliance. ¶¶ 294-97.

---

[37]    Defendants contend that Pembroke's filing of an initial complaint before the final three corrective disclosures forecloses their ability to demonstrate loss causation for these dates. Br. at 41. The *Hall* court considered and rejected this exact argument. 2019 WL 7207491, at *28.

Analysts described these disclosures as "surpris[ing] . . . given commentary in late '23." ¶ 299.[38]

On May 6, 2024, Integra slashed its guidance, extended the Boston Facility's production halt until 2025, and revealed that it was considering relocating all of its EBM manufacturing operations to Braintree. ¶¶ 300-05. Finally, on July 29, 2024, Integra disclosed the need to implement a "compliance master plan," including vast production halts and shipping holds, because of its longstanding cGMP violations. ¶¶ 311-19. The Company stated that it was implementing this plan because it needed to take steps to "bolster [its] manufacturing quality compliance processes"—steps investors thought Integra had undertaken years earlier. ¶ 314. Integra also reduced its guidance for 2024 and 2025. ¶ 312. Analysts were shocked by these disclosures. ¶ 321.

Because the final three corrective disclosures "provided new information [to investors] as to the seriousness and extent of the . . . alleged fraud" and its "full financial impact," the AC adequately pleads loss causation for those disclosures. *Hall*, 2019 WL 7207491, at *27; *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 292 (S.D.N.Y. 2008); *Mylan*, 2025 WL 1874621, at *5.[39]

## CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied in its entirety.[40]

---

[38] Allegations "that the investing public related the corrective disclosure to the earlier misinformation" are supportive of loss causation. *Jastram v. NextEra Energy, Inc.*, 2025 WL 3293701, at *14 (11th Cir. Nov. 26, 2025).

[39] Defendants' authorities are misplaced. In *Dalberth v. Xerox Corp.*, 766 F.3d 172, 188 (2d Cir. 2014) the court's loss causation ruling flowed from its rejection of the plaintiffs' "overarching theory of this case." Their remaining cases involved disclosures that revealed no new information about the subject of the alleged fraud. *See Lopes v. Fitbit Inc.*, 2020 WL 1465932, at *12 (N.D. Cal. Mar. 23, 2020), *aff'd,* 848 F. App'x 278 (9th Cir. 2021); *SLF Holdings LLC v. Uniti Fiber Holdings, Inc.*, 499 F. Supp. 3d 49, 71 (D. Del. 2020), *aff'd,* 2022 WL 3442353 (3d Cir. Aug. 17, 2022); *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013).

[40] Because the AC adequately alleges Section 10(b) claims, it also adequately pleads Section 20(a) claims against each individual defendant (¶¶ 526-29). *See Becton*, 620 F. Supp. 3d at 199.

Dated: December 15, 2025

Respectfully submitted,

By: */s/ James E. Cecchi*
James E. Cecchi
**CARELLA, BYRNE, CECCHI, BRODY
  & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel.: (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com

*Liaison Counsel for Lead Plaintiffs*

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
Salvatore J. Graziano (*pro hac vice*)
James A. Harrod (*pro hac vice*)
Alexander Noble (*pro hac vice*)
Emily A. Tu (*pro hac vice*)
Sarah Schmidt (*pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Tel.: (212) 554-1400
Fax: (212) 554-1444
salvatore@blbglaw.com
jim.harrod@blbglaw.com
alexander.noble@blbglaw.com
emily.tu@blbglaw.com
sarah.schmidt@blbglaw.com

**SAXENA WHITE P.A.**
David R. Kaplan (*pro hac vice*)
Emily R. Bishop (*pro hac vice*)
505 Lomas Santa Fe Dr.
Suite #180
Solana Beach, CA 92075
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com
ebishop@saxenawhite.com

Steven B. Singer (*pro hac vice* forthcoming)
Sara DiLeo (*pro hac vice*)

54

10 Bank Street, 8th Floor
White Plains, New York 10606
Telephone: (914) 437-8551
ssinger@saxenawhite.com
sdileo@saxenawhite.com

Lester R. Hooker (*pro hac vice*)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
lhooker@saxenawhite.com

**KESSLER TOPAZ MELTZER
   & CHECK, LLP**
Gregory M. Castaldo
Richard A. Russo, Jr.
Nathaniel C. Simon (*pro hac vice*)
Farai Vyamucharo-Shawa (*pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Tel.: (610) 667-7706
Fax: (610) 667-7056
gcastaldo@ktmc.com
rrusso@ktmc.com
nsimon@ktmc.com
fshawa@ktmc.com

*Lead Counsel for Lead Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 15, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

I certify under penalty of perjury that the foregoing is true and correct.

Dated: December 15, 2025

Respectfully submitted,

/s/ *James E. Cecchi*

James E. Cecchi
**CARELLA, BYRNE, CECCHI, BRODY
  & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel.: (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com

*Liaison Counsel for Lead Plaintiffs*

56